## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| HM FLORIDA-ORL, LLC, | |
|     Plaintiff, | |
|       v. | |
| THE STATE OF FLORIDA; RON DESANTIS, in his official and individual capacity as Governor of Florida; and MELANIE GRIFFIN, in her official capacity as Secretary of the Department of Business and Professional Regulation, State of Florida, | Case No. 6:23-cv-00950 |
|     Defendants. | |

## DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION[1]

On May 17, 2023, Governor Ron DeSantis signed the Protection of Children Act into law. *See* Fla. Laws ch. 2023-94 (SB 1438) (Ex. A). The Act makes it a misdemeanor to "knowingly admit a child to an adult live performance." Fla. Stat. § 827.11(3), (4). It defines an "adult live performance" as a sexually explicit show that the adult community of the state would consider patently offensive "for the age of the child present." *Id.* § 827.11(1)(a). In other words, it is the policy of Florida that a five-year-old should not be admitted to a nude dance at a strip club.

---

[1] This combined motion and response is 24 pages long. Defendants are aware that Rule 3.01 of the Local Rules of the United States District Court for the Middle District of Florida sets a limit of 25 pages for a motion and 20 pages for a response. Defendants believe that their decision to combine the two pleadings warrants application of the 25-page limit. Furthermore, Plaintiff's motion for a preliminary injunction itself spilled onto 27 pages.

Several days later, Plaintiff HM FLORIDA-ORL, LLC ("HM") filed this complaint. Though no enforcement action has been instituted against it—and though it disclaims any desire to violate the Act—HM requests a preliminary injunction on the ground that the Act is facially unconstitutional. The Act, HM asserts, has chilled the company's free speech, as HM will no longer allow children to attend drag shows hosted at its bar and restaurant.

Not only should the preliminary injunction be denied, but HM's complaint is also due to be dismissed. The Protection of Children Act is constitutional. The Act's definition of "adult live performance" tracks obscenity standards approved in cases such as *Ginsberg v. New York*, 390 U.S. 629 (1968), *United States v. Miller*, 413 U.S. 15 (1973), and *American Booksellers v. Webb*, 919 F.2d 1493 (11th Cir. 1990), with the additional refinement that obscenity is measured according to the age of the child exposed to the "adult live performance." The Act does not prevent establishments from continuing to stage "adult live performances" or deny access by adults to those performances. It merely requires the exclusion of children for whom the performance would not be age-appropriate. And contrary to HM's implication, the Act does not target drag shows; by its terms, it protects children from exposure to any kind of sexually explicit live performance that is obscene for the age of the child present. And apart from the Act's constitutionality, HM's complaint should be dismissed because it is a prototypical instance of impermissible shotgun pleading; because HM lacks standing; and because Defendants State of Florida and Governor DeSantis have sovereign immunity.

Even if the Court disagrees and further regards HM as likely to succeed on the merits of its complaint, the Court should still deny HM's motion for a preliminary injunction. HM has not shown that it will suffer injury, let alone irreparable injury, without a preliminary injunction. HM claims it has excluded children from its performances because of the Act, but it also claims no intention to host performances that even arguably would require it to exclude children. Assuming HM's allegations regarding those performances are true, HM remains free to continue to operate its restaurant and bar, with its liquor license intact, and host the performances it describes in its complaint—with children present. Enjoining the Act thus will prevent no harm to HM. But it will do great harm to the State's interest in protecting children from exposure to age-inappropriate, sexually explicit live performances in other venues, particularly if the Court grants the statewide relief HM apparently seeks, which would itself be improper.

## BACKGROUND

### A.    The Statute

At the time the Protection of Children Act was enacted, a number of Florida statutes protected children from sexually explicit performances and materials deemed harmful to minors, but each had a limited scope. For instance, Fla. Stat. § 847.013(3)(a) made it a misdemeanor to "knowingly sell to a minor an admission ticket or pass or knowingly admit a minor for a monetary consideration to premises whereon there is exhibited a motion picture, exhibition, show, representation, or other presentation which, in whole or in part, depicts nudity, sexual conduct,

sexual excitement, sexual battery, bestiality, or sadomasochistic abuse and which is harmful to minors," as defined in Fla. Stat. § 847.001(7). That statute thus was limited to exposures accompanied by the exchange of consideration. Another statute, Fla. Stat. § 800.04(7), made it a felony to engage in a "lewd and lascivious exhibition" in the presence of a child under 16, but the definition of "lewd and lascivious exhibition" was limited to certain live or simulated sex acts, such as masturbation or bestiality.

The Protection of Children Act brings together in one place a comprehensive prohibition on exposing children to age-inappropriate, sexually explicit live performances, irrespective of any exchange of consideration, with propriety of the exposure gauged specifically to the age of the child present. The Act gives the Department of Business and Professional Regulation the power to levy fines and to revoke the licenses of establishments that violate the Act. Fla. Stat. §§ 509.261(10), 561.29(1). And by deeming a violation of the Act to be "an immediate, serious danger to the public health, safety, or welfare for the purposes of s. 120.60(6)," the Act affords the Department emergency powers to revoke, suspend, or limit licenses not clearly available under other statutes. Fla. Stat. §§ 509.261(10)(b), 561.29(1)(*l*)1.

The Act makes it a first-degree misdemeanor to "knowingly admit a child to an adult live performance." Fla. Stat. § 827.21(3), (4). As defined by the Act, an "adult live performance" has two components. First, the performance must be a "show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or

specific sexual activities as those terms are defined in s. 847.001, lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts." *Id.* § 827.11(1)(a). Second, the performance must satisfy a variable obscenity standard derived from the Supreme Court's decisions in *Ginsberg* and *Miller*. Under that standard, the performance must "[p]redominantly appeal[] to a prurient, shameful, or morbid interest"; be "patently offensive to prevailing standards in the adult community of this state as a whole with respect to what is suitable material or conduct for the age of the child present"; and "[t]aken as a whole," be "without serious literary, artistic, political, or scientific value for the age of the child present." Fla. Stat. § 827.11(1)(a)1.–3.

Nowhere does the Protection of Children Act target or even mention drag performances. The Act protects children from exposure to age-inappropriate sexually explicit live performances, no matter who performs them or what social viewpoint they seek to convey. It is similar in this regard to existing Florida statutes, such as Sections 847.012 and 847.013, which restrict the exposure of minors to sexually explicit materials, images, and films, and mention nothing of depicting individuals who happened to be dressed in drag.

### B.    This Lawsuit

On May 22, five days after the Protection of Children Act was signed into law, HM sued the State of Florida, Governor Ron DeSantis, and Melanie Griffin, the Secretary of the Department of Business and Professional Responsibility ("DBPR"), and moved for a preliminary injunction. HM seeks to enjoin most of the

operative provisions of the Protection of Children Act, including Section 827.11, which makes it a misdemeanor to knowingly admit a child to an "adult live performance," and Sections 561.29 and 509.261, which authorize DBPR to fine, suspend, or revoke licenses of establishments that admit children to "adult live performances."

HM states that it operates a restaurant and a bar, with a liquor license, featuring entertainment that includes drag show performances, comedy sketches, and dancing. DE1 at 2. HM says that it offers "family friendly" drag performances on Sundays that children are invited to attend. *Id.* HM insists that "[t]here is no lewd activity, sexually explicit shows, disorderly conduct, public exposure, obscene exhibition, or anything inappropriate for a child to see." DE1 at 6. But on the occasion that its performances are "not suitable for children," HM avers, "children are not allowed to attend and the venue announces this in advance on their website and in their advertising." DE1 at 19. HM does not state that it is subject to any pending enforcement action or that it has been subject to one in the past.

HM says it has "advised its customers that children would not be permitted to attend any drag shows," DE1 at 18, but it bases this approach on an unreasonably expansive interpretation of the Act. On its telling, the term "adult live performances" would include any show featuring "female impersonators," covering classics like "I Love Lucy" and "Some Like It Hot." DE1 at 17. While acknowledging that the Act "does not mention 'drag' by name," HM nevertheless asserts that the Act "targets drag queens." DE1 at 11, 16.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To obtain a preliminary injunction, a litigant must establish each of the following four elements: "that (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020) (citation omitted). HM does not meet either of these standards.

## ARGUMENT

### I.     HM's complaint should be dismissed.

#### A.     The Protection of Children Act is constitutional.

HM's complaint should be dismissed because the Protection of Children Act is constitutional. Though inartfully pled, HM's complaint and PI motion appear to contend that the Protection of Children Act is unconstitutional for four separate reasons. None is correct.

1. HM first asserts that the Protection of Children Act is content-based and fails to survive the resulting strict scrutiny because it is not narrowly tailored and "overbroad." DE1 at 10–11. But a statute is overbroad only if it "prohibits a

substantial amount of protected speech." *United States v. Williams*, 553 U.S. 285, 292 (2008). And here, the Protection of Children Act restricts conduct unprotected by the First Amendment: admission of a child to a sexually explicit performance that is obscene for the age of the child present. It applies only to a subset of obscenity—"adult live performances" where children are present—but this feature does not require close First Amendment scrutiny because such "discrimination consists entirely of the very reason the entire class of speech at issue is proscribable"—i.e., protecting a vulnerable class from materials obscene as to them. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992) (noting that "a State might choose to prohibit only that obscenity . . . which involves the most lascivious displays of sexual activity" without triggering strict scrutiny); *see also Virginia v. Black*, 538 U.S. 343, 361–62 (2003). It is well established that the government has a "compelling interest in protecting the physical and psychological well-being of minors," which "extends to shielding minors from the influence of literature that is not obscene by adult standards." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) (citations omitted). And courts have repeatedly upheld statutes vindicating this interest by denying children access to sexually explicit material that is not denied to adults. *See, e.g.*, *Ginsberg*, 390 U.S. at 636–43; *Webb*, 919 F.2d at 1501.

"The first step in overbreadth analysis is to construe the challenged statute." *Williams*, 553 U.S. at 293. To achieve its legitimate aims, the Protection of Children Act uses an obscenity standard that measures whether an "adult live performance" is appropriate for a child to view according to the child's age. As noted, the Act

makes it a misdemeanor to "knowingly admit a child to an adult live performance."

Fla. Stat. § 827.11(3), (4). "Adult live performance" means:

> [A]ny show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 847.001, lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts when it:
>
> 1. Predominantly appeals to a prurient, shameful, or morbid interest;
>
> 2. Is patently offensive to prevailing standards in the adult community of this state as a whole with respect to what is suitable material or conduct for the age of the child present; and
>
> 3. Taken as a whole, is without serious literary, artistic, political, or scientific value for the age of the child present.

Fla. Stat. § 827.11(1)(a).

This language is constitutional. First, as required by *Miller*, 413 U.S. at 24, the Protection of Children Act "confine[s] the permissible scope of [its] regulation to works which depict or describe sexual conduct" that is "specifically defined" in the statute—e.g., "nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 847.001." Fla. Stat. § 827.11(1)(a). Second, as *Miller* also requires, 413 U.S. at 24, the Protection of Children Act defines obscenity by the familiar three-part test (prurient interest; patent offensiveness; lack of redeeming social value), with adjustments to account for the fact that children are the ones viewing the performances.

Those adjustments have been approved in other cases. In *Ginsberg*, the Supreme Court upheld a New York statute's use of what it called a "variable" obscenity standard for minors, which closely resembles the language in the Protection of

Children Act. 390 U.S. at 635 n.4, 637. The statute prohibited the sale to minors of materials deemed "harmful to minors," which it defined as "that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse" when the representation:

> (i) predominantly appeals to the prurient, shameful or morbid interest of minors, and

> (ii) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and

> (iii) is utterly without redeeming social importance for minors.

*Id.* at 646.

Similarly, in *Webb*, the Eleventh Circuit upheld a Georgia statute that criminalized providing to minors material deemed "harmful to minors," defined as "that quality of description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse," when it

> (A) Taken as a whole, predominantly appeals to the prurient, shameful, or morbid interest of minors;

> (B) Is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and

> (C) Is, when taken as a whole, lacking in serious literary, artistic, political, or scientific value for minors.

919 F.2d at 1513.[2]

---

[2] The only difference between the Georgia statute upheld in *Webb* and the New York statute upheld in *Ginsberg* is that the third part of the test reflected an updating based on the intervening Supreme Court decision in *Miller*, 413 U.S. at 24, such that a greater quantum of "literary, artistic, political, or scientific value" was necessary to justify exposure of the minor to otherwise age-inappropriate material. Florida's Protection of Children Act reflects the same updating.

Compared to the statutes upheld in *Ginsberg* and *Webb*, the Protection of Children Act is even more carefully tailored: its variable-obscenity standard ties what is considered obscene for the child to the actual age of the child at the "adult live performance." That refinement addresses an issue the Third Circuit deemed problematic in *ACLU v. Ashcroft*, 322 F.3d 240 (3d Cir. 2003), *aff'd*, *Ashcroft v. ACLU*, 542 U.S. 656 (2004). The statute there employed a "harmful to minors" test that ignored the age of the particular child. The Third Circuit was concerned that what is obscene for a "five-year-old" might not be obscene for "a person just shy of age seventeen." *Id.* at 254. The Protection of Children Act allays that concern by basing the prohibition in the Act on the age of the actual child in question.

The Act also does not unnecessarily deny adults access to material that is constitutionally protected for them. *See, e.g.*, *Sable*, 492 U.S. at 126. The Act pro-scribes only the knowing exposure of children to "adult live performances." It does not prohibit the performances themselves or deny access to adults who wish to view them. Because the Act does not affect the First Amendment rights of adults, it is reasonably tailored and not overbroad. *See, e.g.*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 389 (1988); *Webb*, 919 F.2d at 1501–02.

2. HM next argues that the Protection of Children Act should be subject to strict scrutiny because it was "adopted by the government because of disagreement with the message the speech conveys." DE1 at 16 (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015)). The message that HM seems to have in mind is the social viewpoint inherent in drag performances. *See* DE1 at 6–8, 15–16. But the Act does

not discriminate among viewpoints. It applies to any kind of "show, exhibition, or other presentation in front of a live audience," as long as the performance is sexually explicit and meets the obscenity standard. Fla. Stat. § 827.11(a). Other live performances, conveying other social viewpoints, could also meet this test—for example, a patriotic cabaret with risqué performances that caters to servicemembers. The objective of the Act is to protect children from any kind of age-inappropriate, sexually explicit live performance, irrespective of the performers' sexual preferences or whether they are in common dress or drag. This purpose is not viewpoint-discriminatory.

HM further asserts that, even though the Act mentions nothing of drag performances on its face, a deeper probe into the subjective motives of certain legislators will expose a viewpoint-discriminatory goal of targeting drag shows specifically. DE1 at 16–17. The Eleventh Circuit has held "many times" that "when a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose." *NetChoice LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1224 (11th Cir. 2022) (quoting *In re Hubbard*, 803 F.3d 1298, 1312 (11th Cir. 2015)). Isolated, subjective remarks by lawmakers thus fall short of demonstrating that the government has regulated speech "because of disagreement with the message the speech conveys." *Reed*, 576 U.S. at 164 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)); *see United States v. O'Brien*, 391 U.S. 367, 384 (1968) (court may

not invalidate statute "constitutional on its face" "on the basis of what fewer than a handful of [legislators] said about it").

In any event, the legislative history of the Act only confirms that the purpose of the statute is viewpoint-neutral. In its lone citation to portions of the legislative record, HM points to references in the House and Senate staff analyses to the December performance of "A Drag Queen Christmas." DE1 at 16–17. But those documents (accompanied by disclaimers that they "do[] not reflect the intent or official position of the bill's introducer or the Florida Senate") cite that incident because of stated concerns that children under 16 were allowed to view "sexual conduct, simulated sexual activity, and lewd, vulgar, and indecent displays." *E.g.*, Professional Staff of the Committee on Judiciary, *Bill Analysis and Fiscal Impact Statement—SB 1438—Protection of Children* at 5–6 (Mar. 20, 2023), https://tinyurl.com/mrxw344v. Nothing in these analyses indicates an aim to suppress a particular social message, such as that conveyed by performers dressed in drag.

HM notes that "Florida already has on its books, laws preventing exposure of minors to lewd, sexually explicit, obscene, vulgar or indecent displays." DE1 at 9. It cites a recent case in which a district court preliminarily enjoined a Tennessee statute criminalizing the performance of "adult cabaret entertainment" in the presence of children, in part on the ground of its "redundancy" with existing Tennessee statutes. *Friends of George's, Inc., v. Tennessee*, No. 2:23-cv-02163, 2023 WL 2755238, at *5 (W.D. Tenn. Mar. 31, 2023). The court viewed this redundancy as evidence that the statute was adopted "because of disagreement with the message

13

[the speech] conveys." *Id.* (quoting *Ward*, 491 U.S. at 791). As already noted, however, the Protection of Children Act fills certain gaps in existing Florida statutes with respect to protection of children and so is not redundant. Moreover, statutes overlap with each other all the time without provoking constitutional scrutiny. *See, e.g.*, *Conage v. United States*, 346 So. 3d 594, 602 (Fla. 2022) (noting ways Florida's drug-trafficking statute is "redundan[t]" and "overlap[ping]" in its design). That some expressive conduct might happen to violate more than one statute cannot by itself be justification for imputing a viewpoint-discriminatory intent to the later-enacted statute, when that statute is neutral on its face and in its purpose and is carefully crafted to prohibit only speech unprotected by the First Amendment.

3. For many of the same reasons, HM is incorrect that the Protection of Children Act "prohibits protected speech based on the identity of the speaker." DE1 at 10. The Act prohibits the knowing exposure of children to "adult live performances" no matter who is leading or performing it. And the objective purpose, again, is not to target drag queens but to protect children from exposure to age-inappropriate, sexually explicit live performances. The Act thus differs materially from the Tennessee statute in *Friends of George's*, which applied to "adult cabaret entertainment" performed by "entertainers like topless dancers, strippers, male or female impersonators *but not others*." 2023 WL 2755238, at *4 (emphasis added). Florida's law does not so discriminate.

4. Last, HM contends that the Protection of Children Act is unconstitutionally vague—i.e., insufficiently precise to give "'adequate notice of what is

prohibited,'" as required by due process. *Ginsberg*, 390 U.S. at 643 (quoting *Roth v. United States*, 354 U.S. 476, 492 (1957)). HM complains, for instance, that "[t]he terms 'predominately,' 'shameful or morbid' are vague terms subject to the interpretation of the reader and not subjective." DE1 at 14. But those same terms appear in the statutes upheld in *Ginsberg*, 390 U.S. at 633, and *Webb*, 919 F.2d at 1513. The same is true for HM's contention that the phrase "lewd conduct" in the Act is vague. DE1 at 13.[3] HM can therefore prevail only if the Court deviates from decades of controlling precedent.

### B.    HM's complaint is a shotgun pleading.

HM's complaint should also be dismissed as a shotgun pleading. "A shotgun pleading is a complaint that violates either Federal Rule of Civil Procedure 8(a)(2) or Rule 10(b), or both." *Barmapov v. Amual*, 986 F.3d 1321, 1324 (11th Cir. 2021). "The self-evident purpose of these rules is to require the pleader to present his claims discretely and succinctly, so that[] his adversary can discern what he is claiming and frame a responsive pleading." *Id.* (internal quotations omitted).

The Eleventh Circuit has identified four examples of pleading practices that constitute impermissible shotgun pleading. One is failing to separate "each cause

---

[3] *See, e.g.*, *United States v. 12 200-Ft. Reels of Super 8mm. Film*, 413 U.S. 123, 130 n.7 (1973) ("If and when such a 'serious doubt' is raised as to the vagueness of the words 'obscene,' 'lewd,' 'lascivious,' 'filthy,' 'indecent,' or 'immoral,' . . . we are prepared to construe such terms as limiting regulated material to patently offensive representations or descriptions of that specific 'hard core' sexual conduct given as examples in *Miller*" (citations omitted)); *Chesebrough v. State*, 255 So. 2d 675, 677 (Fla. 1971) ("'Lewd' and 'lascivious' are words in common use, and the definitions indicate with reasonable certainty the character of acts and conduct which the Legislature intended to prohibit and punish, so that a person of ordinary understanding may know what conduct on his part is condemned.").

of action or claim for relief" into a different count. *Id.* at 1325. HM's complaint is deficient in this regard. It consists of a single Count I with a mish-mash of different, vaguely articulated constitutional theories presented in non-consecutively numbered paragraphs. Some of the paragraphs in Count I are not numbered at all; some employ numbering systems that do not match the ones preceding it.

Part I.A represents Defendants' best attempt to identify and respond to the various claims sprinkled throughout HM's single-count complaint. Under the aegis of the First Amendment, HM seems to present three speech-based theories (overbreadth, discriminatory legislative purpose, and speaker-based discrimination) and one (vagueness) that actually arises under the Due Process Clause of the Fourteenth Amendment. The complaint fails to disambiguate the constitutional theories and allege them in separate counts, leaving Defendants to "speculate as to which" claims they should be defending against or which allegations HM proposes would support any of those claims. *Weiland v. Palm Beach Cty. Sheriff's Off.*, 792 F.3d 1313, 1323 & nn. 12–13 (11th Cir. 2015) (citation omitted).

### C.   HM does not have Article III standing.

Another important reason that HM's complaint should be dismissed is that HM lacks standing—"an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To have standing, HM must show "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020)

(citing *Lujan*, 504 U.S. at 560–61)). HM has not stated facts sufficient to show injury in fact, let alone traceability or redressability.

To establish injury in fact, HM must show injury that is "concrete, particularized, and actual or imminent." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010). HM cannot evade this requirement by challenging the Protection of Children Act as overbroad. "The overbreadth doctrine does not relieve a plaintiff of the burden to prove constitutional standing, which requires that 'the plaintiff himself has suffered some threatened or actual injury resulting from the putatively illegal action,'" *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1270 (11th Cir. 2006) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)), before the plaintiff then may assert the First Amendment rights of third parties.

Here, HM does not claim that it is the subject of any enforcement action or that it has been the subject of one in the past; it instead brings a pre-enforcement challenge to prevent one from happening. To do so, HM must show both "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute" and a "credible threat of prosecution thereunder." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979). HM need not "confess that [it] will in fact violate that law," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014), nor must it "first expose [itself] to actual arrest or prosecution to be entitled to challenge a statute that [it] claims deters the exercise of [its] constitutional rights," *Steffel v. Thompson*, 415 U.S. 452, 459

(1974). It must, however, at least show an intent to engage in conduct "arguably proscribed" by that law. *Driehaus*, 572 U.S. at 162.

HM states no such intention. Rather, HM insists that the performances it hosts at its establishment feature "no lewd activity, sexually explicit shows, disorderly conduct, public exposure, obscene exhibition, or anything inappropriate for a child to see." DE1 at 6. If "the entertainment is not suitable for children, children are not allowed to attend and the venue announces this in advance on their website and in their advertising." DE1 at 19. Nothing HM describes in its complaint even arguably contravenes the Protection of Children Act or suggests that enforcement action is imminent.

That likewise disposes of any contention that HM has already suffered injury based on the alleged chilling effect of the Protection of Children Act. *See Harrell v. The Florida Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). HM says it now bars children from attending its performances because it fears prosecution. DE1 at 9, 18. But "one cannot demonstrate standing merely by announcing a chill." *Equality Fla. v. Fla. State Bd. of Educ.*, No. 4:22-cv-134, 2022 WL 19263602, at *3 (N.D. Fla. Sept 29, 2022). HM "must show that the challenged law arguably forbids the chilled speech and that exercising the speech may have real consequences." *Id.* Like the plaintiff in *Dermer v. Miami-Dade County*, 599 F.3d 1217, 1220 (11th Cir. 2010), HM has "failed to provide the court with anything more than generalizations" about its performances, from which this Court could determine that these performances even arguably fall within the Protection of Children Act.

HM refers in its complaint to other enforcement proceedings against establishments that have apparently allowed children to view certain sexually explicit drag performances. DE1 at 2–3 & nn. 1–3. HM suggests that these proceedings have deterred it from allowing children at its events. In *Driehaus*, the Supreme Court allowed standing to a plaintiff who had been inhibited from making certain political statements because of a prior enforcement proceeding against another individual, but only because the plaintiff had "alleged an intent to engage *in the same speech* that was the subject of [the] prior enforcement proceeding." 573 U.S. at 166 (emphasis added). The proceedings to which HM refers, by contrast, involve different statutes and different performances. *See* Exs. B–E (declaration of DBPR deputy general counsel; three administrative complaints). Based on the generalizations in HM's complaint, HM's performances are unlike the ones at issue in these other proceedings and do not permit a parallel like what the Court was able to draw in *Driehaus*.

HM is thus more like the plaintiffs in *Younger v. Harris*, 401 U.S. 37 (1971), who sought to intervene in the prosecution of an individual under a California leafletting statute, contending that the prosecution inhibited their own leafletting activity. The putative intervenors did not have standing, the Supreme Court held, because they did "not claim that they ha[d] ever been threatened with prosecution, that a prosecution [was] likely, or even that a prosecution [was] remotely possible." *Id.* at 42. They claimed instead that the prosecution made them "feel inhibited."

*Id.* This did not establish a "genuine controversy" as to these plaintiffs or entitle them to enjoin the prosecution. *Id.*

HM also lacks standing because any conjectural injury is neither traceable to nor redressable by Defendants. "The principal problem is that most of [HM's] alleged harm is not plausibly tied to the law's *enforcement* so much as the law's very *existence*." *Equality Fla.*, 2022 WL 19263602, at *2. HM appears to predicate standing on the alleged chilling effect of what it *perceives* to have been the purpose of the Act, rather than its actual, objective purpose. Like the plaintiffs in *Equality Florida*, HM essentially "contend[s] the law's passage, the sentiment behind it, the Legislators' motivation, and the message the law conveys all cause them harm." *Id.* This abstract injury could not have been caused by Defendants, nor is there anything they could do to remedy it.

### D. The State of Florida and Governor DeSantis have sovereign immunity.

The final reason HM's complaint is unlikely to succeed on the merits, at least as to two of the Defendants, is that the State of Florida and Governor DeSantis have sovereign immunity under the Eleventh Amendment.

The State of Florida is immune because it has not consented to this lawsuit and no federal statute has validly abrogated the State's immunity. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54–55 (1996). As a state official, Governor DeSantis is similarly immune. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89,

101–02 (1984); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).[4] *Ex parte Young* carves out an exception to this immunity for when the plaintiff seeks "prospective equitable relief to end continuing violations of federal law." *Lane v. Cent. Ala. Cmty. Coll.*, 772 F.3d 1349, 1351 (11th Cir. 2014) (per curiam) (quotations and internal emphases omitted). But to fit this exception, the Governor must have "some connection with [] enforcement," which arises from "being specially charged with the duty to enforce the statute." *Ex parte Young*, 209 U.S. 123, 157–58 (1908); *see Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1248 (11th Cir. 1998). The Governor lacks this connection. *See Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 534 (2022) ("While *Ex parte Young* authorizes federal courts to enjoin certain state officials from enforcing state laws, the petitioners do not direct this Court to any enforcement authority the attorney general possesses in connection with S.B. 8 that a federal court might enjoin[.]").

At most, the Governor has a general duty to take care that the laws of the State of Florida are executed, Fla. Const. art. IV, § 1(a), and the authority to supervise the various state departments, Fla. Const. art. IV, § 6. These are not enough. "The required 'connection' is not 'merely the general duty to see that the laws of

---

[4] This is true whether the Governor is sued in his official or in his individual capacity. "The Eleventh Amendment bars a suit against state officials when the state is the real, substantial party in interest." *Pennhurst*, 465 U.S. at 101 (quotations omitted). As a "general rule," "relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter." *Id.* That includes where the relief sought would "interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting." *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1277 n.3 (11th Cir. 1998). Enjoining enforcement of a state law would "operate against" the sovereign in precisely those ways.

the state are implemented,' but 'the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Morris v. Livingston*, 739 F.3d 740, 746 (5th Cir. 2014) (quoting *Okpalobi v. Foster*, 244 F.3d 405, 416 (5th Cir. 2001) (en banc) (plurality op.)). The Act assigns enforcement responsibility to two divisions of the Department of Business and Professional Regulation: the Division of Hotels and Restaurants and the Division of Alcoholic Beverages and Tobacco. It is the Secretary of the Department of Business and Professional Regulation who is vested with the responsibility to "[p]lan, direct, coordinate, and execute the powers, duties, and functions vested in that department or vested in a division, bureau, or section of that department." Fla. Stat. § 20.05(1)(a). And responsibility for prosecuting misdemeanors under the Act in circuit court would fall to the local State Attorney. *See* Fla. Const. art. V, § 17.

## II. Even if the Court does not dismiss HM's complaint, it should deny preliminary injunctive relief.

It follows from the foregoing analysis that HM has failed to meet the first prerequisite for a preliminary injunction—likelihood of success on the merits. But even if the Court disagrees, it should still deny HM's motion, because HM has failed to meet any of the remaining prerequisites. HM has not shown irreparable injury—"'the *sine qua non* of injunctive relief.'" *Ne. Fla. Chapter of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quotation omitted). To justify a preliminary injunction, the putative irreparable injury "must be neither remote nor speculative, but actual and imminent." *Id.* (quoting

*Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 973 (2d Cir. 1989)).

Taking HM's complaint at face value, HM faces no threat of irreparable injury, actual or imminent, because the performances it claims are characteristic of its Sunday Brunch drag show do not violate the Protection of Children Act. HM thus can continue to operate its restaurant, serve alcohol at its bar, and host live performances, all without excluding children. It does not require a preliminary injunction to do so. For this reason alone, HM's motion should be denied.

The final two factors in the preliminary-injunction test are the balance of harms and the public interest. "[W]here the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." *Swain v. Junior*, 958 F.3d 1081, 1091 (11th Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). Again, HM has claimed no intention to engage in any conduct actually or even arguably prohibited by the Protection of Children Act. HM thus cannot identify any threatened injury that would outweigh the impairment a preliminary injunction would cause to the State of Florida's interest in protecting children from exposure to age-inappropriate, sexually explicit live performances. And because HM lacks overbreadth standing, *see supra* pp. 17–20, it cannot use alleged injury to third parties as a basis for preliminary injunctive relief. *Compare Garcia v. Stillman*, No. 22-cv-24156, 2023 WL 3478450, at *2 (S.D. Fla. May 16, 2023).[5]

---

[5] *See also Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish . . . that *he* is likely to suffer irreparable harm" (emphasis

HM apparently seeks statewide relief, asking the Court to issue an injunction "preventing [the Act] from taking effect." DE6 at 26. This Court should not award HM any relief, for the reasons discussed, but if it does, it should limit that relief to the parties and not extend it statewide. *See, e.g.*, *United States v. Nat'l Treas. Emps. Union*, 513 U.S. 454, 477–78 (1995); *Georgia v. President of the United States*, 46 F.4th 1283, 1303–04 (11th Cir. 2022). A statewide injunction would harm the public by exposing children to "adult live performances" in other venues less scrupulous than HM professes to be.

## CONCLUSION

HM's complaint should be dismissed. In the alternative, HM's motion for a preliminary injunction should be denied.

Respectfully submitted,

June 2, 2023

ASHLEY MOODY
ATTORNEY GENERAL

Henry C. Whitaker (FBN 1031175)
SOLICITOR GENERAL

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
Nathan.Forrester@myfloridalegal.com

Jeffrey Paul DeSousa (FBN 110951)
CHIEF DEPUTY SOLICITOR GENERAL

*/s/ Nathan A. Forrester*
* Nathan A. Forrester (FBN 1045107)
SENIOR DEPUTY SOLICITOR GENERAL

*Counsel for Defendants*

*\* Lead Counsel*

---

added)); *Flowers Indus. v. FTC*, 849 F.2d 551, 552 (11th Cir. 1988); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 822 (9th Cir. 2018); *Oviedo Medical Center, LLC v. Adventis Health Sys./Sunbelt, Inc.*, No. 6:19-cv-1711, 2020 WL 4218276, at *2 (M.D. Fla. Apr. 28, 2020).

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of June, 2022, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

/s/ Nathan A. Forrester
Senior Deputy Solicitor General