1

```
             UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
                  ORLANDO DIVISION



. . . . . . . . . . . . . . . . . :
                                  :
HM FLORIDA-ORL, LLC,              :
                                  :
             Plaintiff,           :
vs.                               : Case Number
                                  : 6:23-CV-950-GAP-LHP
                                  :
RON DeSANTIS, MELANIE GRIFFIN,    :
and STATE OF FLORIDA,             :
                                  :
             Defendants.          :
. . . . . . . . . . . . . . . . ..:



             TUESDAY, JUNE 6, 2023; 1:30 P.M.
                     MOTION HEARING
        BEFORE THE HONORABLE GREGORY A. PRESNELL
                UNITED STATES DISTRICT JUDGE


APPEARANCES:

COUNSEL FOR PLAINTIFF,
  Brice Timmons, Esq.
  Melissa Stewart, Esq.
  Gary Israel, Esq.
    (by phone)


COUNSEL FOR DEFENDANTS:
  Nathan Forrester, Esq.
  Jeffrey DeSousa, Esq.
  Daniel Bell, Esq.



Official Court Reporter:
  K. Stanford
_____
Proceedings recorded by mechanical stenography.
 Transcript produced by computer-aided transcription.
```

2

1                    P R O C E E D I N G S

2          THE COURT:  Good afternoon, everyone.

3          Be seated, please.  Okay, Anita.  Call the case.

4          THE COURTROOM DEPUTY:  This is in the matter of

5  HM Florida-ORL, LLC versus Ron DeSantis, Melanie Griffin, and

6  the State of Florida, Case number 6:23-Civil-950-GAP-LHP.

7          Will counsel please state your name for the record.

8          MR. TIMMONS:  Brice Timmons, B-r-i-c-e

9  T-i-m-m-o-n-s, representing the plaintiffs.

10          MS. STEWART:  Melissa Stewart, M-e-l-i-s-s-a

11  S-t-e-w-a-r-t, representing the plaintiffs.

12          THE COURT:  Okay.  And I think Mr. Israel is on the

13  phone, correct?

14          THE COURTROOM DEPUTY:  Yes, sir.

15          THE COURT:  Okay.  And for the defendants?

16          MR. FORRESTER:  Nathan Forrester, N-a-t-h-a-n

17  F-o-r-r-e-s-t-e-r, for the defendants.

18          THE COURT:  Okay.

19          MR. DeSOUSA:  Jeffrey DeSousa, D-e-S-o-u-s-a.

20          MR. BELL:  And Daniel Bell for the defendants.

21          THE COURT:  Okay.  All right.

22          Well, some housekeeping matters before we begin.

23          We're here, obviously, on the motion for a temporary

24  injunction filed by the plaintiff.  And in their response,

25  defendants raised a motion to dismiss.

1        And so because of that, I gave the plaintiffs an

2   opportunity to respond to that in writing.

3        So technically, today's hearing is just on the

4   motion for temporary injunction, although there are obvious

5   issues that are common to both.

6        I didn't put a time limit in my order noticing this

7   hearing.  I would think 40 minutes should be adequate.  If you

8   think you need more time than that, just let me know, but

9   let's try to do it in 40 minutes per side.  And if the

10  plaintiff wants to reserve five or ten minutes for rebuttal,

11  that will be fine.

12       Also a housekeeping matter, there's an issue of the

13  propriety of including the governor and the State as

14  defendants.

15       Are plaintiffs willing to concede that they ought

16  not to be parties to this?

17            MR. TIMMONS:  We are, Your Honor.

18            THE COURT:  Okay.  So --

19            MR. TIMMONS:  We think Ms. Griffin is the proper

20  defendant.

21            THE COURT:  Okay.  Thank you.

22            And I assume the defendants agree that Ms. Griffin

23  is an appropriate defendant, correct?

24            MR. FORRESTER:  Yes, Your Honor.

25            THE COURT:  Okay.  All right.

4

1          Well, let me go ahead and entertain argument, then.

2          I'll begin with plaintiffs, and we'll go from there.

3          MR. TIMMONS:  Your Honor, we would like to reserve

4     ten minutes for rebuttal.

5          THE COURT:  Okay.

6          MR. TIMMONS:  Thank you, Your Honor.

7          My name, again, is Brice Timmons.  And I appreciate

8     the Court indulging us with pro hac vice admission.

9          Ms. Stewart and I are from Memphis, Tennessee, but

10    we've been asked to come down and represent the plaintiff in

11    this matter, HM Florida-ORL, LLC.

12         THE COURT:  Were you involved in the Friends of

13    George case?

14         MR. TIMMONS:  We were the -- yes, Your Honor.  We

15    were lead counsel.

16         THE COURT:  Okay.  You have a judge up there who

17    likes to write long opinions.  Don't expect that from me.

18         MR. TIMMONS:  Judge Parker is usually pretty

19    succinct, but 70 pages is -- that was impressive.  He also

20    made us go to trial in 58 days from filing.  So that was --

21         THE COURT:  I'm going to give you 60.

22    [Light laughter.]

23         MR. TIMMONS:  I appreciate that.

24         But that has allowed us -- Ms. Stewart and I have

25    been pretty deep in this case law for a while now, and so

5

1   we're pretty familiar with the standards in both -- both the

2   Supreme Court standards and the Eleventh Circuit.

3           The Eleventh Circuit is not a circuit with a great

4   breadth of obscenity case law, but the standards at issue here

5   really are all set by Supreme Court precedent.  There's very

6   little need to drill down further.

7           I do want to first address the issue of standing.

8   The State has raised -- and even though Ms. Griffin is the

9   proper defendant, I will probably continue to refer to the

10  State as the State.

11          The State has raised concerns about whether

12  Hamburger Mary's is an appropriate plaintiff in this matter,

13  specifically because at present, Hamburger Mary's is

14  particularly careful not to violate this statute.  We don't

15  really know what the statute means, and we'll get to that in a

16  moment.  But the -- the question is whether Hamburger Mary's

17  engages in conduct that could arguably fall within the

18  statute's reach.  And that is from the Susan B. Anthony

19  Foundation case that's cited in our brief.

20          THE COURT:  Mr. Timmons, let me help you.  I really

21  don't have much concern about the standing issue.

22          MR. TIMMONS:  All right.  Let's move on.

23          THE COURT:  If, after you hear from the State, you

24  think you need some rebuttal time on that, I'll be happy to

25  hear it, but --

1        MR. TIMMONS:  Okay.  Well, let's move on, then.

2        The statute is vague and overbroad in three ways

3   that specifically affect Hamburger Mary's.  And

4   HM Florida-ORL, LLC, does business as Hamburger Mary's, and I

5   will refer to them that way because it's a lot easier.

6        The statute permits the Division of Professional

7   Regulations to revoke the licensure of any business that

8   permits children to attend what they call an adult live

9   performance.  Adult live performance is defined in a way that

10  is largely extremely specific and consistent with

11  constitutional standards.  However --

12        THE COURT:  Constitutional standards for obscenity.

13        MR. TIMMONS:  For obscenity.  However --

14        THE COURT:  What about lewd conduct?  Is there any

15  definition of that in Florida?

16        MR. TIMMONS:  You nailed it, Your Honor.  There is

17  no definition of lewd conduct in Florida.  There is no

18  definition of lewd conduct within the Eleventh Circuit.

19  There is no definition of lewd conduct that we've been able to

20  find in Florida state case law.

21        There is -- the term "lewd conduct" has never been

22  utilized by the Supreme Court in my lifetime and certainly is

23  not permissible as a term for defining regulable speech within

24  the bounds of Ashcroft versus ACLU or Reno versus ACLU, the

25  critical cases involving the protection of minors from

1    inappropriate material.

2         Also, there's no definition of lewd exposure of

3    prosthetic or imitation genitals or breasts.  And I really

4    want to talk about that one, because the statute does not

5    appear to target drag performers specifically.  However, that

6    language right there -- lewd exposure of prosthetic or

7    imitation genitals or breasts -- belies the statute's real

8    purpose, which is to target drag performers.

9         We know that's true because Governor DeSantis went

10   on television yesterday and said it.  He said, There is no

11   such thing as a harmless drag show, when referencing this

12   legislation.  But the text of the legislation is the more

13   important place to look and where the Court should ground its

14   decision to grant the preliminary injunction.

15        It should -- the Court should look to the issue of

16   lewd exposure of prosthetic or imitation genitals or breasts

17   to know who it's targeting, because there are two categories

18   of people in the world who wear prosthetic breasts.  They are

19   people who have undergone a mastectomy and drag performers.

20        And I think the Court can safely infer that the

21   Florida legislature was not attempting to target women who had

22   undergone a mastectomy when they drafted a statute about adult

23   live performances.  There's only one category of performer

24   that wears prosthetic breasts.

25        And, again, what does lewd exposure mean?

8

1          Is that showing some cleavage?

2          You know, in most statutes that govern these types

3     of performances, like strip club regulations, there will be

4     very detailed, specific language about the number of inches

5     below or, you know, the -- the areola that a top can --

6          THE COURT:  Well, I think Florida's general

7     obscenity statute has all those requirements, right?

8          MR. TIMMONS:  It does, Your Honor.  It absolutely

9     does.  And you will note also that Florida's obscenity statute

10    does not contain the words "lewd conduct" or "lewd exposure."

11    Those were added specifically to this statute, and they

12    enabled the State to target drag performers because of their

13    vagueness.

14         We know that the State has, in fact, targeted drag

15    performers.  We know that police were present undercover at a

16    drag performance entitled -- it was a Christmas drag show.

17         We know that the --

18         THE COURT:  Was that the one here in Orlando?

19         MR. TIMMONS:  I believe so, Your Honor.  Let me

20    confirm.

21         THE COURT:  Yeah, the Plaza Live.

22    (Brief pause in proceedings.)

23         MR. TIMMONS:  Yes, Your Honor.  That was here in

24    Orlando.

25         These drag performers were surveilled, targeted, and

1    a police report was ultimately written that said that they

2    didn't do anything illegal.  And yet the department -- or,

3    rather, the Division of Professional Regulations still

4    targeted them for the revocation of a liquor license.  This

5    has happened to another -- another venue as well.

6            So we know that law enforcement are interpreting

7    that language, lewd conduct, to mean drag performances.  We

8    know that the governor's said it out loud.  We know that it is

9    vague enough that it can certainly encompass anything that a

10   law enforcement officer believes subjectively to violate their

11   moral standards.  And we know that that's going to be used

12   against businesses, specifically LGBT-friendly businesses like

13   Hamburger Mary's that actively present drag performances.

14           This is a question that parents should answer:

15   Should my children go to a drag show?  What is the level of

16   appropriate -- you know, what's the appropriate level of

17   conduct for my child to see?  Those are things that parents

18   should figure out, not the State.

19           The third portion of the law that is problematic is

20   the provision about the age of the minor present.

21           Specifically -- let me get the exact quote again.

22   The statute requires the venue to ensure that the performance

23   is appropriate for the age of the minor present.

24           Now, that specific provision is problematic under

25   Reno versus ACLU and Ashcroft versus ACLU, but the best

1   analysis of that type of provision is found at ACLU versus

2   Mukasey, which is actually Ashcroft -- it's the Ashcroft case

3   on remand to the Third Circuit.  And in the Mukasey analysis,

4   the Third Circuit explicitly discusses this sort of moving

5   target age-range framework.

6           What the court said in that case -- and the Supreme

7   Court seems to have at least tacitly endorsed this result.

8   The court upheld the preliminary injunction in that case.

9   That was the Ashcroft versus ACLU opinion.  And the same

10  reasoning was found -- it was reiterated in the Mukasey

11  opinion and certiorari was denied after the Mukasey court

12  followed its own precedent and the Supreme Court's

13  instructions on remand and upheld the permanent injunction

14  against the Child Online Protection Act.

15          The court took specific issue with a definition of

16  minor that was essentially subjective, that it could -- that

17  minor could mean anything.  And when you talk about community

18  standards, as this statute does, the community standards for

19  what content is appropriate for a five-year-old and a

20  17-year-old are very different things.

21          So when you give law enforcement officers this power

22  to decide what is and isn't appropriate for minors, and

23  especially when you specifically tell them for the age of the

24  minor present, they get to make a lot of subjective decisions

25  of what they think is appropriate for any given age group to

1   see.

2           That gives businesses no guidance on what they can

3   and cannot do.  And it's completely inconsistent with the Reno

4   decision's requirement that Congress -- or the legislature in

5   this case -- not reduce all speech that is fit for the mailbox

6   to what is fit for the sandbox.

7           It requires businesses to essentially turn all of

8   their performances into performances that are appropriate for

9   kindergartners.  And the First Amendment simply does not

10  permit that.  The Supreme Court has reiterated it in Reno and

11  in Ashcroft, and then the McKenzie court in the Third Circuit

12  did a detailed analysis that I would encourage the Court to

13  take a look at.

14          Honestly, Your Honor, I had gotten up here planning

15  to spend ten minutes talking about standing issues, and if the

16  Court doesn't have concerns about that --

17          THE COURT:  Well, you can go ahead and summarize

18  your argument for me.  It may help.  I just -- I tend to be

19  one of these people up here that tell you what's on my mind.

20  So --

21          MR. TIMMONS:  Well, no.  I appreciate it.  I just

22  don't want to waste the Court's time.

23          THE COURT:  You're not wasting my time.

24          MR. TIMMONS:  Okay.  The standing argument simply is

25  that Hamburger Mary's has already had to self-censor.

1      They have taken shows that used to be 18 -- that

2  used to be all ages -- these are not shows where children were

3  encouraged to attend, but parents would bring their kids

4  because they wanted to go out and have fun and they wanted to

5  bring their kids with them -- and they've turned all the shows

6  except for Sunday shows into 18 and up.  And those Sunday

7  shows are now literally things like spoofs on the Lion King

8  and other G-rated, you know, Disney-type movies.  I think

9  they're doing Les Mis next week.

10      But Hamburger Mary's has been forced to self-censor.

11  They are directly impacted by this law, and they have a

12  reasonable concern that there's a credible threat of

13  enforcement based on Florida's -- the Department of

14  Professional Regulations' recent conduct.

15      THE COURT:  So there is -- their speech has been

16  chilled, as they would say.

17      MR. TIMMONS:  Their speech has been chilled, but I

18  would say that they -- it's more than just the chilling

19  effect.  This law is specifically targeted at the kind of

20  speech that drag performers typically engage in and is being

21  used to -- is actually being used against venues where drag

22  shows take place.  So they face a specific credible threat of

23  enforcement.  The standard is only that their speech, the

24  speech being put on at their performances, must arguably fall

25  within the bounds of the statute.

1          Lewd conduct is so generalized a term that it scoops

2    up a tremendous amount of speech and places them at a real

3    risk of enforcement of a criminal statute with heavy fines and

4    the revocation of the licenses necessary to operate their

5    business.

6          THE COURT:  Let me ask you your view about -- and

7    you mentioned it just a minute ago -- the legislative history.

8          As you know, courts are somewhat reluctant to put a

9    whole lot of confidence in legislative history because it's so

10   broad and difficult to discern.  But I notice Judge Parker

11   spent a lot of time in his opinion dealing with the

12   legislative history of the Tennessee Act.  And then you just

13   mentioned something Governor DeSantis said yesterday?

14         MR. TIMMONS:  Yes, Your Honor.

15         THE COURT:  What did he say yesterday?

16         MR. TIMMONS:  He gave a speech yesterday.

17         THE COURT:  I can't keep up with all his speeches.

18   See, that's the problem.

19         MR. TIMMONS:  I just found out about this.  So let

20   me see if I've got it here.

21         Melissa, would you send me that?

22      (Brief pause.)

23         That's it, Your Honor.

24         While Ms. Stewart pulls that up, I do want to be

25   clear.  We aren't basing any of our argument in the external

1    comments of political leadership.  I think it's important that

2    we -- let's not lie to ourselves or pretend that the legal

3    fiction is true, that this is not -- this statute wasn't

4    specifically targeted at drag queens.  The legislators passing

5    the law all said it.  Governor DeSantis has said it.  It's

6    very clear what they meant to do.  However, that's not where

7    the Court should ground the opinion.  You're right, Judge

8    Parker did undergo a lengthy analysis of the legislative

9    history.

10           Oddly enough, it's an analysis that Ms. Stewart and

11   I did not spend a great deal of time arguing, because we were

12   much more concerned with the text of the statute in question

13   and comparing it to other obscenity laws or other public

14   indecency laws in the State of Tennessee.  You could see very

15   clearly what the legislature was trying to do by just

16   comparing the statutes to existing statutes on the books, and

17   it's the same here.

18           Lewd conduct doesn't appear in any of these other

19   Florida obscenity statutes in a meaningful -- you know, it is

20   not a term that is defined anywhere in Florida law.  It's --

21   the statute is just designed to broaden the sweep of what

22   Florida law enforcement officers can do in their discretion to

23   arrest or shut down businesses or effect fines on those

24   businesses.

25           By the time -- even if the Court were to adopt an

1    as-applied challenge here or to prefer an as-applied

2    challenge, the harm will already have been done to any

3    business by the time a court is reviewing that -- those cases

4    because there are criminal penalties to this law.  Enforcement

5    can begin with an arrest.  Once that happens, the harm is

6    already done.

7           THE COURT:  Let me ask you about that.

8           It occurred to me that if an injunction is granted,

9    I would enjoin Ms. Griffin from using the department's

10    resources to fine or revoke a license.

11           But what about the state attorney in Orange County

12    bringing a misdemeanor charge against Hamburger Mary's.

13           How do I -- how do you deal with that?  Do I need

14    to enjoin the state attorney or the attorney general?

15           MR. TIMMONS:  I think you need to enjoin the

16    attorney general, Your Honor.

17           THE COURT:  Well, maybe the State's lawyers can help

18    me on that.  So --

19           MR. TIMMONS:  Understood.

20           Also, in order to determine that the statute

21    warrants injunctive relief, the Court functionally has to

22    grant declaratory relief first, finding that the statute is

23    unconstitutional.

24           THE COURT:  Sure.

25           MR. TIMMONS:  And I would like to believe that we

1    live in a place where law enforcement officers follow the

2    dictates of federal judges.

3            We -- certainly, that's not always been the case

4    throughout history, but as a general rule, I find that when

5    federal judges declare laws unconstitutional, law enforcement

6    officers don't spend a lot of resources on enforcing

7    unconstitutional laws.

8            THE COURT:  Well, that's hopefully still true.

9            MR. TIMMONS:  I hope it's still true.

10           Your Honor, honestly, I think that gets to the bulk

11   of my concerns with the statute.  And unless the Court has any

12   questions, I think I'll let the State tell you why I'm wrong.

13           THE COURT:  That's fine.  I appreciate you coming

14   down here from Memphis and appreciate your thoughts, and I'll

15   recognize you for rebuttal.

16           MR. TIMMONS:  Thank you, Your Honor.

17           THE COURT:  Okay.  Mr. Forrester.

18           MR. FORRESTER:  Your Honor, may I have a second to

19   confer with --

20           THE COURT:  Sure.

21       (Pause in proceedings.)

22           MR. FORRESTER:  Thank you, Your Honor.  And may it

23   please the Court.

24           My name is Nathan Forrester.  I represent the three

25   defendants in this case.  With me are my co-counsel,

1   Jeffrey DeSousa and Daniel Bell.

2          The plaintiff in this case, which I will just

3   abbreviate as HM, has brought a facial challenge to the

4   constitutionality of Florida's recently enacted Protection of

5   Children Act, and this Act makes it a misdemeanor to knowingly

6   admit a child to an adult live performance.

7          An adult live performance is defined as a sexually

8   explicit show -- and I'm condensing slightly here -- that the

9   adult community of the state would consider patently offensive

10  for the age of the child present.  And my opposing counsel

11  made something of the -- that phrase, for the age of the child

12  present, which I will come to in a second.

13          Our position, of course, is that this statute is

14  entirely constitutional because it tracks language that the

15  Supreme Court and the Eleventh Circuit have held

16  constitutional in other cases in which a state was seeking

17  through legislation to protect children from exposure to

18  activity or material that is obscene for the child; not

19  necessarily for adults, but for the child.

20          THE COURT:  Let me see if I can understand this.

21  Your briefing seems to switch from what I think is the issue

22  in this case, that is, a new standard that is -- I mean, if we

23  look at it, 827.11, as you know, defines adult live

24  performance meaning a show, exhibition, et cetera, that

25  depicts, simulates nudity or sexual conduct as defined in

1   847.001, which is Florida's obscenity statute.  So I read that

2   as not doing anything except reaffirming what is already in

3   the Florida statutes.

4          But then it goes further and says, sort of out of

5   the blue, lewd conduct.  And then it goes even a further step

6   by referencing the lewd conduct as the exposure of prosthetic

7   or imitation genitals or breasts, which seems to me to be a

8   brand-new standard, to the extent it is a standard, of lewd

9   conduct that applies to someone wearing a prosthetic breast,

10  I suppose, for -- as a drag person.

11         And then in your briefing, you keep going back to

12  the obscenity standard.  We're not dealing with an obscenity

13  case here.  We're dealing with a new statute that talks about

14  lewd conduct, including lewd exposure of a prosthetic or

15  imitation female breast.  So your reference to obscenity in

16  your briefing, as well as, I think, where you're starting to

17  go now, seems to me to be sort of not dealing with -- with the

18  elephant in the room.

19         MR. FORRESTER:  I understand what Your Honor is

20  saying.  I think there are two parts to your question --

21         THE COURT:  Okay.

22         MR. FORRESTER:  -- and I'll try to start with the

23  latter part first.

24         We would, with respect, dispute that this is not

25  about obscenity, because the list of activities that you just

**19**

1  read out are still modified and narrowed by the three-part

2  obscenity test that derives from cases like Ginsberg v.

3  New York and --

4       THE COURT:  I agree with you.  I agree.  I think

5  what you're doing here is trying to tie the term "lewd" into

6  the standard recognized for obscenity.

7       MR. FORRESTER:  "Lewd" is being narrowed by the

8  terms that define what is obscene so that really what is being

9  proscribed here is what is obscene for the age of the child

10 present.  So it is still something that is obscene for that

11 child.

12      THE COURT:  So it's your position that "lewd" falls

13 within the same definition of what would be obscene if it's

14 not appropriate for the particular age of that child?

15      MR. FORRESTER:  Yeah.  It is circumscribed by that

16 three-part test, which is critical to determining that a

17 particular activity is obscene under the Supreme Court's and

18 the Eleventh Circuit's case law here.

19      THE COURT:  So what the statute really does, then,

20 is make the obscenity standard applicable to someone wearing a

21 prosthetic breast.

22      MR. FORRESTER:  If it is done in a --

23      THE COURT:  I just said that.  If it's done -- if it

24 falls within one of these obscene standards.  The State of

25 Florida wants to make clear that something obscene by a drag

1    queen is illegal in Florida as if it was done by anybody else.

2              MR. FORRESTER:  Well, it's not necessarily just a

3    drag queen.  It is lewd exposure of prosthetic or imitation

4    genitals or breasts.  I mean, that could be done by anybody.

5    And lewd conduct is actually a word -- a phrase that is

6    also -- it does have a definition in Florida law.  It's a --

7              THE COURT:  It does?  Where?

8              MR. FORRESTER:  It's a phrase that appears

9    throughout Florida statutes.

10             THE COURT:  Where is it?  I've never seen it.

11             MR. FORRESTER:  There's a statute that -- several

12   statutes that prohibit lewd and lascivious conduct.  One of

13   them is discussed in this 1973 Florida Supreme Court case

14   called -- or 1971 Florida Supreme Court case called

15   Chesebrough, which we cite in our brief.  And it includes a

16   definition of lewd in there.

17             THE COURT:  Well, okay.  But there's no statutory

18   definition of it, right?

19             MR. FORRESTER:  Not in -- not in this particular

20   statute, no.  There is another lewd conduct statute that

21   includes a definition, but for this one, no, there is not a

22   definition.

23             But it is a term that has -- as the Florida Supreme

24   Court put it in Chesebrough, is a word in common use and it

25   connotes wicked, lustful, unchaste, licentious, or sensual

21

1    design on the part of the perpetrator.

2          So it does -- that comes -- the court talked in that

3    case about how lewdness or open and public indecency were

4    offenses even at common law.  It brings with it this entire

5    common law gloss of what the word "lewd" means.

6          And I would submit it's no more vague than the words

7    that are in the actual Miller test which have been imported

8    into the Florida statute, like prurient, shameful, or morbid,

9    and that those, obviously, have been approved by the courts.

10         The obscenity standards can only, you know, be

11   precise to a certain point in describing that the line here is

12   obviously a somewhat ineffable line that, you know,

13   Potter Stewart famously called difficult to discern; I would

14   know it when I see it.  But that is -- it's endemic to

15   obscenity, in general.  It's not unique to the Florida statute

16   in this respect.  So we do believe that this is about what is

17   obscene for the child.  Again, not necessarily for the adult,

18   but for the child.

19         THE COURT:  Let's talk about the vagueness in terms

20   of age appropriateness.

21         Would you agree that some things that would be

22   obscene, inappropriate, or lewd with respect to a six-year-old

23   would not be for a 16-year-old?

24         MR. FORRESTER:  Yes, Your Honor.  And that's

25   precisely why this statute has it keyed to the age of the

1   child present.  It actually addresses the concern from the

2   ACLU v. Ashcroft and ACLU v. Mukasey cases that opposing

3   counsel raised about what might be appropriate for a

4   17-year-old might not be appropriate for a five-year-old.

5          At it does is it actually prohibits the admission of

6   a child to the performance based on the age of that child.

7   And I would emphasize here, it doesn't prevent the performance

8   from happening, and it doesn't prevent adults from attending

9   the performance.  And it may very well be the case that the

10   kind of performance at issue would be one that 17-year-olds,

11   16-year-olds, 12-year-olds could attend, but not a five- or a

12   six-year-old.

13          THE COURT:  But you have the State of Florida making

14   that subjective -- that's such a subjective decision.  How is

15   anybody going to risk their liquor license by taking that

16   chance?

17          MR. FORRESTER:  Well, the Supreme Court in Ginsberg

18   upheld the harmful to minors test there that was actually

19   based on what was inappropriate for minors as a category,

20   which is, obviously, broader than one that is keyed to the age

21   of the child present.

22          And actually, in the Eleventh Circuit case American

23   Booksellers v. Webb, they said, We would interpret that, the

24   word "minors," to mean a reasonable 17-year-old.

25          And all that Florida has done in this case is said,

1  We're just going to now make it so that the prohibition here

2  on admission of the child is just simply keyed to the age of

3  the child.  We're no longer going to make it based on what

4  would be obscene for minors, which would then effectively be a

5  definition keyed to the reasonable 17-year-old.

6         THE COURT:  Let me ask you this.  Why does Florida

7  need this statute?  Doesn't Florida already have laws that

8  would prohibit everything we've been talking about today?

9         MR. FORRESTER:  It's not totally clear, Your Honor.

10  There is -- some of these -- some of the other statutes come

11  with requirements that the activity in question be done for

12  consideration.  Some have -- actually just enumerate specific

13  categories of sexual activity.

14         This brings together in one place and it does so

15  with a very tightly-tailored obscenity standard that is

16  designed to ensure compliance with the obscenity standards

17  that have been approved by the Supreme Court and Eleventh

18  Circuit.

19         It actually, in a very real sense, addresses

20  vagueness concerns that could otherwise arise from application

21  of statutes like nuisance and disorderly conduct to conduct of

22  this nature.

23         THE COURT:  What's the status of your case against

24  the Plaza Live?

25         MR. FORRESTER:  I'm sorry, Your Honor?

1    THE COURT:  The Secretary is seeking to revoke the

2    liquor license of the Plaza Live Foundation here, right?

3    MR. FORRESTER:  Oh.  I'm actually not sure,

4    Your Honor.  I don't know where that is.  We attached the

5    administrative complaint, but I don't know what the status of

6    it is.

7    THE COURT:  Well, I'm just -- I'm curious, because,

8    I mean, they're going after a license revocation and they're

9    not using this statute.  They're using another statutory

10   framework to do that, right?

11   MR. FORRESTER:  That was actually a point I wanted

12   to make.  These other complaints were brought under actually

13   different statutes than this one.  This one has not yet been

14   enforced, so -- and I would also point out that in the

15   investigations to which opposing counsel has referred, in some

16   cases they went and looked at drag clubs and determined that

17   they were not engaged in any problematic conduct under Florida

18   law.

19   So they're not just targeting drag clubs even in

20   that enforcement under a different statute.  They're looking

21   specifically for sexually explicit conduct.  And that's a bit

22   of a shorthand, I know, for the terms of these other statutes,

23   but that's the same thing that this statute does here.

24   On its face, it is simply making it unlawful to

25   admit a child to a sexually explicit performance meeting the

1  obscenity standard that would be inappropriate for the age of

2  that child present.  And in so doing, it is, again, not

3  prohibiting any speech by adults.  These adult live

4  performances could continue to go on.  It's not prohibiting

5  adults from having access to these performances.  They could

6  continue to attend.  It is only barring the admission of the

7  child.

8          THE COURT:  Well, it would bar a parent from

9  bringing a child that he thinks is age appropriate, right?

10          MR. FORRESTER:  Yes, it would.

11          THE COURT:  Does that square with the Florida

12  Parental Rights Act?

13          MR. FORRESTER:  In what way, Your Honor?  I'm --

14          THE COURT:  Telling the parent what the State thinks

15  is age appropriate for their child in terms of a drag show.

16          MR. FORRESTER:  Well, there are times when, you

17  know, the State, in the exercise of its police power, can

18  determine that something is inappropriate even for a parent

19  to, you know, allow a child to do or to do to a child.  That

20  sounds like a suggestion of perhaps -- actually, like a Fifth

21  Amendment substantive due process parental right to direct the

22  upbringing of the children claim.  That's not one that --

23          THE COURT:  No.  I'm talking about Florida's

24  parental rights statute.

25          MR. FORRESTER:  I'd have to go and look at what that

1    says specifically, Your Honor, in order to address that.

2         THE COURT:  I've got it up here somewhere.

3      (Brief pause.)

4         Parents' Bill of Rights, Chapter 101.4.

5         It raises another interesting issue.  You say this

6    doesn't have to be for compensation to be illegal, right?

7         MR. FORRESTER:  Right.

8         THE COURT:  So if on Father's Day a father went out

9    in the backyard for his Father's Day party dressed as -- in

10   female garb, he could be at risk of violating the statute if

11   he did anything that might suggest something sexual?

12        MR. FORRESTER:  It would have to be a show,

13   exhibition, or other presentation in front of a live audience.

14        THE COURT:  Yeah.  What's a live audience?  That's

15   another good question.  Does it take more than one person?

16   What's a live audience?

17        MR. FORRESTER:  Yeah.  I imagine at least one,

18   Your Honor.

19        Those are questions of interpretation that do remain

20   to be determined in the way we apply the law.

21        THE COURT:  Well, there are also questions of

22   vagueness and overbreadth of a statute, I think.

23        MR. FORRESTER:  Yeah, I just continue to think that

24   to say that this statute is vague in any respect is to suggest

25   that statutes like were upheld in Miller and Ginsberg and in

1   American Booksellers v. Webb also suffer from the same

2   infirmity.  They also use general phrases to describe both the

3   category of conduct that was of concern.  And then the

4   familiar three-part test for Miller that defines whether --

5   when that kind of conduct actually qualifies as obscene and

6   uses phrases like prurient, shameful, morbid.  You know, those

7   obviously come with a certain imprecision, but that's just

8   inherent in the nature of -- the standards of this nature.

9        I, again, just do not think the Florida statute here

10  is unique in this respect.  I think it represents a very

11  good-faith effort on the part of the State to tailor the

12  prohibition in this statute as closely as possible to what is

13  proscribable under these -- in these cases.

14       THE COURT:  With respect to these standards,

15  something that's patently offensive to prevailing standards in

16  the adult community of the state as a whole, how would a judge

17  go about determining that?

18       MR. FORRESTER:  I didn't quite hear, Your Honor.

19       I apologize.

20       THE COURT:  Sometimes I don't speak into the mic.

21       Part of the standard, the obscenity standard, is

22  something that's patently, which means obviously, offensive to

23  prevailing standards in the adult community of the state as a

24  whole with respect to what is suitable material for the age of

25  the child.

1          And I'm sitting up here thinking, How in the world

2     would I -- if I were trying a criminal case -- would I know

3     where that line is?  Am I in Key West or am I in Jacksonville?

4     Am I in Miami Beach or am I in Pensacola?

5          MR. FORRESTER:  I understand the concern,

6     Your Honor.

7          I believe in the America Booksellers v. Webb case,

8     they said that the first two of the three prongs of the Miller

9     test that was used in a modified form in the Georgia statute

10    in that case would assess prurience and patent offensiveness

11    by what the average member of that -- of the adult community

12    would consider it to be.

13         THE COURT:  Which is?

14         MR. FORRESTER:  And that would be the measure

15    that --

16         THE COURT:  But that would require a very

17    sophisticated statistical survey, I would think.

18         MR. FORRESTER:  Well, there's an element of judgment

19    inevitably involved in this.  I mean, I can't deny that.

20         But again, it just is endemic to statutes of this

21    nature.  The Florida statute is not unique in this respect.

22    You could take issue with nearly every obscenity statute that

23    has been passed in the wake of the Supreme Court decisions

24    from the '60s and '70s --

25         THE COURT:  I'm not trying to do that.

1       MR. FORRESTER:  -- on grounds like these.

2       THE COURT:  Okay.  Well, I'm sorry.  I didn't mean

3  to interrupt you.  I just -- I had these concerns and so I

4  thought I would --

5       MR. FORRESTER:  No.  I appreciate it, Your Honor.

6  It's helpful to focus the argument.

7       I would like to address standing, although it does

8  -- it sounds like Your Honor is skeptical of our standing

9  argument, but we do believe there is a serious standing

10  problem here.

11       THE COURT:  Okay.  Go for it.

12       MR. FORRESTER:  Opposing counsel correctly stated

13  what the applicable standard is under Driehaus.  There has to

14  be -- the plaintiff has to allege conduct that is at least --

15  or state an intention to engage in conduct that is at least

16  arguably proscribed by the statute.  And that does set a

17  bound.  You can't concoct an implausibly expansive

18  interpretation of the statute, say that that applies to your

19  conduct, then use that to bootstrap yourself into standing.

20       And in the way the plaintiff seems to characterize

21  the statute in this case as giving rise to their alleged

22  injury, in fact, is that it would have the effect of barring

23  even shows like I Love Lucy or Milton Berle comedy sketches.

24  And that is simply not the case.  That is not even an arguable

25  reading of the statute.

1     This is true even if they're invoking the

2  overbreadth standing doctrine, because the Eleventh Circuit

3  has made clear that to invoke the overbreadth standing

4  doctrine, you still have to point to an injury of your own.

5  It may arise from an entirely constitutional application of

6  the statute to you, but you have to show the statute applies

7  to you and would restrict your conduct.

8     And everything that they say in their complaint

9  indicates that nothing they do here would violate this

10  conduct -- violate this statute.  They insist that the

11  performances they host feature, quote, no lewd activity.

12  They evidently are able to determine what lewd means enough

13  to assert that they're not doing it.

14     No sexually explicit shows.  No disorderly conduct.

15  No public exposure.  No obscene exhibition or anything

16  inappropriate for a child to see.  And they say that if

17  entertainment were to cross a line and then become unsuitable

18  for a child, they would bar children from attending.  So they

19  profess an intention to steer well, well clear of any

20  violation of the Act.

21     And there's also a traceability and a redressability

22  concern with allowing such an implausibly expansive reading of

23  the statute to give rise to standing, because effectively what

24  they're saying is, We've chosen to take something of a

25  prophylactic approach to steer very, very far clear from

1   violating the statute, and then they are faulting the

2   defendants for that.

3          But there's nothing that defendants can do about

4   that kind of decision.  That is their prerogative, and that's

5   their right.  But it has to stem from at least an arguable

6   reading of the statute that would make the conduct that they

7   profess to engage in arguably proscribed.  And we just don't

8   see any way on the basis of the allegations in their verified

9   complaint that what they're saying is even arguably

10  proscribed.

11         THE COURT:  Okay.

12         MR. FORRESTER:  And as for -- and the same goes for

13  the argument of standing based on chill.  In a recent this

14  recent Equality Florida case, the Northern District of Florida

15  said, You can't demonstrate standing merely by announcing a

16  chill.  You must show that the challenged law arguably forbids

17  the chilled speech.  And --

18         THE COURT:  What case was that you're referring to?

19         MR. FORRESTER:  Equality Florida versus Florida

20  State Board of Education is a decision from 2022 in the

21  Northern District of Florida.  We cite it in our brief.

22         THE COURT:  Okay.

23         MR. FORRESTER:  And it's true that in the case that

24  opposing counsel cited, Driehaus -- Susan B. Anthony List

25  v. Driehaus -- the Supreme Court did allow standing to a

1    plaintiff who -- whose asserted injury was that they were
2    inhibited from making certain political statements because of
3    enforcement proceedings brought against other -- other
4    parties.  But the Court was clear, though, that the reason was
5    that the plaintiff had alleged an intent to engage in the same
6    speech.
7            And based on the statements in HM's verified
8    complaint, the performances that they say that are typical of
9    their venue, they're nothing like the performances that are
10   described in the administrative complaints, which we've
11   attached to the response for that reason.
12           There are other First Amendment issues that they
13   have raised.  I don't know if Your Honor wants me to go into
14   it, because Your Honor seems chiefly to be concerned with
15   content neutrality, overbreadth, and vagueness.  But they have
16   suggested, at least, that the Act is imbued with a viewpoint
17   discriminatory purpose, although they seem to be retreating
18   from that somewhat now by saying they're really not asking the
19   Court to look into legislative history.
20           But I do want to point out, the Eleventh Circuit has
21   taken a very dim view of the use of isolated lawmaker
22   statements to suggest a purpose to an otherwise
23   facially-neutral statute.  It has basically said, We
24   understand that a content-based purpose can be a basis for
25   invalidating a law, but you can't discern that by just picking

1    and choosing from legislative history.

2           And basically you have to engage in what is -- what

3    I gather from those cases is sort of a traditional analysis

4    of what the statute means from text structure.  And it may be

5    legislative history, you know, considered as a whole, but not

6    isolated statements of lawmakers.

7           And then finally, they also suggest that what really

8    is up here is an intent to target speakers based on their

9    identity, basically drag performers.  And that was a concern

10   that did come up in the Friend of George's case out of

11   Tennessee, which did actually have a list of the kinds of

12   performers that were subject to the prohibition there.

13          This statute doesn't have any such list.  It just

14   prohibits adult live performances.  It doesn't matter who is

15   performing it.  And we -- you know, we suggested, you know,

16   one example, a strip club risque patriotic performance that,

17   you know, is put on for service members or something like

18   that.  By its very operative effect, it is not targeting the

19   identity of any particular speakers.

20          THE COURT:  Well, my concern is it does that by

21   adding this lewd exposure of a prosthetic breast.  That, to

22   me, is specifically targeting something, a person wearing a

23   prosthetic breast, which, to me, is either a female who

24   medically requires one or someone performing in drag.

25          MR. FORRESTER:  But it has to be lewd, which, as

**34**

1    I've pointed out, does have a content that Florida law --

2              THE COURT:  I understand that.

3              MR. FORRESTER:  And it still has to satisfy the

4    three-part obscenity test.  So it's not just any --

5              THE COURT:  No, I understand that.  But there's no

6    question to me that this targets a drag performance and puts

7    them on notice that they are now subject to these standards.

8              MR. FORRESTER:  I would, you know, respectfully

9    disagree and say it may cover drag performances but it's by no

10   means limited to drag performances.

11             THE COURT:  Who else would it cover?

12             MR. FORRESTER:  Anybody who would, you know, choose

13   to wear prosthetic genitalia, I suppose, and do so in a way

14   that was, you know, in the face of a child at a particular

15   establishment.  I mean, it doesn't have to be somebody who is

16   of a particular sexual orientation, particular sexual

17   identity.  It doesn't have to be someone who identifies as

18   male or female.  I mean, it could be anybody.

19             It would be -- I mean, it's hard for me to

20   hypothesize what -- you know, circumstances in the world would

21   lead somebody to do that, but it's certainly possible.  And it

22   falls within a rationale which is itself viewpoint neutral,

23   which is based on the concern that that's just not the kind of

24   thing to do in the presence of a child.

25             THE COURT:  Okay.

1        MR. FORRESTER:  And unless Your Honor has further

2   questions along these lines, I would be happy to --

3        THE COURT:  I think they have some suggestions for

4   you.

5     (Pause in proceedings; confers with co-counsel.)

6        MR. FORRESTER:  I'm not going to pretend like this

7   thought came from me when it came from my co-counsel, but he

8   wanted -- suggested, I think cogently, that I point out that,

9   of course, the lewd exposure of prosthetic genitalia is only

10  part of a larger category of proscribed conduct, including the

11  sexual conduct that is defined specifically by statute.

12       And all it is doing, when the statute is read as a

13  whole, is ensuring that drag performances are not excluded,

14  that they are included but it is not, by no means, targeting

15  because it's making clear that if they do that, that they

16  might be within the proscription of the earlier statutes.

17       THE COURT:  Okay.

18       MR. FORRESTER:  Your Honor also raised a question

19  about the state attorneys or the attorney general.  They're

20  simply not defendants here so --

21       THE COURT:  I understand, but -- I'll deal with that

22  later if need be.

23       MR. FORRESTER:  Okay.  As a matter of -- there's a

24  lot of case law to indicate that the attorney general is not

25  the officer in Florida charged with enforcing statutes of this

1    nature.  It is the state attorney.

2           I was going to make an argument as to why the

3    governor didn't fall within Ex Parte Young.  That's been

4    mooted by Your Honor's introductory remarks.  But that would

5    also apply to the attorney general.  I think the attorney

6    general is not the one specifically who has the direct

7    connection to enforcement of the statute.  So it wouldn't be

8    appropriate, at the very minimum, to include the attorney

9    general in any such injunction.  But in any event, neither the

10   attorney general nor the state attorney is a defendant to this

11   case, like was the case in the Friend of George's case.

12           THE COURT:  And I understand.

13           Well, I think Mr. Timmons commented on that, that an

14   injunction by a federal judge ruling a particular statute

15   unconstitutional, I don't know many state attorneys would try

16   to bring a lawsuit until that was overturned.  So I suspect

17   that's not a real concern.

18           MR. FORRESTER:  Okay.  Well, thank you, Your Honor.

19           THE COURT:  Okay.  Thank you, sir.  I appreciate you

20   coming down.

21           MR. TIMMONS:  Thank you, Your Honor.

22           I do want to -- just so everybody is clear, we may

23   amend to add the state attorney as a defendant.

24           Ms. Stewart and I were brought on to this case a

25   little bit late in the game and originally were asked just to

1    do some back office work.  Mr. Israel, the attorney who was to

2    be lead counsel, had a medical condition that caused him to

3    have to have surgery on short notice, and he asked us to take

4    over completely.

5           As a result of that, we may make some decisions to

6    amend and add additional defendants.  But, obviously, that's

7    not before the Court right now.  And I don't expect my

8    opposing counsel to have to argue against things that we might

9    do in the future.

10          I want to address this obscenity -- this so-called

11   obscenity standard that's built into the statute.  I've heard

12   this referred to as a modified Miller test or a Miller for

13   minors.  It's not an obscenity standard.

14          It looks a lot like the obscenity standards set out

15   in Miller, but it isn't, because it changes the standard that

16   Miller sets forth and adds the term "for minors" to it.  That

17   renders the statute intrinsically a content-based regulation,

18   because it pulls that definition back from the line of pure

19   obscenity, which is unprotected speech, and moves it into the

20   realm of speech that is protected, that is at least

21   permissible for adults to engage in.

22          Now, the State certainly has a compelling

23   governmental interest in protecting children, no question

24   about that.  But any content-based speech regulation must be

25   narrowly tailored to achieve that compelling governmental

1   interest in order to survive strict scrutiny.

2          My co-counsel referred to this statute as requiring

3   an element of judgment and suffering from an inherent level of

4   interpretation that he described as endemic to statutes of

5   this nature.  It's endemic to statutes of this nature

6   because -- and you see this in a lot of different states',

7   you know, obscenity for minors laws, like display statutes

8   relating to pornography and things like that.

9          You will see states attempt to just insert the

10  Miller test as it's laid out in Miller and then add the word

11  "for minors," and then say, Okay, law enforcement can enforce

12  -- can stop any conduct or any speech that falls into this

13  category of what lawyers frequently term obscenity for minors.

14         That's not how Miller is supposed to work.  Miller

15  proscribes conduct, clearly defined conduct.  It doesn't say

16  you can just cut and paste the language from Miller and say,

17  Any conduct that falls into this category.

18         Miller is meant to be applied to statutes, not on a

19  case-by-case basis to an individual's speech.  That gives law

20  enforcement officers too much of that element of judgment such

21  that they can do anything we -- that they want.

22         My opposing counsel, respectfully, struggled

23  somewhat to give Your Honor a definition of lewd that could

24  mean anything.  The term "wicked" popped up.  You know, what

25  is wicked conduct?  You know, I think we all might have an

1   idea, but I think all of our ideas probably vary somewhat.

2          This is, again, really the sort of thing that

3   parents are supposed to deal with.  In fact, Your Honor

4   brought up the Florida Parental Rights statute.  That bill of

5   rights contains a right to direct the upbringing and the moral

6   or religious training of his or her minor child.  So Florida

7   clearly contemplates that that type of moral decision-making

8   belongs to parents, not to the State.

9          Let's see here.

10      (Brief pause.)

11         Let me go back just a moment to the discussion of

12  why Miller is supposed to apply to statutes that clearly

13  define proscribed conduct.  Reno versus ACLU, that's a 1997

14  Supreme Court case that addressed the CDA, the Communications

15  Decency Act, and struck down provisions of that law.

16         The court said, The second prong of the Miller test,

17  the purportedly analogous standard, contains a critical

18  requirement that is omitted from the CDA that the proscribed

19  material be specifically defined by the applicable state law.

20  This requirement reduces the vagueness inherent in the

21  open-ended term "patently offensive," as used in the CDA.

22  Moreover, the Miller definition is limited to sexual conduct,

23  whereas the CDA also extends to include -- so on and so forth.

24  That's not really the issue here.

25         But the Reno court clearly understood that the

1   Miller test was not to be handed out as an open-ended tool for

2   law enforcement to use to proscribe whatever conduct they

3   deemed patently offensive or, here, lewd, but is to be used by

4   courts to determine the validity of statutes that proscribe

5   specific conduct with particularity.

6           My opposing counsel described our construction of

7   the statute as implausibly expansive.  It appears that it's --

8   the very fact that we're having this discussion and that

9   it's -- that the conduct that we're talking about is not

10  clearly and specifically defined, it gives law enforcement the

11  ability to make whatever expansive definition of lewdness they

12  wish to.

13          My opposing counsel mentioned -- and I don't know

14  where this came from -- sketches like Milton Berle or I Love

15  Lucy.  Hamburger Mary's, to be very clear, has two separate

16  categories of performances.  There are 18 and up shows now.

17  As a result of this statute, there are shows that are 18 and

18  up, which are probably appropriate for older minor children.

19  They are certainly not appropriate for five-year-olds.

20          This law requires Hamburger Mary's to either make

21  those performances 18 and up or to assume that every minor

22  that comes into -- that anybody coming into the establishment

23  might be a young minor, because they've got to make those

24  performance decisions in advance.

25          If a parent comes in the door with their

1    five-year-old, does Hamburger Mary's have to stop all the

2    performances and make sure that they're now tailored to

3    children?  The real answer is, No, they just have to become an

4    18 and up establishment to do drag performances.

5            And when they did that -- as put out in paragraph 43

6    of our verified complaint, when they did that, they lost

7    20 percent of their bookings.  They lost 20 percent of their

8    bookings for the next show.

9            It shouldn't be incumbent on businesses to inquire

10   into the age of every single person who comes into their

11   establishment and then try to guess at what Floridians as a

12   whole think is appropriate for a five-year-old, a

13   ten-year-old, a 16-year-old, what have you.

14           When a statute is subject to strict scrutiny under

15   the First Amendment, it is not incumbent on the plaintiff to

16   prove that the statute is not narrowly tailored.  It is

17   incumbent on the defendant to prove that the statute is

18   narrowly tailored.  That's their burden to prove.

19           And the defendant has put forward no argument as to

20   why the statute is narrowly tailored.  Instead, the defendant

21   has ignored questions like, Why is there not a parental

22   consent affirmative defense?

23           That type of defense existed in the CDA,

24   Communications Decency Act.  It existed in COPA, the

25   Children's Online Protection Act.  Both of those statutes were

1    struck down even though they did contain certain affirmative

2    defenses, specifically including one for parental consent.

3           The State relies heavily on the Ginsberg opinion.

4    I'd note that Ginsberg, while not having been explicitly

5    overturned, pre-dates the Miller case and, thus, the Miller

6    test.  It pre-dates Reno.  It pre-dates Ashcroft.

7           Every single case addressing these issues of

8    obscenity and the protection of children from indecent

9    material is post-Ginsberg and essentially modifies the

10   Ginsberg standard.  Yes, states have a valid interest in

11   protecting minors from indecent material, but they have to do

12   so in a narrowly-tailored fashion.  And that's what every

13   post-Ginsberg case says.

14          Opposing counsel referenced a 1971 Florida Supreme

15   Court case that appeared to place some definition on lewdness.

16   I'd note, again, that pre-dates Miller.  It pre-dates

17   Ginsberg.  It pre-dates Ginsberg, pre-dates Miller,

18   pre-dates every other case referenced.  So a Florida Supreme

19   Court case from 1971 that does not even apply those modern

20   standards is probably not of very much utility.

21          The question of parental rights should also be taken

22   into account by the Court when dealing with the issue of

23   narrow tailoring.  The State should have included, if they

24   were going to try to -- first, they should have included a

25   definition of lewd conduct.  They should have been very clear

1   about what they meant.

2        Second, they should have included affirmative

3   defenses for parental consent.  They did include an

4   affirmative defense for the ignorance of a child's age.

5   However, they didn't do so in a way that actually protects --

6   I'm sorry.  It included a knowing requirement, a mens rea

7   requirement as to the child's age, but then included a

8   prohibition on using a person's ignorance of a child's age, a

9   child's misrepresentation of his or her age, or a bona fide

10  belief of a child's consent may not be raised as a defense in

11  a prosecution for a violation of this section.

12       That puts businesses in an awfully awkward position.

13  They have to not only -- they have to guess at the ages of

14  every single person who comes in, and they can't even argue

15  that somebody provided a fake ID or something to that effect.

16       If we, as attorneys, cannot agree today on a

17  definition of lewd conduct or lewd exhibition that gives

18  meaningful guidance on how a court should interpret the

19  statute, it is absolutely implausible that we could rely on

20  law enforcement officers who have high school or maybe some

21  level of college education to interpret this statute in a way

22  that is even-handed, fair, and conforms to the First

23  Amendment's requirement of narrow tailoring whenever a

24  content-based regulation impacts free speech.  And if the

25  Court does not have any questions, I'll conclude.

1          THE COURT:  No.  I don't think so.  Thank you, sir.

2          MR. TIMMONS:  Thank you, Your Honor.

3          THE COURT:  Mr. Forrester, I'll give you the final

4    few minutes if you need them.

5          MR. FORRESTER:  Thank you, Your Honor.

6          THE COURT:  You know, one thing Mr. Timmons just

7    mentioned is interesting.  Florida Statute 847.013, which

8    would apply to letting minors into an R-rated movie, for

9    example, or any other sort of presentation that contains

10   obscenity, as a parental -- it says, The paragraph does not

11   apply to a minor when the minor is accompanied by his or her

12   parents.  So there -- Florida already recognizes that with

13   respect to one aspect of this problem, it's the parent that

14   should decide what's appropriate for their child, not the

15   State of Florida, it seems.  But anyway, that's just an

16   observation.

17         MR. FORRESTER:  Yeah, that is a point I wanted to

18   address.  It's not at all clear that a parental consent

19   defense is compelled by the First Amendment.  I had mentioned

20   this earlier.  That seems to sound in a Fifth Amendment

21   substantive due process, parental right to direct upbringing

22   of a child claim.

23         It is true that in -- actually in Ginsberg, the

24   statute there that prohibited sales of obscene material to

25   minors didn't prevent an adult from bringing the same material

1   home and showing them to their child.  And that was an

2   observation that was made later by the court, the Supreme

3   Court, in ACLU v. Reno.  But these were passing remarks as

4   part of -- at least in the Reno case -- as part of several

5   grounds of potential distinction.

6           And in American Booksellers v. Webb, the Eleventh

7   Circuit case which upheld that the Georgia statute that

8   prohibited display of materials under a test very much like

9   this that was geared to what would be obscene for minors,

10  there was no parental consent defense there either.  So we

11  don't think it's at all clear that that is required.

12          And as for the innocent mistake defense, the State

13  would still bear the burden in its case in chief of showing

14  that the admission of a child was knowing and that at least

15  requires reason to have inquired and investigate.  And if

16  somebody had inquired and investigated and determined

17  reasonably that the child doesn't appear to be that age, they

18  wouldn't be -- the State wouldn't be able to make out a prima

19  facia case.  The lack of that defense wouldn't affect the

20  application of that knowing standard.  And that knowing

21  standard also comes directly out of Ginsberg.  It tracks the

22  language of Ginsberg almost directly.

23          I do want to also address the assertion that we

24  haven't made an argument that the statute is not narrowly

25  tailored.  We most definitely have.

1          We, again, have pointed out that this -- nothing in

2     the statute does anything to actually prevent any of these

3     adult live performances from taking place or for the adults to

4     have access to them.  It merely denies admission of children

5     to them.

6          This is -- it's different critically from that

7     Tennessee statute in Friend of George's, which actually said,

8     You just can't put on -- I think the phrase there was -- adult

9     cabaret entertainment in any public place and any place where

10    a child could see it.  It was much broader, and it was an

11    actual prohibition on the performance ever occurring to begin

12    with.  That is not the case here.

13         So we believe this is, in fact, precisely tailored

14    to the State's interest, as opposing counsel concedes, which

15    is compelling in preventing children from exposure to

16    materials which is obscene as to them.

17         I would also point out the Chesebrough case, which

18    is from 1971.  It carries forward.  That is used as a jury

19    instruction.  You can look it up online.  But it's -- that

20    exact phrasing is still used in instructions to the juries on

21    what it means for there to be lewd and lascivious conduct

22    under the criminal statutes.  So it definitely has carried

23    forward to the present day.

24         It doesn't bear the characteristics of the statute

25    in ACLU v. Reno, which used the word "indecent," which was a

1  term that the Congress had come up sort of out of nowhere with

2  no definition, but no sort of common law or other statutory

3  backdrop to give it content.  I mean, there is definitely

4  longstanding content to the word "lewd" as a matter of Florida

5  law.

6          And I also want to say, finally, that if this Court

7  is inclined to grant a preliminary injunction, we would ask

8  that it be confined only to these plaintiffs.  The Eleventh

9  Circuit has, I believe, just yesterday enjoined an order in a

10 Southern District of Florida case that applied to more than

11 just the plaintiffs in that case.  And we think it would be

12 inappropriate to grant an injunction that would be -- that

13 would apply to all the establishments in the case instead of

14 just the plaintiffs in this case.

15         And I have nothing further, Your Honor.

16         THE COURT:  Okay.

17         MR. TIMMONS:  Your Honor, can I speak to just that

18 very last point, because it wasn't raised previously in

19 argument?

20         THE COURT:  Sure.

21         MR. TIMMONS:  That was the same request that the

22 Tennessee attorney general made at the very end of their

23 argument in the Friends of George's case, that the injunction

24 be confined to only the plaintiffs in this case.

25         THE COURT:  Yeah.  But there, the defendant was just

1    that state attorney, right?

2          MR. TIMMONS:  Correct.  But the injunction -- the

3    request is an odd one.  To determine that a statute is

4    unconstitutional and then only enjoin its application to one

5    particular defendant belies any understanding of how

6    constitutional arms function.

7          If you were enjoining somebody -- and this was

8    Judge Parker's observation.  Maybe if I were enjoining

9    somebody from burning trash on somebody else's property, that

10   might make some sense.  But I don't see how that can apply in

11   the First Amendment context.  And we challenged the State to

12   find any case in which a First Amendment injunction had been

13   rendered in that context, and they were unable to produce any.

14   So --

15         MR. FORRESTER:  Your Honor, as I understand it, the

16   case that I mentioned, the Garcia case --

17         THE COURT REPORTER:  Please adjust the microphone.

18     (Counsel adjusts microphone.)

19         MR. FORRESTER:  The Garcia case that I just

20   mentioned, it was a First Amendment case.  And I'll give you

21   the -- I'll give you the case number, at least.  I don't have

22   a Westlaw cite.  Number 23-10872.  Thank you.

23         THE COURT:  One-zero what?

24         MR. FORRESOTER:  10872.

25         THE COURT:  And that's the Southern District of

1    Florida case?

2           MR. FORRESTER:  It's the Eleventh Circuit.  It was

3    the one that just stayed the -- it was out of the Southern

4    District, and the Eleventh Circuit just stayed that

5    injunction.

6           THE COURT:  Okay.  I'll take a look at it.

7           All right.  Well, unless there's something else that

8    somebody feels compelled to comment on, I want to thank you

9    all for being here on short notice and giving your arguments.

10   I've got a lot here to review, obviously.

11          Are you all inclined to order a transcript?

12          It would help me to have a transcript of this.

13          MR. TIMMONS:  If it would help the Court, then,

14   certainly, Your Honor.

15          THE COURT:  All right.

16          Can the State of Florida afford to pay half of it?

17          MR. FORRESTER:  Sure.

18          THE COURT:  Okay.  All right.  And then I may get

19   another paper from the plaintiffs with respect to the motion

20   to dismiss.  So I'll try to get an order out as soon as

21   reasonably possible.

22          MR. TIMMONS:  We'll have that in as quickly as

23   possible for you, Your Honor.

24          THE COURT:  Okay.  Thank you.

25       (Adjourned at 2:48 p.m.)

50

1                    *       *       *       *

2                Certificate of Official Reporter

3    I certify that the foregoing is an accurate transcript of the

4    record of proceedings held in the above-entitled matter.

5

     Koretta Stanford
6    _____
     Official Court Reporter
7    United States District Court
     Middle District of Florida       Date:  07/27/2023
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25