### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

|  |  |
|---|---|
| HM FLORIDA-ORL, LLC, <br><br>      Plaintiff, <br><br>        v. <br><br> MELANIE GRIFFIN, in her official capacity as Secretary of the Department of Business and Professional Regulation, State of Florida, <br><br>      Defendant. | Case No. 6:23-cv-00950-GAP |

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant Melanie Griffin respectfully moves that this Court grant summary judgment and dismiss the complaint of plaintiff HM Florida-ORL, LLC ("Hamburger Mary's"). In its complaint, Hamburger Mary's seeks an injunction against enforcement of Florida's Protection of Children Act, Fla. Laws ch. 2023-94, alleging that the Act is unconstitutional. But Hamburger Mary's still has not marshaled evidence—as is its burden—to show injury in fact that is traceable to the Act, for purposes of Article III standing. The Act furthermore complies with the First Amendment and is not void for vagueness, both facially and as applied to Hamburger Mary's.

To be considered a restriction on the speech rights of adults, the Protection of Children Act would have to either (1) prevent adults from hosting or participating in sexually explicit live performances or (2) prevent adults from viewing sex-

ually explicit live performances. The Act does neither. Adult proprietors and entertainers at Hamburger Mary's can continue with all their live performances—and adult patrons can continue to attend those live performances—without the slightest interference.

The only thing Hamburger Mary's cannot do is admit children for whom the live performances would be obscene. But Hamburger Mary's does not have such a right, any more than adults have a right to admit other adults to live performances that are obscene for adults. The Protection of Children Act thus affects no First Amendment rights of adults, not even at the margins.

The Act affects only the rights of children. And because it prevents children from viewing only those live performances that would be obscene for them, it applies only to speech that is beyond the protection of the First Amendment. It is therefore not subject to strict or indeed any kind of heightened scrutiny.

Finally, Hamburger Mary's cannot show that the Act is void for vagueness. Hamburger Mary's has centered its claim of vagueness on the Act's use of the word "lewd" to describe activity that would—if it rose to the level of obscenity under the Act's three-part age-variable test—require the exclusion of children. But "lewd" is a word of longstanding common-law and statutory usage. If "lewd" is vague, so are scores of statutes that have governed private conduct without constitutional controversy for decades.

For all these reasons, this Court should grant the Secretary's motion for summary judgment and dismiss Hamburger Mary's complaint.

## PROCEDURAL BACKGROUND

On May 22, 2023, five days after the Protection of Children Act was signed into law, Hamburger Mary's filed a verified complaint against the Secretary under 42 U.S.C. §§ 1983 and 1988. DE1 at 1, 9. In that complaint, Hamburger Mary's challenged the Act on First Amendment free-speech and Fourteenth Amendment void-for-vagueness grounds. DE1 at 9–20. As relief, Hamburger Mary's sought to enjoin, preliminarily and permanently, most of the operative provisions of the Act. DE1 at 20; DE6 at 1.

On June 23, 2023, this Court granted the preliminary injunction and denied the Secretary's motion to dismiss. DE29; DE30. This Court then granted Hamburger Mary's leave to amend its complaint, which Hamburger Mary's did on August 11, 2023. DE51. In that complaint, which was not verified, Hamburger Mary's continued to press its First Amendment free-speech and Fourteenth Amendment void-for-vagueness claims.

Discovery closed on January 30, 2024.

## STATEMENT OF MATERIAL FACTS

1.   The Protection of Children Act makes it a misdemeanor to "knowingly admit a child to an adult live performance." Fla. Stat. § 827.11(3), (4).

2.   The Act defines an "adult live performance" as "any show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual

activities as those terms are defined in s. 847.001, lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts," when that performance

> 1. Predominantly appeals to a prurient, shameful, or morbid interest;
>
> 2. Is patently offensive to prevailing standards in the adult community of this state as a whole with respect to what is suitable material or conduct for the age of the child present; and
>
> 3. Taken as a whole, is without serious literary, artistic, political, or scientific value for the age of the child present.

Fla. Stat. § 827.11(1)(a).

3. Plaintiff HM Florida-ORL, LLC operates a restaurant and bar with a liquor license in Orlando called "Hamburger Mary's," at which it hosts drag shows throughout the week. DE1 at 2, 6.

4. Until March 2020, when the COVID-19 pandemic hit, Hamburger Mary's required its drag entertainers to sign a contract with restrictions on their conduct. Paonessa Depo. (attached), Ex. 5 (Entertainer Agreement).

5. One restriction was that there be no exposure of "certain anatomical areas" at any time. *Id.*, Ex. 5, at HM_000004.

6. "Certain anatomical areas" was defined to include "[l]ess th[a]n completely and opaquely covered human genitals, pubic region, buttocks, anus or female breasts below a point immediately above the top of the areola," and "[h]uman male genitals in a flaccid state or in discernibly turgid state, even if completely and opaquely covered." *Id.*, Ex. 5, at HM_000003.

7. Another restriction was that there be no performance of "certain sexual activities at any time." *Id.*, Ex. 5, at HM_000004.

4

8.   "Certain sexual activities" was defined to include "[t]he fondling, exposing or touching of human genitals, pubic region, buttocks, anus or female breast"; "[s]ex acts, normal or perverted, actual or simulated, including intercourse, oral copulation or sodomy"; "[m]asturbation, actual or simulated"; and "[e]xcretory functions as part of, or in connection with any of the activities set forth" previously. *Id.*, Ex. 5, at HM_000003.

9.   Hamburger Mary's also prohibited performers from performing lap dances. *Id.*, Ex. 5, at HM_000004.

10.   When it resumed operations after the temporary shutdown during the COVID-19 pandemic, Hamburger Mary's no longer required drag performers to sign this contract, but posted equivalent house rules in the dressing room and verbally communicated these restrictions to the performers. Paonessa Depo. (attached) at 37–42; *id.*, Ex. 6, at HM_000005 (House Rules); *id.*, Ex. 1, at 9 (First Supplemental Responses to Interrogatories).

11.   Those house rules again required that there be "no exposure or nudity of any kind"; "no lap dances or touching of the guests at any time"; and no conduct "deemed unprofessional or inappropriate" by the on-site proprietor of Hamburger Mary's, John Paonessa. *Id.* at 41–42; *id.*, Ex. 6 at HM-000005.

12.   Until April 2023, Hamburger Mary's had a policy of not allowing children to attend its drag shows unless accompanied by an adult. *Id.*, Ex. 1, at 5.

13. Hamburger Mary's did so because its shows sometimes featured "language and sexual innuendo and provocative outfits" that in its estimation could push the shows to the rough equivalent of an R-rated movie. *Id.* at 47.

14. In April 2023, Hamburger Mary's changed its policy to exclude children from all shows except the "family-friendly Sunday Broadway Brunch," which children could still attend if supervised by an adult. *Id.*, Ex. 1, at 5.

15. At these Sunday shows, "[t]here is no lewd activity, sexually explicit shows, disorderly conduct, public exposure, obscene exhibition, or anything inappropriate for a child to see." DE1 at 6.

16. That April 2023 policy change resulted from "an abundance of caution given the political climate around drag shows in the state." Paonessa Depo., Ex. 1, at 4.

17. The Protection of Children Act (Fla. Laws ch. 2023-94 (SB 1438)) had not yet passed and did not pass until May 17, 2023.

18. Following passage of the Act, Hamburger Mary's changed its policy again to make all shows, including the Sunday brunch, "strictly 18+ without an adult supervision exception." Paonessa Depo., Ex. 1, at 5.

19. Hamburger Mary's maintained that policy until this Court preliminarily enjoined enforcement of the Act on June 23, 2023. *Id.* at 5–6; DE29.

20. At that point, Hamburger Mary's reverted to its original policy of allowing children to attend all shows if accompanied by an adult. Paonessa Depo., Ex. 1, at 6.

## MEMORANDUM OF LAW

### LEGAL STANDARD

"Summary judgment is appropriate when the evidence," viewed in the light most favorable to the non-movant, "presents no genuine dispute of material fact and compels judgment as a matter of law." *Phillips v. Legacy Cabinets*, 87 F.4th 1313, 1320 (11th Cir. 2023). "A factual dispute is genuine if it has a real basis in the record and the evidence is such that a reasonable jury could rule in favor of the nonmovant." *Id.* A fact is material if it could affect the outcome of the suit. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

### ARGUMENT

## I. Plaintiff lacks standing to assert its First and Fourteenth Amendment claims.

To have standing, Hamburger Mary's must show "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). To date, HM has adduced no evidence that any content it features in its drag shows is even "arguably proscribed" by the Protection of Children Act. *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014). In its verified complaint, Hamburger Mary's went out of its way to assure that if "the entertainment is not suitable for children, children are not allowed to attend and the venue announces this in advance on their website and in their advertising." DE1 at 19. And

the restrictions that Hamburger Mary's places on its performers, *see supra* Statement of Material Facts ¶¶ 4–11, make it exceedingly unlikely that anything happening in the restaurant would rise to the level of being obscene for children under the age-variable standard set forth in the Act.

In April 2023, before the Act was even passed, Hamburger Mary's opted to take a prophylactic approach, preferring to "err on the side of safety" and make all shows 18+ except the family-friendly Sunday brunch. Paonessa Depo. at 24. It did so, as it says, "out of an abundance of caution given the political climate around drag performances in the state." *Id.*, Ex. 1, at 4. It was thus motivated not by the Act but by larger public-relations concerns predating the Act, which are not fairly traceable to any conduct by the defendant in her enforcement capacity as Secretary of the Department of Business and Professional Regulation. If Hamburger Mary's wishes to "err on the side of the safety," that is its prerogative, but the costs of so erring should not be borne by Secretary Griffin, particularly not in the form of a universal injunction that would protect even non-parties whose conduct, unlike Hamburger Mary's, may fall within the prohibition of the Act.

## II. Plaintiff's First Amendment claim fails because the Protection of Children Act applies only to unprotected speech, is not facially overbroad, and was not adopted for an impermissible purpose.

In its amended complaint, Plaintiff alleges that the Protection of Children Act violates the First Amendment because it (1) restricts speech based on its content and viewpoint; (2) is facially overbroad; and (3) was adopted for the impermissible purpose of targeting drag performers. DE51 ¶¶ 39, 42, 46. But no genu-

ine issue of material fact exists as to whether the Protection of Children Act violates the First Amendment. The Act regulates only unprotected speech—speech that is obscene for minors—and places no burden on speech that is protected for adults. For that reason, it does not impose a content- or viewpoint-based restriction on speech in violation of the First Amendment, nor does it prohibit a "substantial"—or indeed any—"amount of protected speech . . . relative to the statute's plainly legitimate sweep." *United States v. Williams*, 553 U.S. 285, 292 (2008) (facial overbreadth standard). Finally, the Legislature enacted the Protection of Children Act to comprehensively protect children from exposure to age-inappropriate sexually explicit live performances, in furtherance of the State's compelling interest in protecting the physical and psychological well-being of minors. This is a permissible and viewpoint-neutral purpose.

### A.    The Protection of Children Act restricts only the rights of children and does so only by preventing them from receiving unprotected speech.

The Protection of Children Act does not restrict the First Amendment rights of adults or children. It does not restrict the First Amendment rights of adults because it poses no obstacle to adult participation in or viewing of any "adult live performances." And it does not restrict the First Amendment rights of children because it prevents children only from viewing "adult live performances" that are obscene for those children. As a result, and as a matter of law, the Act is not subject to strict or indeed any kind of heightened scrutiny.

1. In *Ginsberg v. New York*, the Supreme Court upheld a New York statute using a "variable" obscenity standard, under which certain materials were deemed obscene for minors but not for adults. 390 U.S. 629, 635 n.4, 637 (1968). That statute prohibited selling to minors materials containing "nudity, sexual conduct, sexual excitement, or sadomasochistic abuse," when the representation

> (i) predominantly appeal[ed] to the prurient, shameful or morbid interest of minors, and

> (ii) [was] patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, and

> (iii) [was] utterly without redeeming social importance for minors.

*Id.* at 646. The Supreme Court declined to apply heightened scrutiny because "obscenity is not protected expression." *Id.* at 641. Five years later, the Court clarified that obscenity means speech that "appeals to the prurient interest"; "depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law"; and "lacks serious literary, artistic, political, or scientific value," when "the work" is "taken as a whole." *Miller v. California*, 413 U.S. 15, 24 (1973). And in *American Booksellers v. Webb*, the Eleventh Circuit upheld a Georgia statute modeled after *Ginsberg* and *Miller* that prohibited selling minors material containing "nudity, sexual conduct, sexual excitement, or sadomasochistic abuse," when the representation,

> (A) Taken as a whole, predominantly appeal[ed] to the prurient, shameful, or morbid interest of minors;

> (B) [Was] patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors; and
>
> (C) [Was], when taken as a whole, lacking in serious literary, artistic, political, or scientific value for minors.

919 F.2d 1493, 1513 (11th Cir. 1990).

The Protection of Children Act tracks the model approved in *Ginsberg*, *Miller*, and *Webb*. It makes it a misdemeanor to "knowingly admit a child to an adult live performance." Fla. Stat. § 827.11(3), (4). An "adult live performance" is

> any show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 847.001, lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts when it:
>
> 1. Predominantly appeals to a prurient, shameful, or morbid interest;
>
> 2. Is patently offensive to prevailing standards in the adult community of this state as a whole with respect to what is suitable material or conduct for the age of the child present; and
>
> 3. Taken as a whole, is without serious literary, artistic, political, or scientific value for the age of the child present.

Fla. Stat. § 827.11(1)(a). The only material difference between the Protection of Children Act and the statutes upheld in *Ginsberg* and *Webb* is that the Act's scope is narrower because it ties what is considered obscene—for the child alone—to the actual age of the child at the "adult live performance." Fla. Stat. § 827.11(1)(a)2., 3. Thus, the Act regulates speech that would be obscene for minors—speech that "[m]inors have no right to view or in any way consume"—in the

manner prescribed by the Supreme Court and the Eleventh Circuit. *Webb*, 919 F.2d at 1501.

Because the Act does not simultaneously regulate, or otherwise burden, speech that is protected for adults, it does not infringe the First Amendment rights of adults. By its terms, the Protection of Children Act's restrictions apply only to children. The Act does not prohibit any adult from (1) putting on what it defines as an "adult live performance" or (2) viewing an "adult live performance." The only restriction is that a child for whom the show would be obscene must be excluded from it. Fla. Stat. § 827.11(3). The show can otherwise go on without any change in content.

Hamburger Mary's itself has confirmed that the Act did not compel it to alter the content of its shows. In response to the interrogatory asking what activity Hamburger Mary's "ha[d] been prevented or otherwise deterred from engaging in as a result of [the Act]," Hamburger Mary's identified only that it was "unable to offer entry to any of its shows to persons under the age of 18." Paonessa Depo., Ex. 1, at 15. Because the Act suppresses no protected speech for adults, and restricts children only from receiving speech obscene for them, it is not content-based or subject to heightened scrutiny. *See Webb*, 919 F.2d at 1501 ("[A] state may, absent an impermissible burden on adults, deny minors all access *in any form* to materials obscene as to them."). The Protection of Children Act is thus unlike the Child Online Protection Act struck down in *Ashcroft v. ACLU*, which was deemed content-based and subject to strict scrutiny because it "effectively

suppresse[d] a large amount of speech that adults have a constitutional right to receive and address to one another." 542 U.S. 656, 665 (2004).

2. As a matter of law, the Protection of Children Act also does not burden the First Amendment rights of children. Like the Georgia law in *Webb*, the Act "employs a narrowly crafted *Ginsberg*-type adaptation of the current definition of adult obscenity announced in *Miller* . . . to determine whether material is harmful to minors." *Id.* at 1503. It prevents minors only from viewing performances obscene as to children of their age. "Minors," of course, "have no right to view or in any way consume . . . material[s] [obscene as to them]." *Id.* at 1501. Because the Protection of Children Act regulates only unprotected speech—speech obscene as to minors—it does not trigger First Amendment scrutiny. *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992) (content discrimination within a category of unprotected speech does not trigger strict scrutiny if that "discrimination consists entirely of the very reason the entire class of speech at issue is proscribable").

Even if the Act were subject to heightened scrutiny, it would survive it. There is no dispute that the State has a "compelling interest in protecting the physical and psychological well-being of minors." *Reno v. ACLU*, 521 U.S. 844, 869 (1997) (quoting *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989)). The only question then would be whether the Act is narrowly tailored to protect that interest. It is. In *Webb*, the appellees maintained that the Georgia law was "overly broad because it [did] not accommodate the differences between older and younger minors in maturity levels." 919 F.2d at 1504. While the Eleventh

Circuit rejected that challenge anyway, *id*. at 1504–05, the Protection of Children Act leaves no room for doubt by tying its variable-obscenity standard to the actual age of the child at the adult live performance. The Act requires the exclusion of a child from a performance that is "patently offensive" and lacks "serious literary, artistic, political, or scientific value for the age of the child present." Fla. Stat. § 827.11 (1)(a)2.–3. The Act thus resolves the concern that prohibiting minors from viewing materials obscene for minors as a whole may violate the First Amendment rights of older children, since what is obscene for a "five-year-old" might not be obscene for "a person just shy of age seventeen." *ACLU v. Ashcroft*, 322 F.3d 240, 254 (3d Cir. 2003), *aff'd*, 542 U.S. 656.

Narrow tailoring does not require a parental-consent exception. Whether material is obscene for a child does not depend on parental consent. Rather, it is tied to the community's standards, i.e., to "[w]hether the average person, applying contemporary community standards[,] would find that the work, taken as a whole, appeals to the prurient interest." *Ashcroft v. ACLU*, 535 U.S. 564, 574 (2002) (quotation omitted). This ensures that "material will be judged by its impact on an average person." *Id*. at 575. If, as the Supreme Court has acknowledged many times, the State has an independent "interest in protecting the physical and psychological well-being of minors," *Sable*, 492 U.S. at 126, it would make no sense to require an exception for parental consent. Obscene material is no less obscene just because a parent permits a child to view it. Indeed, including a parental-consent exception would "raise[] serious doubts about whether the gov-

ernment is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 802 (2011).

Further, the Supreme Court has never held that a law regulating obscenity for minors must have a parental-consent exception to avoid violating the First Amendment. *Ginsberg* did not require New York's statute applying a variable-obscenity standard to have such an exception; it merely noted that feature as limiting the restrictive impact of the statute. 390 U.S. at 639. Instead, it relied on the State's "independent interest in the well-being of its youth" to justify the statute's prohibition, an interest that again does not vary with an individual parent's permissiveness. *Id.* at 640. Similarly, the reason the Communications Decency Act did not pass constitutional muster in *Reno* was not that it lacked a parental-consent exception. The problem rather was that it "effectively suppresse[d] a large amount of speech that adults have a constitutional right to receive and address to one another." *Reno*, 521 U.S. at 874. Again, the Protection of Children Act poses no such concern.

Narrow tailoring also does not require that the Protection of Children Act be limited to commercial transactions. The Eleventh Circuit has made clear that under *Ginsberg*, "a state may, absent an impermissible burden on adults, deny minors all access *in any form* to materials obscene as to them." *Webb*, 919 F.2d at 1501. The State's interest in protecting the well-being of minors from speech obscene as to them does not depend on whether money changes hands. Were the

Act to apply only to commercial transactions, Hamburger Mary's no doubt would argue that it is under-inclusive. The statute would furthermore fail to protect children in circumstances where they are even more vulnerable because they face one less barrier—exchange of consideration—to being exposed to obscene live performances.

### B.    The Act is not overbroad and is constitutional on its face.

Because the Act does not restrict any adult speech and restricts children's access only to obscene material, it is constitutional on its face. It is not overbroad in the slightest, let alone in a "substantial number" of cases "relative to its plainly legitimate sweep"—as would be Hamburger Mary's burden to show in order to establish facial overbreadth. *Williams*, 553 U.S. at 292. But apart from all that, it is inappropriate even to consider the question of facial overbreadth in this case. The Supreme Court has said repeatedly that facial overbreadth is "strong medicine," *United States v. Hansen*, 599 U.S. 762, 769–70 (2023), which should be reserved for cases in which a statute is constitutional as applied to the plaintiff but unconstitutional as applied to non-party claimants. *Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484–85 (1989); *see also Broadrick v. Oklahoma*, 413 U.S. 601, 612–13 (1973) (overbreadth employed "only as a last resort"). Facial overbreadth is a special means of avoiding the prudential standing doctrine that plaintiffs may not challenge violations of others' constitutional rights. *See Hansen*, 599 U.S. at 769. It is not a license to strike down statutes in

their entirety when a plaintiff suffers constitutional injury from application of the statute. As-applied relief remains the ordinary course. *Fox*, 492 U.S. at 484–85.

If this Court disagrees with the Secretary's analysis in Part II.A and believes that the Protection of Children Act infringes the First Amendment rights of Hamburger Mary's, it will mean that this Court has determined the Act is unconstitutional as applied to Hamburger Mary's. That is precisely the circumstance in which the Supreme Court has warned against use of the facial overbreadth doctrine. If a court were "to proceed to an overbreadth issue unnecessarily—that is, before it is determined that the statute would be valid *as applied*," it "would convert use of the overbreadth doctrine . . . into a means of mounting gratuitous attacks upon state and federal laws." *Fox*, 492 U.S. at 484–85 (emphasis added). Consequently, unless Hamburger Mary's can show that "no set of circumstances exists under which the [Protection of Children Act] would be valid," *United States v. Salerno*, 481 U.S. 739, 745 (1987), or that the Act lacks "a plainly legitimate sweep," *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008), there is no ground to deem the statute facially invalid. *See Hansen*, 599 U.S. at 769 ("overbreadth challenge[s are] unusual" because "litigants mounting a facial challenge to a statute normally 'must establish that *no set of circumstances* exists under which the [statute] would be valid'" (quoting *Salerno*, 481 U.S. at 745)). Hamburger Mary's cannot come close to making either showing.

### C.    The Act does not have a viewpoint-based purpose.

"[W]hen a statute is facially constitutional, a plaintiff cannot bring a free-speech challenge by claiming that the lawmakers who passed it acted with a constitutionally impermissible purpose." *NetChoice, LLC v. Att'y Gen.*, 34 F.4th 1196, 1224 (11th Cir. 2022) (quoting *In re Hubbard*, 803 F.3d 1298, 1312 (11th Cir. 2015)), *cert. granted on other grounds sub nom. Moody v. NetChoice, LLC*, 144 S. Ct. 478 (2023). But even if it were appropriate to inquire into the purpose behind the Protection of Children Act, no genuine issue of material fact exists as to whether that purpose is viewpoint-based. The Protection of Children Act was passed to fill gaps in existing law and comprehensively prohibit exposing children to age-inappropriate, sexually explicit live performances. The Supreme Court has long recognized a state's "compelling interest" in "protecting the physical and psychological well-being of minors," including an interest in "shielding" minors "from indecent messages that are not obscene by adult standards." *Reno*, 521 U.S. at 869–70 (quoting *Sable*, 492 U.S. at 126). The Act is meant to fulfill that interest, not to target drag performances.

Prior to the Act's passage, other Florida statutes did protect children from sexually explicit performances and materials, but each had a limited scope. Section 847.013(3)(a), for example, makes it a misdemeanor to knowingly admit a minor to "a motion picture, exhibition, show, representation, or other presentation which, in whole or in part, depicts nudity, sexual conduct, sexual excitement, sexual battery, bestiality, or sadomasochistic abuse and which is harmful to mi-

nors," as defined in section 847.001(7). But section 847.013(3)(a) applies only when the minor is admitted in exchange for consideration. Another statute, section 800.04(7), makes it a felony to engage in a "lewd or lascivious exhibition" in the presence of a child under 16. But it limits "lewd or lascivious exhibition" to lewd exposure of genitals and certain live or simulated sex acts, like masturbation or bestiality. *See, e.g.*, *Lowe v. State*, 40 So. 3d 789, 792 (Fla. 5th DCA 2010). It also imposes criminal responsibility only on those who expose themselves to children and not on those who knowingly admit a child to such exposure.

Now, the Protection of Children Act makes it a first-degree misdemeanor to "knowingly admit a child to an adult live performance," Fla. Stat. § 827.11 (3), (4), using the aforementioned variable-obscenity standard derived from *Ginsberg*, *Miller*, and *Webb*. As a result, protecting children from age-inappropriate, sexually explicit live performances in Florida is no longer contingent upon the exchange of consideration, nor limited to the display of genitals or certain sex acts. And to evaluate the propriety of the exposure, a jury must now specifically consider the age of the child present. The "harmful to minors" standard used in earlier Florida statutes treated children as an undifferentiated whole. *See* Fla. Stat. § 847.001(7).

The Act should not be deemed to target drag performers simply because it includes the "lewd exposure of prosthetic or imitation genitals or breasts" among the host of sexually explicit activities to which children may not be exposed when those activities would be obscene for them. Rather, the inclusion ensures that this

19

kind of performance, when it rises to the level of being obscene for a child, is not omitted from the larger array of performances to which a child should not be exposed. The Act seeks merely to remedy the under-inclusiveness of the existing statutory scheme and to protect children from exposure to obscene live performances, no matter who performs them or what social viewpoint they seek to convey. In short, the Act's purpose also does not justify the application of heightened scrutiny, which as already discussed the Act would survive in any event.

### III. Plaintiff's Fourteenth Amendment claim also fails as a matter of law because the Act is not vague.

In its amended complaint, Plaintiff alleges that the Protection of Children Act also violates the Fourteenth Amendment because it "is unconstitutionally vague." DE51 ¶ 49. Hamburger Mary's asserts that "it is impossible to determine from the text of the statute what conduct is prohibited" because it does not define "lewd conduct" or "lewd exposure." DE51 ¶¶ 49–51. But no genuine issue of material fact exists as to whether the Act is vague because (1) the word "lewd" is one of longstanding usage both in criminal statutes and at common law and (2) the Act has a mens rea requirement, which the Supreme Court and the Eleventh Circuit have repeatedly said will serve in most cases to address any concerns about vagueness.

"[A] statute is not ambiguous merely because it contains a term without a statutory definition." *United States v. Sepulveda*, 115 F.3d 882, 886 n.9 (11th Cir. 1997). Here the term—"lewd"—is one of longstanding usage in criminal law. *See,*

*e.g.*, *Chesebrough v. State*, 255 So. 2d 675, 677 (Fla. 1971) ("'Lewd' and 'lascivious' are words in common use, and the definitions indicate with reasonable certainty the character of acts and conduct which the Legislature intended to prohibit and punish, so that a person of ordinary understanding may know what conduct on his part is condemned."); *id.* at 678 ("Lewdness, or open and public indecency, were offenses even at common law."). The Florida Supreme Court has stated that "when used in a statute to define an offense," "lewd" and "lascivious" each means "an unlawful indulgence in lust, eager for sexual indulgence." *Id.* at 677.

Consistent with *Chesebrough*, the Florida Supreme Court's jury instructions define "lewd" and "lascivious" to mean "a wicked, lustful, unchaste, licentious, or sensual intent on the part of the person doing an act." Fla. Bar, Criminal Jury Instructions § 11.10(d), https://tinyurl.com/3pu2tcvv (last accessed Feb. 29, 2024). And the word "lewd" appears throughout the Florida criminal code.[1] It appears in numerous federal[2] and state[3] statutes as well and has been held appropriate to define the kind of conduct that could be considered obscene if it

---

[1] *See, e.g.*, Fla Stat. §§ 787.01(3)(a)3., 787.02(3)(a)3., 794.011(4)(d)1., 794.051(1), 794.053, 796.07(1)–(2), 798.02, 800.04(4), 800.09(2)(a)2., 825.1025(2)–(4), 827.071 (1)(*l*), 847.0135(5). Indeed, chapter 800 of the Florida Statutes is entitled "Lewdness; Indecent Exposure."

[2] *See, e.g.*, 18 U.S.C. §§ 1384, 1461, 1462, 1463, 1465; 20 U.S.C. § 7131(e)(6)(B); 47 U.S.C. § 941(j)(1)(B).

[3] *See, e.g.*, Cal. Penal Code § 288; Haw. Rev. Stat. § 712-1217; Idaho Code § 52-104; Kan. Stat. Ann. § 21-5513; La. Stat. Ann. § 14:281; Mass. Gen. Law ch. 272, § 16; Miss. Code Ann. § 97-29-31; Nev. Rev. Stat. § 201.210; N.J. Rev. Stat. § 2C:14-4; N.Y. Penal Law § 245.00 (McKinney); N.C. Gen. Stat. § 19-1.2; Okla. Stat. tit. 21, § 1123; 18 Pa. Cons. Stat. § 5901; S.C. Code Ann. § 16-15-365; Utah Code Ann. § 76-9-702; Vt. Stat. Ann. tit. 13, § 2601; Wash. Rev. Code § 7.48A.020.

meets the three-part *Miller* test.[4] It would be surprising, to say the least, if after many years of usage all these statutes were suddenly discovered to be unconstitutionally vague.

Widespread statutory use of the term "lewd" and its variants shows that "the ordinary person exercising ordinary common sense can sufficiently understand" the conduct proscribed by the Protection of Children Act. *Broadrick*, 413 U.S. at 608. Any ambiguity in the term, therefore, results not from a failure to define it in the statute but from the fact that "[w]ords inevitably contain germs of uncertainty." *Id*. It is "always . . . true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question.'" *Grayned v. City of Rockford*, 408 U.S. 104, 110 n.15 (1972) (quoting *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 412 (1950)). But "[i]f run-of-the-mill statutory ambiguities were enough to violate the Constitution, no court could ever clarify statutes through judicial interpretation, for the first person against whom the clarified version applied (and likely others as well) could argue that he was unfairly surprised and thus his due process rights were violated." *Sabetti v. Dipaolo*, 16 F.3d 16, 18 (1st Cir. 1994) (Breyer, J.). "Courts, of course, clarify textual ambiguities all the time," *id*., and "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activi-

---

[4] *See, e.g., United States v. 12 200-Ft. Reels of Super 8mm. Film*, 413 U.S. 123, 130 n.7 (1973) ("If and when such a 'serious doubt' is raised as to the vagueness of the words 'obscene,' 'lewd,' 'lascivious,' 'filthy,' 'indecent,' or 'immoral,' . . . we are prepared to construe such terms as limiting regulated material to patently offensive representations or descriptions of that specific 'hard core' sexual conduct given as examples in *Miller*[.]" (citations omitted)).

ty," *Williams*, 553 U.S. at 304 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)). The Protection of Children Act is hardly unique in this regard.

Even so, any concerns about imprecision at the margins of the term "lewd" are laid to rest by the mens rea requirement in the Protection of Children Act. The Act imposes criminal liability only for "knowing[ ]" violations. Fla. Stat. § 827.011(1)(b),(3). As the Eleventh Circuit and Supreme Court have explained, "even laws that are in some respects uncertain may be upheld against a vagueness challenge if they contain a scienter requirement." *Jones*, 975 F.3d at 1047 (quoting *United States v. Waymer*, 55 F.3d 564, 568 (11th Cir. 1995)); *see also, e.g.*, *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007). For these reasons, the Secretary is entitled to summary judgment on Hamburger Mary's vagueness claim.

## IV. Any relief in this case should be limited to Hamburger Mary's and not prevent enforcement of the Protection of Children Act statewide.

If this Court still disagrees with the foregoing analysis, it should at least limit the relief in this case to Hamburger Mary's. The Eleventh Circuit has counseled that relief should generally be limited to the parties in the case. In *Georgia v. President of the United States*, the Eleventh Circuit vacated the district court's universal preliminary injunction preventing enforcement of the contractor vaccine mandate against any contractor nationwide, party or nonparty, because it was "unnecessary to provide complete relief to the plaintiffs." 46 F.4th 1283, 1303, 1307–08 (11th Cir. 2022). Both the Eleventh Circuit and Supreme Court have "cautioned that remedies should be 'limited to the inadequacy that pro-

duced the injury in fact that the plaintiff has established,' and 'no more burden-some to the defendant than necessary to provide complete relief to the plain-tiffs,'" because "[i]t is the political branches—not the courts that are" responsible for "managing government policies in the absence of any actual or imminent in-jury." *Id.* at 1303–04 (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018)). Thus, the circumstances justifying a universal injunction are "rare," *id.* at 1304, and do not include facial overbreadth, contrary to the non-binding decision of the Eleventh Circuit motions panel that denied the Secretary's motion to narrow the preliminary injunction in this case. *See HM Fla.-Orl, LLC v. Gov'r of Fla.*, No. 23-12160, 2023 WL 6785071, at *3 (11th Cir. Oct. 11, 2023). This is because using overbreadth as a ground for universal relief "conflates the merits of a legal claim with the scope of the remedy for that claim." *Id.* at *5 (Brasher, J., dissenting from denial of partial stay). As an exception to the prudential third-party stand-ing rule, overbreadth expands the range of substantive arguments that a plaintiff can raise on the merits, *see* Henry P. Monaghan, *Overbreadth*, 1981 Sup. Ct. Rev. 1, 3–4 (1982), but a successful plaintiff is still entitled only to relief limited to his injury in fact. *See* Richard H. Fallon, Jr., *Making Sense of Overbreadth*, 100 Yale L.J. 853, 853–54, 881 (1991). In any event, as already discussed, the statute is not overbroad and therefore could not support this faulty justification for avoiding traditional equitable constraints.

## CONCLUSION

For the foregoing reasons, the Secretary respectfully requests that the Court either dismiss this case for lack of subject-matter jurisdiction or, in the alternative, grant summary judgment for her as to all of Hamburger Mary's claims.

Respectfully submitted,

ASHLEY MOODY
  ATTORNEY GENERAL

Henry C. Whitaker (FBN 1031175)
  SOLICITOR GENERAL

Jeffrey Paul DeSousa (FBN 110951)
  CHIEF DEPUTY SOLICITOR GENERAL

Office of the Attorney General
The Capitol, PL-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 414-2672 (fax)
Nathan.Forrester@myfloridalegal.com

February 29, 2024

*Counsel for Defendants*

  _/s/ Nathan A. Forrester_____
* Nathan A. Forrester (FBN 1045107)
  SENIOR DEPUTY SOLICITOR GENERAL

Bridget K. O'Hickey (FBN 1048521)
  ASSISTANT SOLICITOR GENERAL

William H. Stafford III (FBN 70394)
  SPECIAL COUNSEL

* *Lead Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of February, 2024, a true and correct copy of the foregoing was filed with the Court's CM/ECF system, which will provide service to all parties.

  _/s/ Nathan A. Forrester_____
  Senior Deputy Solicitor General