# Attachment

1

```
 1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
 2                    ORLANDO DIVISION

 3   HM FLORIDA-ORL, LLC,

 4        Plaintiff,

 5   vs.                   CASE NO.: 6:23-cv-OO950-GAP/LHP

 6   MELANIE GRIFFIN,

 7        Defendant.
     _____/
 8

 9

10              DEPOSITION OF JOHN PAONESSA

11            Taken on Behalf of DEFENDANT

12

13        DATE:        January 25, 2024

14        TIME:        9:54 a.m. - 12:02 p.m.

15        PLACE:    Via Zoom Video-Conference

16

17          Stenographically Reported by:

                 Deborah Alff, RPR
18
            For the Record Reporting, Inc.
19           1500 Mahan Drive, Suite 140
             Tallahassee, Florida  32308
20

21

22

23

24

25
```

2

```
1    APPEARANCES OF COUNSEL (Via Video-Conference):

2   On behalf of the PLAINTIFF:

3        MELISSA J. STEWART, ESQUIRE

4        Donati Law, PLLC
         1545 Union Avenue
5        Memphis, Tennessee  38104
         Phone:  901-209-5500
6        E-mail:  Melissa@donatilaw.com

7   On behalf of the DEFENDANT:

8        WILLIAM H. STAFFORD, III, ESQUIRE
         BRIDGET O-HICKEY, ESQUIRE
9        NATHAN A. FORRESTER, ESQUIRE

10       Office of the Attorney General
         The Capitol, PL-01
11       400 South Monroe Street
         Tallahassee, Florida  32399-1050
12       Phone:  850-414-3300
         E-mail:  William.Stafford@myfloridalegal.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1                          INDEX TO WITNESS

2                                                    PAGE

3    JOHN PAONESSA

4         Index of Deposition Exhibits                4

5         Direct Examination by MR. STAFFORD          5

6         Cross-Examination by MS. STEWART            64

7         Redirect Examination by MR. STAFFORD        66

8    Certificate of Oath                              72

9    Certificate of Reporter                          73

10   Errata Sheet                                     74

11   Notification to Read & Sign                      75

12

13

14

15

16                     S T I P U L A T I O N S

17        It is hereby stipulated and agreed by and

18   between the counsel for the respective parties and the

19   deponent that the reading and signing of the deposition

20   transcript be reserved.

21

22

23

24

25

4

1                        E X H I B I T S

2   DEFENDANT'S              DESCRIPTION                  PAGE

3   Exhibit 1       First Supplemental Interrogatory
                    Responses (18 pgs.)                   21
4
    Exhibit 2       Admission Policy April 2023 to
5                   Enactment of SB 1438 (2 pgs.)         29

6   Exhibit 3       Admission Policy from SB 1438 to
                    Preliminary Injunction (3 pgs.)       31
7
    Exhibit 4       Admission Policy from Preliminary
8                   Injunction to Present (2 pgs.)        45

9   Exhibit 5       Entertainer Agreement (2 pgs.)        34

10  Exhibit 6       House Rules (1 pg.)                   38

11  Exhibit 7       Reservation Cancellations (8 pgs.)    52

12  Exhibit 8       Close of Shift Reports (6 pgs.)       54

13  Exhibit 9       Revenue Report (5 pgs.)               61

14  Exhibit 10      First Amended Complaint (13 pgs.)     48

15  Exhibit 11      30(b)(6) Deposition Notice (4 pgs.)   9

16                          - - - - -

17  All exhibits were digitally marked for identification
    and are attached EXCEPT Exhibit 7.  All original
18  documents retained by Counsel for Defendant.

19

20

21

22

23

24

25

5

1    Whereupon,

2                          JOHN PAONESSA,

3    Called as a witness, being first duly sworn to speak the

4    truth, the whole truth and nothing but the truth, herein

5    testified as follows:

6                    THE WITNESS:  I do.

7                          DIRECT EXAMINATION

8    BY MR. STAFFORD:

9        Q.    Good morning, Mr. Paonessa.  How are you?

10       A.    I'm well.  How are you?

11       Q.    Good, good.  Have you had your deposition

12   taken before?

13       A.    I have.

14       Q.    Okay.  How many times?

15       A.    Two.

16       Q.    Okay.  Being civil or criminal cases?

17       A.    Civil.

18       Q.    Okay.  And so I'm sure you're familiar with

19   the basic rules, but I want to go over a couple.

20       A.    Okay.

21       Q.    When I ask a question, since this is all on

22   the record, your answers need to be verbal.  The court

23   reporter can't record nods of the head or shakes of the

24   head, so everybody needs to answer out loud.  And, also,

25   this is supposed to be like a conversation, but there's

6

1    certain artificialities introduced that in order that we

2    have a clean record.  So that means that when I ask a

3    question, please let me finish the question and wait

4    till I finish before you respond.  And I will do my best

5    to wait for you to finish your answer before, before I

6    ask my next question.

7           A.    Okay.  Sounds good.

8           Q.    And one of the most important things is, if

9    you don't understand a question, and I've been known to

10   ask my share of incomprehensible questions that start

11   one direction and move off, so if you don't understand a

12   question for any reason, just let me know.  And give me

13   a chance to, you know, ask it again and revise it a

14   little bit.  But, if you answer a question, I'll assume

15   that you understand it completely and are responding to

16   that question.

17          A.    Okay.

18          Q.    Is that fair?

19          A.    That's fair.  Thank you.

20          Q.    And your attorney may object to questions from

21   time to time.  That's entirely proper.  What I would ask

22   that you do, if you start answering a question and an

23   objection comes in, just please stop answering the

24   question, or, if you haven't started answering, don't,

25   don't begin to answer until we resolve it, and usually

7

1    I'll just say go ahead and answer the question.

2            The only time that it would be appropriate for

3    you to not answer a question that's been objected to, is

4    if your lawyer instructs you not to answer.  That would

5    be if we need to get into an area that's privileged.  In

6    that case, don't answer and we'll just move on.

7        A.    Okay.

8        Q.    And let's see.  I don't believe that this will

9    be a very long deposition, but, in any event, it's not

10   supposed to be an endurance contest.  So if you need to

11   take a break for any reason, just let me know.  And if

12   we need to do that on our end, we'll do that.

13           The only caveat would be if there is a

14   question pending.  If I've asked a question, I'd ask

15   that you answer or finish answering before we take a

16   break.

17       A.    Okay.  That's fair.  Thank you.

18       Q.    And let's see.  Are you, are you feeling well

19   this morning?

20       A.    I am.

21       Q.    Okay.  And you are not under the influence of

22   any medications that might affect your ability to think?

23       A.    I am not.

24       Q.    And have you -- do you have your cell phone

25   with you?

8

1        A.    I do.

2        Q.    Okay.  I would just ask a couple things.  Just

3   make sure your cell phone is on mute and you turn it so

4   that the screen is facing down.

5        A.    Okay.

6        Q.    And this is, this has been, as we discussed on

7   Monday, this has been designated a 30(b)(6) deposition

8   where you are speaking as the corporate representative

9   for Hamburger Mary's.  And by using "Hamburger Mary's,"

10  I mean, that corporation HM or HM Florida-Orlando?

11       A.    Correct.

12       Q.    Okay.  If you -- do you have a -- have you

13  seen a copy of the deposition notice that was provided?

14       A.    Yes.

15       Q.    Okay.  Do you happen to have it with you or

16  should we put it up on the screen?

17       A.    Put it on the screen, that would be good.

18            THE WITNESS:  One moment.  Can you call Mary's

19       and just tell (inaudible) that I'm tied up in case

20       she has an issue?

21            Okay.  Sorry.  I don't want my work calling in

22       the middle of this with some thing to put out a

23       fire and them not get in touch with me so --

24            MR. STAFFORD:  Let's take a quick break here

25       to make sure, make sure we've got our technical

9

1       issues resolved.  Just one second.

2              THE WITNESS:  Okay.

3              (Off the record from 9:59 a.m. to 10:01 a.m.)

4              MR. FORRESTER:  Okay.  Do you see the depo

5       notice now?

6              THE WITNESS:  I do.

7              (Defendant's Exhibit 11 was digitally marked

8       for identification.)

9       BY MR. STAFFORD:

10         Q.   Can you go to the last page, Exhibit A?

11         A.   Oh, you're rolling it, not me.  Sorry.

12         Q.   And, Mr. Paonessa, what the Exhibit A was the

13      areas in which we were seeking testimony.  And your

14      attorney informed us last night that you and Mr. -- is

15      it Rogier?

16         A.   Rogier.

17         Q.   Rogier.  Okay.

18         A.   Mm-hmm.

19         Q.   -- are going to be dividing up these areas.  I

20      just want to make sure before we start, what areas you

21      think you would be testifying to, and the others to

22      which Mr. Rogier would be testifying?

23         A.   Well, I mean -- I'm sorry?

24         Q.   No, go ahead.  We'll try to -- go ahead, tell

25      me what you were going to?

10

1       A.    Yeah, I'm at the restaurant.  Mike works

2   essentially from home most of the time handling the

3   financials, but also is involved, you know, peripherally

4   with what's going on at Mary's, but I am there at the

5   store and dealing with, you know, most of the

6   operational, so I probably have a much better working

7   knowledge on a lot of this information.  Mike would have

8   more with the financial portion of it, if you have

9   questions in that regard.

10       Q.    Okay.  So how about we proceed this way.  I

11  will ask you all of the questions that I have set out,

12  and if there are ones that you think Mike would be

13  better suited to answer, just let me know and then we'll

14  go back to him, you know, immediately after your

15  deposition.

16       A.    Okay.  That's fair.

17       Q.    That's all right?

18       A.    Sure.

19       Q.    Perfect.  Now, what have you done to prepare

20  for your deposition this morning?

21       A.    Well, I've got a lot of information from

22  the -- what do you call them -- the interrogaties

23  (phonetic) that we had sent, a lot of the information

24  that we were requested to respond to, and the paperwork

25  in that regard that I reviewed.  And just to, you know,

1    get, you know, my head back in what we were doing at

2    what time and -- and I'm sure you're going to ask about

3    timelines and when we did this and policy changes.  So I

4    was just working to be able to speak to that without

5    having to think heavily on what days and what dates and

6    all that stuff.

7         Q.   Okay.  And who, if anyone, did you speak to

8    about your deposition?  And if you -- I'm not asking

9    when the -- if you did speak with your attorneys, I have

10   no intention to ask you what you spoke with them, just

11   the fact that you spoke with them and, if so, for how

12   long?

13        A.   Since, since what times, over the last week

14   or --

15        Q.   Well, just in order to, to prepare for the

16   deposition?

17        A.   We've spoken to both Brice and Melissa over

18   the last couple weeks, and just that they are giving us

19   some, some information on how this works and, you know,

20   what questions that we should expect with an exhibit and

21   just the normal prep and -- and just start thinking

22   about, you know, how we would answer these questions and

23   make sure that, you know, we have a good, you know, idea

24   of what is going to be requested and -- and required.

25        Q.   And anybody else that you spoke to?

1       A.    No.

2       Q.    Okay.  But you spoke to them, you spoke --

3       A.    I'm sorry.  There was Shelby Teeter was her

4    name, who also helped put a lot of the documentation

5    that we supplied together to provide to you.  So we did,

6    I did, last week or a week and a half ago, worked with

7    her to get her the information she required.

8       Q.    And her -- okay.  And what, what is your role

9    in Hamburger Mary's?

10      A.    I'm one of the owners.  Mike and I own the

11   business 100 percent.  And like I said, I have

12   management at the store, but, you know, I'm -- it all

13   falls in my lap of making sure everything is done

14   properly and the -- the wheel keeps turning.  So a lot

15   of roles involved in a restaurant business as a -- as an

16   owner.

17      Q.    So you and how about Mike, you mentioned

18   before that he focuses more on the financial aspects?

19      A.    Yeah.  Mike, Mike had been working -- we've

20   been open 16 years as of May, and Mike worked at the

21   restaurant for the majority of that.  And I think maybe

22   the last year and a half or so, he semi-retired, but

23   he's still working from home doing -- handing our --

24   handling our financial portion of the business.  But

25   since then I've been there myself along with, I've got a

13

1   GM and a bar manager and a kitchen manager in that

2   regard.

3       Q.   All right.  And you just mentioned that

4   Hamburger Mary's has been in business for 16 years?

5       A.   Our location, we are franchised, we've been

6   open since May of 2008.

7       Q.   And prior to opening Hamburger Mary's, the

8   location, had you had -- did you have any prior

9   experience in the restaurant, bar, or nightclub

10  industry?

11      A.   If I go back to when I was 17 working at a

12  McDonald's, that's about all I had.  Prior to this,

13  Mike and I sold insurance.  We worked for Allstate or

14  had Allstate agencies here in Orlando, and also in

15  Fort Lauderdale.

16      Q.   And you mentioned that this, that that

17  Hamburger Mary's Orlando is a franchise of the, I guess,

18  corporate, entity, Hamburger Mary's corporate?

19      A.   Yes.  Hamburger Mary's International is a

20  franchisor, and we're all franchisees of that

21  corporation.

22      Q.   And I'm assuming you have a franchise

23  agreement in effect?

24      A.   Correct.

25      Q.   And does that -- what type of, what sort of

OR THE RECORD REPORTING TALLAHASSEE FLORIDA  850.222.5491

14

1  control or -- I'm sorry.  Strike that.

2         In terms of the activities at the restaurant,

3  what sort of control does Hamburger Mary's International

4  have?

5     A.   Zero control.  We have, it is a very loose

6  franchise and we are given great leeway in building our

7  business the way we see fit.  And there's no requirement

8  that we put -- put on shows, but it's part of what

9  Hamburger Mary's does so that's what, why we do it.  And

10  it's, you know, certainly part of our business.  But,

11  yeah, it's -- the franchise is very loose on what the

12  requirements are for what we do.

13     Q.   Okay.  Do they control, I mean, do they have a

14  say in the menu that's offered there?

15     A.   No.

16     Q.   Okay.  So you guys have pretty much free reign

17  as to how you operate the business?

18     A.   Yeah, I mean they suggest certain burgers.  Of

19  course, "hamburger" is in the name, so they were going

20  to make sure that burgers are the star of the shows, and

21  they have suggestions which they have used for years at

22  their -- some of the stores that we do use, but we have

23  full reign to remove/add menu items as we see fit.

24     Q.   And you mentioned that you're not necessarily

25  required to put on shows or performances.  Does

15

1   Hamburger Mary's International have any sort of say or
2   restrictions on the types of performances or the content
3   of those performances?

4        A.   They do not.

5        Q.   Okay.  Now, when I looked on the, I guess,
6   corporate website talking about franchise and mentioned
7   that new franchisees are invited or required to go for
8   training at a flagship location?

9        A.   Yes.  I mean that since we went on our
10  training of like 2007, I -- there's really not a
11  flagship location.  We trained in L.A. and a bit in
12  Chicago, too, because that was where the corporate
13  owners had their location.  They owned Chicago, which
14  now is closed, and West Hollywood, so we trained there.
15  But we've had people train in our, our store because
16  we've been there the longest and, you know, they -- they
17  like what we do.  So it's a little -- again, it's a
18  little more loose on how they, how they train at this
19  point.  And I'm not really involved in that, so I don't
20  know what they're doing, you know, today.

21       Q.   Okay.  Now, prior to, I guess, either
22  obtaining the franchise or opening the restaurant, did
23  you have -- did you talk with other franchisees about,
24  about the business in general or, you know, suggestions
25  on how to get started and keep, you know, keep up and

16

1   running?

2       A.   Well, because the two, the owners, there's

3   three gentleman who -- who own the Hamburger Mary's

4   International.   They had their own stores, so it was

5   easy to bounce off them what would be good ideas and

6   what we should do.   Since we knew them, we didn't call

7   the other locations around the country to get any

8   feedback.   We felt confident with what we were learning

9   from them.

10      Q.   And since Hamburger Mary's Orlando has been

11  open, has it always been in the same location on Church

12  Street?

13      A.   It has.

14      Q.   Okay.   And when you -- since you opened in

15  2008, have you made any structural changes to the

16  building or the layout that would affect the occupancy?

17      A.   No.   I mean we've changed the way that our

18  tables are situated, and, you know, we had some booths

19  that were kind of in the middle of the dining room which

20  were kind of obstructive.   So we've changed that, but

21  everything at the restaurant as far as capacity has

22  remained the same.

23      Q.   How about changes to the -- your opening hours

24  or opening days?

25      A.   We did.   When initially, when we opened, we --

17

1   Friday and Saturday night we stayed open, were trying to

2   stay open until 2:00, 2:00 in the morning.  But we soon

3   found out that downtown Orlando, all you're going to get

4   after 1:00 in the morning are people who are drunk and

5   walk off on their check and throw up in, throw up in the

6   bathrooms.  So we cut that back and we had -- you know,

7   the latest we were open was 11:00, and we've changed

8   those a little bit after Covid, as well.

9        Q.   Okay.  And as I understand it, and correct me

10  if I'm wrong, the current slate of programs or

11  performances, you have a total of five?

12       A.   Five on a regular basis, and then we do a

13  charity bingo sporadically, maybe once a month, just

14  depending on the charities that we approve and work

15  with, so it could be six.  Sometimes there's a special

16  event.  It may be like this coming Sunday, we have a

17  special event on Sunday, but the five core are there

18  every week.

19       Q.   And how long has that schedule been in place?

20       A.   Oh, God, a long time.  We've done bingo since

21  we opened.  And then we slowly added other shows

22  throughout the years, to have a Saturday night show, a

23  Friday night show.  And then a few years ago, we added

24  the Saturday brunch and then the -- the Sunday brunch

25  next and then the Saturday brunch.  So that kind of

18

1   morphed over the years that we added new and different

2   entertainment on different days of the week.

3       Q.   Can you say how long the five-program schedule

4   has been in place?

5       A.   The last show that we added was the Saturday

6   brunch show and that was right at Covid.  So since --

7   we're going on four years now that that has been our

8   schedule.  Prior to that, it was the four, four shows.

9       Q.   And the shows that we're talking about, just

10  to make sure we're on the sage page, is the Twisted

11  Bingo on Mondays?

12      A.   Tuesday.

13      Q.   Tuesdays?

14      A.   Mm-hmm.

15      Q.   Okay.  And Dining with Divas on Fridays?

16      A.   Correct.

17      Q.   Mary's and Mimosas is the Saturday brunch?

18      A.   Yeah, that was the one we added last.

19      Q.   And the -- on Saturday evenings is the --

20  which is it, the Saturday Cabaret dinner show that's the

21  reg -- that's three times a week or three times a month?

22      A.   Right.  The Cabaret Saturday night show is

23  three times a month.  It's second, third and fourth

24  Saturdays.  The first Saturday of the month, we do a

25  star show, which is a celebrity lookalike show which is

1  popular.  That's still, I mean, still a drag show each

2  night, but it's little different on the first Saturday

3  of the month.

4      Q.   And then the Broadway Brunch is on Sunday?

5      A.   That's correct.

6      Q.   Okay.  Are these shows, are these particular

7  shows or performances, are they done in other

8  locations?

9      A.   I mean it just -- again it's a very loose

10  franchise.  So the people, the business owners, the

11  franchise owners have the ability to do what they want,

12  so they may or may not.  So I don't really look at their

13  schedules, I couldn't tell you for sure.

14      Q.   And then pardon me for my ignorance, but with

15  a show like Dining with Divas, is that, is that produced

16  by -- do you guys actually produce that show or is it

17  like a traveling program --

18      A.   No, it's the same --

19      Q.   -- if that makes sense?

20      A.   I'm sorry?

21      Q.   Yeah, if that makes sense?

22      A.   Yeah.  I mean the show director for Friday

23  night and Sunday night, Jimmy Rossi produces both of

24  those shows and it's just -- it's unique to our

25  location.

1      Q.   And would that be the same for all of these,

2  all of these shows, the five, the five core?

3      A.   The same in what regard?

4      Q.   That they're produced, that they're performed,

5  that this, you know, precise show is performed just at

6  your location?

7      A.   Yeah.  The particular shows that we have,

8  they're not rotating across Hamburger Mary's or other

9  locations or other bars, so it's just they're unique to

10  ours.

11      Q.   Okay.  That's what I needed to know.  Now, one

12  of the things -- I'm sorry, go ahead?

13      A.   Yeah, I just want to interject.  The

14  performers may be different.  It's not the same

15  performers for a lot of the shows.  So they may go

16  travel somewhere else because they're -- they're not

17  employees of mine.  They're, you know, 1099 contract so

18  they may go somewhere else and perform, but when

19  they're, you know, our particular shows where we call

20  them, and Mary -- the Dining with the Divas, that has

21  the same cast that we repeat.  The Saturday evening show

22  has a rotating cast so you may not see the same people

23  there every week, but it's the same show.

24      Q.   Okay.  Now, I'm going to kind of switch gears

25  a little bit and talk about the -- the age policies --

21

1        A.    Okay.

2        Q.    -- that you've had over the years.  And I

3   guess we'll start with the -- your interrogatory

4   answers.  And I don't know if you have a -- do you have

5   a copy of those in front of you?

6        A.    So --

7        Q.    I mean if not, we'll go ahead, put it up, up

8   on the screen as well.  This would be Exhibit 1.

9             MS. STEWART:  If you wouldn't mind putting

10       them up on the screen just to make sure we're all

11       looking at the same --

12            MR. STAFFORD:  Right.

13            MS. STEWART:  -- version because I think we

14       had some supplemental answers.

15            MR. STAFFORD:  I think we're getting them, I

16       think we're getting them up there now.

17            THE WITNESS:  That would make it easier for

18       me, too.

19            (Defendant's Exhibit 1 was digitally marked

20   for identification.)

21   BY MR. STAFFORD:

22       Q.    Okay.  And these are the supplementals, yeah.

23   Let's go to page four.

24            (Court reporter interrupts momentarily.)

25            (Discussion off the record.)

22

1   BY MR. STAFFORD:

2        Q.   Can we go to page three would be so we can get

3   the question, bottom of page three.   Mr. Paonessa, do

4   you see the -- where we're looking, the bottom of page

5   three where it says interrogatory number one?

6        A.   Yes.

7        Q.   Okay.   And that's just asking for all

8   policies, including age policies, regarding admission to

9   drag performance held on the premises prior to

10  the passage of S.B. 1438.   Do you see that?

11       A.   Yes, sir.

12       Q.   And you understand that when we're talking

13  about S.B. 1438, that's the law that you and your

14  attorneys are challenging?

15       A.   Yes, sir.

16       Q.   Okay.   And in your answer, let's go to the

17  bottom of page four.   This would be your supplemental

18  answer.   You mentioned that the shows were -- where did

19  I see that?   You mentioned that the shows were generally

20  18-plus.   Oh, where did I see that here, that's on

21  the -- in the middle of page four, from May 17, 2020 to

22  the present or prior to -- correction, sorry.   "Prior to

23  April, 2023, Plaintiff's shows were generally 18-plus."

24  Do you see that in the middle of the --

25       A.   Yes.

1      Q.   -- page there?

2      A.   Yes, I do.  Mm-hmm.

3      Q.   All right.  And what, what was meant by the

4   term "generally 18-plus"?

5      A.   I'm not sure why the word "generally" is in

6   there.  Prior to that time it was, our policy was always

7   18-plus.  Under 18 required adult supervision.  That's

8   always been our policy.

9      Q.   Okay.  And that applied to all shows?

10      A.   Correct.

11      Q.   Okay.  And this was sent in -- the policies

12   were sent to guests who made an online reservation?

13      A.   Yeah.  We're a little unique because all

14   the -- we don't take online reservations because Yelp

15   Reservations is not smart enough to put them at the best

16   table or when they call.  All reservations are made over

17   the phone, and we put it -- my staff puts it into the

18   Yelp Reservation.  Then they're sent an e-mail

19   confirmation with the requirements for the show.

20      Q.   From the Yelp?

21      A.   Reservation.

22      Q.   From the Yelp, okay.  Understood.  And again

23   what we're talking about prior to, I guess, the passage

24   of S.B. 1438 in --

25      A.   Yes.

24

1      Q.    -- April of 2023, did HM Orlando have a policy
2   as to the age of the minors who would be permitted?
3      A.    No.
4      Q.    Okay.
5      A.    As long as they had adult supervision, yeah.
6   Not on their own, of course.
7      Q.    What was the reason for the 18-plus general
8   policy?
9      A.    We had seen what had happened at Plaza Live.
10  I think the article came out sometime like around March,
11  20, that the inspectors who -- the undercover inspectors
12  who went into that venue did not -- reported that they
13  didn't see anything that was, in their opinion,
14  inappropriate, but the state, even without that, that
15  information or that violation in their perspective, they
16  still were targeted.
17          So we decided it didn't matter what we did in
18  our shows, and if -- that someone is going to come after
19  our liquor license and find something where there is
20  nothing, and we didn't want to take that chance.  So we
21  decided at that point we're going to be, you know, err
22  on the side of safety and do 18-plus for all of our
23  shows, except the Sunday show which was -- we kept
24  family-friendly at that time.
25     Q.    Okay.  I appreciate that.  And, but I think

25

1   that was -- I was, I was asking, and this is my fault.

2   No, nothing that you did.  I was asking, I guess, in

3   general, the 18-plus with, you know, parental exception,

4   what was the reason for that, I guess, the 18-plus

5   policy part of that?

6       A.   I don't understand the question.

7       Q.   Okay.  Well, you mentioned that from May of

8   2020 till the time that S.B. 1438 passed, you had a

9   policy of 18-plus with a parental exception.

10      A.   Mm-hmm.

11      Q.   What was the reason for having that in place

12  in the first place?

13      A.   Having the 18-plus?

14      Q.   Yeah, with the parental override.

15      A.   Well, I mean we don't want -- I mean if I'm

16  understanding your question, I mean, we didn't want a

17  5-year-old or an 8-year-old to wander in without their

18  parents and watch a show.  So it was 18-plus because

19  they're considered adults, but, you know, anyone who is

20  still a minor coming in with their parents.  So that was

21  the only reason we did that, you know, to keep people

22  from coming in who were younger without their parents.

23      Q.   Okay.  And was that in any way affected by

24  the -- by the liquor license?

25      A.   Maybe we're talking about two different

1   things, I apologize.

2        Q.   Well, I'm trying to find out what you did, if

3   the liquor license requirement informed the initial

4   decision to have the shows at 18-plus with that parental

5   override?

6        A.   Well, I mean I -- the only change that we did

7   in April to only have 18-plus was because of what the

8   state was doing.  And we were feeling targeted because

9   that's what was happening at other, at other venues.  So

10  we changed it to 18-plus because we didn't want to have

11  to worry that someone is going to come in and

12  essentially make up something, you know, so they could

13  come after our liquor license, which obviously it's a --

14  you know, it will destroy the business, so for an

15  abundance of caution we put that policy in place.

16       Q.   Understood.  Let me see if I can ask it

17  another way.  Prior to S.B. 1438 being put in place --

18       A.   In May.

19       Q.   Okay.  But in your -- in your interrogatory

20  answers you make a distinction between April, you know,

21  prior to April of 2023, April to May of 2023, and May to

22  June of 2023.  So I was -- we can just do it in general

23  prior to the passage of 1438, why was the policy of HM

24  Orlando to be 18-plus with parental override as opposed

25  to all ages?

1       A.   Well, all ages are welcome.  It's we just --

2  and that was our policy for years and years.  All are

3  welcome, but, if you're under 18, you have to have your

4  parent.

5       Q.   Okay.

6       A.   That's it.

7       Q.   Understood.  I appreciate that.  And you also

8  mentioned in this interrogatory response, and you

9  already mentioned it here that from April, 2023 to May,

10  I believe, May 17 of 2023, you made shows 18-plus

11  without the adult supervision exception.  And I believe

12  you testified that was because you were concerned about

13  how the state would interpret the bill and run the risk

14  of affecting your liquor license?

15       A.   Correct.

16       Q.   Okay.  And then also you mentioned in that

17  same time frame, April to May of 2023, you had the --

18  you did have an exception for the Sunday brunch, is that

19  correct?

20       A.   Yes, sir.

21       Q.   Okay.  What was different about the -- what

22  was, I guess, or is different about the Broadway Brunch

23  on Sunday than -- that differ from your other, other

24  performances?

25       A.   Well, I mean, we feel and felt that -- I mean

1   there's no language or off-color jokes or anything like

2   that.  The queens are, you know, on the other shows

3   they -- they can be provocative and that's, you know,

4   maybe what you'll see at another show.  But we try to

5   keep it, you know, that would be as family-friendly as

6   it is.  And it's -- it's Broadway productions.  It's

7   dancing and costumes and things like that.  It's a

8   different show than our other shows, so we thought we

9   would be safe in leaving that as is.

10      Q.   And has the content of that Sunday Broadway

11  Brunch show, has that changed as a result of that

12  S.B. 1438?

13      A.   No.

14      Q.   Okay.  Now, when you changed the policy from

15  all shows being 18-plus to -- with the parental override

16  or adult override to strict 18-plus except for the

17  Sunday brunch show, and I know you touched on it, but

18  just for the record, how did you, how did you come to

19  the decision to change that policy?

20      A.   Well, the law was not in effect at that point.

21  And we felt that if we -- just looking at what we do.

22  What we do on Sundays, like I said, is a little less

23  provocative and edgy.  So we thought that that still

24  was, would be appropriate enough to continue doing it

25  the way we were doing it.

29

1            MR. STAFFORD:  Okay.  And can we put up

2       Exhibit 2?

3  BY MR. STAFFORD:

4       Q.   Mr. Paonessa, can you see that?

5       A.   Yes.

6       Q.   Oh, he hasn't put it up yet.

7            MR. FORRESTER:  Is it on the screen?

8            THE WITNESS:  Yes.

9            MR. FORRESTER:  Okay.

10            (Defendant's Exhibit 2 was digitally marked

11  for identification.)

12  BY MR. STAFFORD:

13       Q.   And do you recognize this?  And if you need

14  to, if you want us to scroll down to the bottom we can,

15  but do you recognize this as the -- what was sent with,

16  I guess, what was sent from Yelp by HM Orlando to folks

17  who made reservations from April, 2023 till May of 2023?

18       A.   That's correct.

19       Q.   Okay.  And now that -- and what, what happened

20  after the enactment of S.B. 1438, which I believe was in

21  mid May of 2023?

22       A.   Yeah.  I think it was May 17.

23       Q.   Yes, sir.

24       A.   We put all of our shows 18-plus.

25       Q.   And then what was the -- how did you come to

1   that decision?

2        A.   Well, I mean, again there was a lot of fear

3   that the state would find something inappropriate, in

4   their opinion, and target our liquor license.  So we did

5   not want to chance even having any children at any of

6   our shows and have to worry about losing our business.

7        Q.   Okay.  And prior to having this policy, have

8   you ever, were you aware of ever having any

9   investigators from the Department of Business and

10  Professional Regulation or any other state agency

11  investigate or visit your businesses, your business?

12       A.   No.

13       Q.   Okay.  But you were aware of media reports of

14  investigations or actions taken against other, other

15  venues that put on drag, drag performances?

16       A.   That's correct.

17       Q.   Now, when you decided to change your policy to

18  a strict 18-plus, who did you -- did you discuss this

19  with anybody other than Mike prior to coming to this

20  decision?

21       A.   No.  That was Mike and my, my decision solely.

22       Q.   Okay.  And is there any sort of like informal,

23  formal or informal group or association of clubs or

24  venues that put on drag shows that would discuss these

25  types of things?

31

1            MS. STEWART:  Object to form.

2            MR. STAFFORD:  You can go ahead and answer.

3            THE WITNESS:  Could you repeat the question?

4     BY MR. STAFFORD:

5       Q.   Yes, sir.  Is there any sort of group or even

6     like a discussion board, where owners or operators of

7     venues that put on drag performances get together to

8     discuss things of common interest?

9       A.   If there is, I'm not aware of it.

10      Q.   Okay.  There's not like a group that's meets,

11    does a Zoom meeting or meets at somebody's -- somebody's

12    bar to talk about things that --

13      A.   (Shaking head.)

14      Q.   All right.

15      A.   No.

16      Q.   All right.

17      A.   Not in my, not -- not that I'm aware of again.

18      Q.   All right.  And finally the -- I'm sorry, do

19    we have --

20            MR. STAFFORD:  Can you put up Exhibit 3?

21            (Defendant's Exhibit 3 was digitally marked

22     for identification.)

23    BY MR. STAFFORD:

24      Q.   And I'm going to show this to you,

25    Mr. Paonessa.  I just want to make sure that this is

1 the -- this is what was sent to folks who made

2 reservations in that period of between April and -- I'm

3 sorry -- between May to June of 2023?

4     A.    Yes, until the temporary injunction went in

5 place.

6     Q.    Okay.  And now, and then once that temporary

7 injunction went into place, how did your policy change?

8     A.    We had reverted back to our original policy,

9 18-plus.  Under 18 requires adult supervision.  So all

10 are welcome, and again, under 18 requires adult

11 supervision.

12     Q.    Okay.  And are you aware of how other clubs

13 or venues that have drag programs have responded to

14 S.B. 1438?

15     A.    I have not.

16          MS. STEWART:  Object to form.

17          MR. STAFFORD:  Say that again?

18          THE WITNESS:  I have not.

19 BY MR. STAFFORD:

20     Q.    Okay.  And on your -- on the HM Orlando

21 website, you publish a -- I guess you put up, there's a

22 page with calendar of performances?

23     A.    Yes.

24     Q.    And when you click on those, you know,

25 specific links of those performances, does the current

33

1   policy regarding admissions -- would you agree that

2   that's not listed on there?

3       A.   Repeat the question, please?

4       Q.   Yes.  On your website there's -- I guess this

5   comes under the event tab.

6       A.   Mm-hmm.

7       Q.   And it lists the calendar, and the events are

8   listed with their own links, and under the links there's

9   a description of the programs?

10      A.   Yes.

11      Q.   Is that -- and would you agree that the --

12  when you would click on one of those, it would not say

13  that, you know, this is -- this program is 18-plus

14  with -- but you can, but children attend with adult

15  supervision?

16      A.   It should, but I can't say for sure because we

17  change those out so often that sometimes, I will admit,

18  they fall through the crack and that may not be on

19  there, but we did, it is explained to the guest when

20  they call to make a reservation.

21      Q.   Okay.  Now, I want to switch a little bit into

22  the rules, your policies or rules governing the drag

23  performances.  And that would be interrogatory -- that

24  we asked about that in interrogatory number seven.  Do

25  you have a copy of the interrogatories in front of you,

34

1    or do you want us to put it back up on the screen?

2         A.   If you put it back on the screen would be

3    great so I can look for it here, if you want.

4         Q.   One.  That would be on page eight, and that

5    that refers us to documents that you provided.  Let's

6    see if I can find -- and that would be exhibit -- that

7    would refer to the document that we're going to put up

8    as Exhibit 4.  I'm sorry.  Let's -- never mind.  It

9    would be Exhibit 5.  I apologize for that.

10             (Defendant's Exhibit 5 was digitally marked

11   for identification.)

12   BY MR. STAFFORD:

13        Q.   Mr. Paonessa, do you recognize this document?

14        A.   I do.

15        Q.   That's the entertainer agreement?

16        A.   Yes.

17        Q.   That was in effect at Hamburger Mary's?

18        A.   Previously.  It's a little bit old, but that

19   that's the original one that, um, I mean there's a

20   little story behind this.  I'll just explain how this

21   came about.

22             One of the performers at one of the venues

23   from Hamburger Mary's had, in doing her number, grabbed

24   a guest just with the music and kind of moved his head,

25   like shook his head around just to be fun.  And

35

1    apparently he had a neck injury.  So that, you know,

2    caused a lawsuit against that location.  So Hamburger

3    Mary's sent this out to say we -- this is what we should

4    do just so that, you know, the queens are not, you know,

5    in their -- you know, during the performance, touch

6    anybody, grab anybody, move them, just because you could

7    have one of these situations in your hand.  So we -- we

8    used this agreement and I think it's going back to 2010,

9    a long time ago that we had our -- our drag artists sign

10   this, that they would adhere to these policies.

11        Q.   Okay.  And but obviously you reviewed it

12   before you had the performer sign it?

13        A.   Yes.

14        Q.   You're familiar with the contents?

15        A.   Yes.

16        Q.   Okay.  And it dealt with, let me see if I can

17   get back to it.  And under section number four, can you

18   scroll down there a little bit to paragraph number four,

19   and it refers to, I guess, the display of certain

20   anatomical areas?

21        A.   Mm-hmm.

22        Q.   And then in number five it refers to certain

23   sexual activities, is that correct?

24        A.   Yes.

25        Q.   All right.  And then on the second page, at

36

1   six and seven it states that performer shall not expose,

2   and both certain anatomical areas at any time, and

3   number seven, the performer shall not include or

4   undertake certain sexual activities at any time.  Is

5   that -- and this was part of the Entertainer Agreement,

6   correct?

7        A.   Yes.

8        Q.   And did this, did you expect your -- the

9   performers who performed at Hamburger Mary's to abide by

10  these, by this Entertainer Agreement?

11       A.   Yes.

12       Q.   And to your knowledge did the -- did the

13  performers abide by this?

14       A.   Yes, by and large.  I mean that there's -- I

15  mean these terms are open to interpretation, some of

16  them.  I mean it's the -- the queens are still

17  provocative with their outfits, but as far as walking

18  around naked, obviously, things like that are certainly

19  not allowed and -- and exposing your genitals, certainly

20  not.

21       Q.   And in considering this Entertainer Agreement,

22  did you or Hamburger Mary's's Orlando or -- strike that.

23            Did this Entertainer Agreement make any

24  distinction between real and/or prosthetic genitalia or

25  female breasts?

37

1      A.    No.

2      Q.    And you mentioned that the agreement came from

3  Hamburger Mary's International as a result of a lawsuit,

4  is that correct?

5      A.    Right.

6      Q.    Okay.

7      A.    Correct, that's fair.  And that agreement we

8  haven't used in probably ten years.

9      Q.    Okay.  I believe the interrogatory answer

10  mentioned that it was used up until the time of Covid?

11      A.    It was prior to that.  I'm sorry if that

12  was -- it was probably a few years before Covid.  And

13  then after that, we were just posting and certainly

14  talking to the performers when they're there for the

15  first time.  And there's some rules posted, and I think

16  you have a copy of that, what we post in the green room

17  for them to see, but we don't have them signing an

18  agreement with this.

19      Q.    Okay.  Why did -- why did you guys, why did

20  you go away from the signed Entertainer Agreement?

21      A.    From we feel like we're there, our manager is

22  there and I'm there and, you know, most of the time, and

23  we can monitor what's going on and see without having a

24  signed agreement in place.

25      Q.    And when -- strike that.

1           Can you, can we put up Exhibit 6?

2           (Defendant's Exhibit 6 was digitally marked

3    for identification.)

4    BY MR. STAFFORD:

5       Q.   And, Mr. Paonessa, this is, I'll represent

6    that this is what was provided as the -- I think it was

7    called the house rules?

8       A.   Yes.

9       Q.   Do you recognize that?

10      A.   Yes.

11      Q.   Okay.  And those, you said this has been in

12   place since for the past ten years or so?

13      A.   I would say since just before Covid.

14      Q.   Okay.  So what was, and so in the time between

15   Hamburger Mary's moving away from the Entertainer

16   Agreement to these house rules being posted, what was,

17   what was the policy, informal or otherwise, regarding

18   performances?

19      A.   In what time period, I'm sorry?

20      Q.   From the time that Hamburger Mary's went or

21   stopped using the Entertainer Agreement to -- to Covid

22   when this -- when the house rules came into effect?

23      A.   Well, I mean this, this particular one is, you

24   know, there's been a couple of iterations that I don't

25   have copies of, but they're basically the same thing

1  that -- you know, that we say now is, you know, what

2  we're saying in this, this message here or this document

3  that they, they see.

4      Q.   And what was the reason that you started

5  posting house rules?

6      A.   I think for us it was -- I'm trying to think

7  back, it's been a while.  Just to have that in the green

8  room when they're getting ready is, in my opinion,

9  better than signing a document and putting it in a file.

10     Q.   Okay.  And I believe your interrogatory

11 answers also mentioned that this was, this is explained

12 to the performers, as well?

13     A.   Mm-hmm.  Yes, sir.

14     Q.   And this, these, I guess we'll call them,

15 we'll call them like you did as house rules.  Are the

16 house rules intended to cover the same areas as the

17 Entertainer Agreement?

18     A.   Essentially, yes.

19     Q.   Okay.  And especially in terms of display of

20 nudity or certain anatomical areas as used in the

21 Entertainer Agreement?

22     A.   I mean, and nudity is certainly -- I mean the

23 definition of nudity is, is vague in this and I -- it

24 would, you know, in any regard, I think nudity is open

25 to interpretation of what that is.

40

1          Q.    Okay.  But is this, are the house rules, were

2     they intended to allow displays of, displays of more

3     anatomical areas than was described in the Entertainer

4     Agreement?

5               MS. STEWART:  Object to form.

6               MR. STAFFORD:  You can go ahead and answer.

7               THE WITNESS:  Yeah, could you repeat that?

8     BY MR. STAFFORD:

9          Q.    Yes.  As we've talked about earlier, the

10    Entertainer Agreement prohibited the display of certain

11    anatomical areas and included a definition of those

12    areas.  Do you recall that?

13         A.    Yes.

14         Q.    Okay.  Was or is the -- or are the house rules

15    intended to allow displays of more anatomical areas than

16    the Entertainer Agreement?

17         A.    I don't think -- um, I don't think it's

18    intended to show more.  I just think it gives a better

19    guideline for interpretation.

20         Q.    Okay.  And the house rules also on that list

21    says there will be no conduct that is deemed

22    unprofessional or inappropriate at any time during that

23    performance.  Do you see that?

24         A.    Yes, sir.

25         Q.    Was that intended to allow conduct that would

 1   have been prohibited by the Entertainer Agreement?

 2              MS. STEWART:  Object to form.

 3              MR. STAFFORD:  You can answer.

 4              THE WITNESS:  Okay.  Again, can you repeat

 5        that question?

 6   BY MR. STAFFORD:

 7        Q.   Certainly.  Let me just preface it by, in the

 8   Entertainer Agreement, that it was prohibited for

 9   performers to engage in certain sexual activities that

10   were described in the Entertainer Agreement.  Do you

11   recall that?

12        A.    Mm-hmm.  Yes, sir.

13        Q.   And is this part of the house rules that said

14   no -- there will be no conduct that is deemed

15   unprofessional or inappropriate at any time, was that

16   deemed or was that intended to allow more, would that be

17   deemed to permit conduct that would have been prohibited

18   under the terms of the Entertainer Agreement?

19        A.   Well, I don't -- I mean if you're referring to

20   exposure of their genitals and -- and things like that,

21   I'd say no, but I -- as far as unprofessional or

22   inappropriate, that in my -- since I am the owner, that

23   would be in my opinion what is unprofessional and

24   inappropriate and I would make that decision, but it --

25   it had nothing to do with the entertainer and

42

1    entertainment agreement at all.

2        Q.   Okay.  Well, then let me ask it this way.

3    Would the fondling or exposing or touching of human

4    genitals, pubic regions, buttocks, anus, or female

5    breasts, would that be considered unprofessional and

6    inappropriate?

7        A.   In my opinion, would be inappropriate.

8        Q.   Okay.  How about sex acts, normal or

9    perverted, actual or simulated, including intercourse,

10   oral copulation or sodomy?

11           MS. STEWART:  Object to form.

12   BY MR. STAFFORD:

13       Q.   Would that be considered inappropriate or

14   unprofessional?

15       A.   If someone is giving somebody a blow job,

16   inappropriate, yes.

17       Q.   Okay.  But just in -- all right.  But the

18   general term or the general description, sex acts,

19   actual or simulated, including intercourse, oral

20   copulation or sodomy, that would be considered

21   unprofessional, inappropriate, if it was done in a

22   performance at HM Orlando?

23       A.   Yes.  If there was a -- someone having sex or

24   performing oral sex is inappropriate, of course.

25       Q.   And then masturbation, actual or simulated,

43

1  would that be -- if it was done during a performance,

2  would that be considered unprofessional or

3  inappropriate?

4      A.   If someone was masturbating in the middle of a

5  performance, absolutely.

6      Q.   Okay.  And the same thing would be with

7  excretory functions?

8          MS. STEWART:  Object to form.

9          THE WITNESS:  Define that?

10 BY MR. STAFFORD:

11     Q.   All right.  Excretory function as a part of,

12 or in connection with any of the -- in with fondling,

13 sex acts or masturbation?

14     A.   I think I -- I mentioned that if it's

15 masturbation or anything in that regard, obviously

16 inappropriate.

17     Q.   Okay.  Let's see here.  Now, in your

18 interrogatory answers you mentioned a couple of times

19 about slowdowns during Covid.  What, what restrictions

20 were imposed on HM Orlando as a result of the Covid

21 pandemic?

22     A.   Restrictions on our shows?

23     Q.   Just restrictions in general, anything that

24 was imposed by the -- by a governmental entity?

25     A.   Yeah, I mean I -- initially there was a limit

44

1   to the number of guests we could have at the restaurant.

2   I think they started at 25 percent.  And we also had to

3   do a six-feet social distancing with the tables.

4        Q.   Was the business ever shut down as a result of

5   Covid?

6        A.   Yes, for about seven weeks.

7        Q.   Okay.  And did HM Orlando then apply for

8   grants or loans or funding as a result of the business

9   interruption?

10       A.   We did apply and were granted the PPP funds,

11  as well as the Restaurant Revitalization funds.

12       Q.   Okay.  Do you have an estimate of how much you

13  received?

14       A.   I do not.

15       Q.   Okay.  Would that be better for Mike to

16  answer?

17       A.   Yes.

18       Q.   Just give me, give me one second here to get

19  back to my place.  (Pause.)

20            Now, in the amended complaint, let's see.

21  That would be --

22            MR. STAFFORD:  Ms. Alff, can you put up

23        Exhibit 11?  Never mind.  That would be Exhibit 10,

24        please.  That would be -- we can put it up on our

25        end and we can --

1          COURT REPORTER:  The amended complaint, can we

2      go off the record while I look for that?

3          MR. STAFFORD:  Sure.  Why don't we use this,

4      why don't we take about a five-minute break, is

5      that good for everybody?

6          THE WITNESS:  Yes.

7          MR. STAFFORD:  All right.  Thanks.

8          (Recess taken from 10:58 a.m. to 11:05 a.m.)

9  BY MR. STAFFORD:

10      Q.   I want to make sure, I think I may have

11  missed something on the record.  So can we go and pull

12  up Exhibit 4.  That should be the policy from --

13          (Defendant's Exhibit 4 was digitally marked

14      for identification.)

15  BY MR. STAFFORD:

16      Q.   Mr. Paonessa, can you see what's up on the

17  screen now?

18      A.   I don't see anything yet.

19      Q.   Okay.  Hold on.  Never mind.  I got ahead of

20  myself.  It wouldn't be the first time.

21          MR. FORRESTER:  No, I'm just -- I'm slow using

22      this (inaudible).  All right.  Does that work now?

23  BY MR. STAFFORD:

24      Q.   Do you see that now?

25      A.   Yes.

46

1      Q.   Okay.  And we had talked earlier about the

2  different age policies that were provided to guests who

3  made reservations.  And I don't think we specifically

4  covered this document, but I just wanted to make sure

5  that, that you recognize this as the policy that was

6  sent to guests from the time June 24, 2023, when the

7  preliminary injunction went into effect, to the present

8  time?

9      A.   That's correct.

10      Q.   Okay.  And now can we go to Exhibit 10?  Yes,

11  let's go ahead and put that up.  But in the -- all

12  right.  In the meantime, you know, all right, but before

13  that in terms -- I want to ask another question about

14  the content of your current shows, the five shows.

15      A.   Okay.

16      Q.   And we've already talked about the Sunday

17  brunch that Hamburger Mary's describes as

18  family-friendly.

19      A.   Mm-hmm.

20      Q.   And I'd like to ask with respect to the other

21  programs and performances, it may be, it may be easier

22  to have you describe the content of those programs in

23  the context of -- of a movie rating system.  Are you

24  familiar, you're obviously familiar with that?

25      A.   Yes, sir.

47

1      Q.   You know, from PG, PG-13 to R, and then we'll

2  just see if we can, we can get -- if we can do this.  If

3  you had to describe the bingo night, how would you, if

4  you had to give that a rating, what would you do?

5           MS. STEWART:  Object to form.

6           THE WITNESS:  I'm not a movie rater so I don't

7      really know what.  I mean, if language and sexual

8      innuendo and provocative outfits might push it into

9      the R rated for a Tuesday.

10  BY MR. STAFFORD:

11      Q.   Okay.  How about the Dining with The Divas on

12  Fridays?

13      A.   Similar.  I mean the -- the host, I mean that

14  there's -- there's obviously dirty jokes and there's

15  language and they are wearing bustiers and, you know,

16  things like that that, you know, I -- I, again, I don't

17  know what would be rated, you know, movie-wise, but I

18  would say it's more provocative, obviously, than a

19  Sunday show.

20      Q.   Okay.  And then the Saturday brunch?

21      A.   Same.

22      Q.   Okay.  And the celebrity impersonation show on

23  the 1st Saturday of the month?

24      A.   Yeah, that one and then just the Saturday

25  night shows in general, I would say the same.

48

1      Q.   Okay.  And the Broadway Brunch would be PG?

2      A.   PG.

3      Q.   All right.  Thank you for that.

4           Now, with respect to the First Amended

5  Complaint, I want to go to page eight.  And if you see

6  paragraph 34, just give us one second.

7           (Defendant's Exhibit 10 was digitally marked

8  for identification.)

9  BY MR. STAFFORD:

10     Q.   All right.  At the bottom there you see

11 paragraph 34.  And that paragraph says, "The Act has

12 forced Plaintiff to either heavily censor its shows or

13 else impose age limitations on who may attend."

14          Has HM Orlando or Hamburger Mary's Orlando,

15 has it censored, has it heavily censored any of its

16 shows as a result of the passage of S.B. 1438?

17     A.   Well, what we did was we changed the -- you

18 know, that was for -- we did the -- impose age

19 limitation where we added 18-plus.  So instead of

20 changing all the shows to try to figure out what was

21 inappropriate or not allowed from the state's

22 perspective -- because at the end of the day, it doesn't

23 matter what I think because there's things that are --

24 you know, again with the Plaza Live situation, there

25 were things that were, to the undercover agent who --

49

1   that were fine, but the state decided they weren't.  So

2   it would be ridiculous for us to try to decide what to

3   censor because we don't know what they're looking for.

4   So we opted for the imposing a limitation on who could

5   attend.

6        Q.   Okay.  And speaking of the Plaza Live, that

7   that occurred prior to the passage or introduction of

8   S.B. 1438, correct?

9        A.   Yes.

10        Q.   Okay.  Now, with the -- I'll ask you a couple

11   of questions about the attendance of minors at your --

12   at HM Orlando's performances.

13        A.   Okay.

14        Q.   Does HM Orlando keep records of any kind

15   indicating the number of minors attending performances

16   either with respect to specific shows or just the

17   attendance of minors in general?

18        A.   We don't have a -- I mean there's no way to

19   see that because guests call in with a reservation for

20   12 people that we don't know if it's three kids, no

21   kids, if they show, you know, if they're allowed to come

22   to that show.  We can see by which kid's meals we sell,

23   and we can take a look to see, you know, how that number

24   tracks over time.

25        Q.   And I guess in with -- are minors who attend a

50

1    show, are they subject to the cover charge, the -- and

2    the minimum, I guess it's either two drinks or an

3    entree, are they subject to that?

4         A.    Obviously, not the drinks.  Okay.

5         Q.    Correct.  But it was, it's either/or, right,

6    two drinks or --

7         A.    Right, two drinks or --

8         Q.    -- an entree?

9         A.    Yeah.  I mean, if they take up a seat, if

10   they're old enough to take up the seat, then they're

11   going to pay the entertainment fee.  If they're in a

12   highchair or something like that, then, then no, but

13   they are required to.  You know, if it's -- you know, if

14   it's a baby, you know, we're not going to require they

15   eat.  If it's a 7-year-old, then they order something

16   off the kid's menu.

17        Q.    Does Hamburger Mary's Orlando -- do you

18   engage, you make efforts to, you know, invite or educate

19   that the shows are, you know, that children or minors

20   are welcome in the shows or to attend the shows?

21        A.    I mean we don't, we don't put an effort out,

22   you know, in all of our advertising to tell kids to

23   come.  We allow, again, the parent to decide what's

24   appropriate for their children.

25        Q.    And, but in terms of, I guess just in general,

51

1   do you have a -- based on your -- the position you're in

2   and your being at the -- at the restaurant most nights

3   do you have -- can you give me an estimate on, like if

4   you look out at the floor, how many children you would

5   see there?

6           MS. STEWART:  Object to form.

7           THE WITNESS:  Yeah, it -- it varies from show

8        to show and the time of year.  If it's during

9        spring break or it's during the summer, we'll see a

10       lot more than during when the kids are in school,

11       but I don't have -- I couldn't give you an idea of

12       how many.

13  BY MR. STAFFORD:

14       Q.    Okay.  And even prior to or even prior to the

15  passage of S.B. 1438, was the Sunday Broadway Brunch,

16  would you see more children there than in other shows?

17       A.    Yeah, because, I mean we advertise it as

18  family friendly only based on the reasons that I -- that

19  I had spoke to previously, but, also, I mean it's --

20  it's more fun for kids because they do Mary Poppins and

21  they do Hairspray and they do Grease, and they're all in

22  costume and it's very entertaining.  So for the kids

23  it's a lot more fun than going to, you know, see three

24  or four drag performers.

25       Q.    Now, the next questions I have dealing with

1    the -- I guess the cancellations and then the gross

2    income information that you sent, that you sent us.  I

3    guess we can go ahead and start these questions, but if

4    you think that any of those would be better for Mike to

5    answer, we can certainly do that.  And I'll tell you

6    ahead of time, I think these are pretty general

7    questions, but if at any time you want Mike to answer

8    or -- just let me know and we'll -- then we'll hold off

9    on those questions.

10        A.   Yeah.  I mean as far as the cancellations, I

11   have the most working knowledge of that.  If you're

12   getting into the gross income of that, then I'll pass it

13   over to Mike, but if you come -- if there's a question

14   that I feel he's better to answer, then I'll -- I'll let

15   you know.

16        Q.   Okay.  Let's start with Exhibit Number 7,

17   please.  And we'll put that up on the screen.

18             (Defendant's Exhibit 7 was digitally marked

19   for identification.)

20   BY MR. STAFFORD:

21        Q.   And do you have a -- John, do you have a copy

22   of that?  That would be the online reservations, the

23   package that was sent, but --

24        A.   I do not have a copy of that.

25        Q.   Okay.  You see, do you see what's up on the

53

1   screen?

2        A.    Yes, sir.

3        Q.    Okay.  Do you recognize that?

4        A.    I do.

5        Q.    Okay.  And this was provided to us when we

6   asked for the facts that support your allegation that

7   20 percent of the bookings canceled for the May 21, 2023

8   show and for future bookings.  I just want to, I want to

9   ask how that shows the -- how this shows a dropoff in or

10  increase in cancellations?  Because it wasn't, wasn't

11  clear to me, but I'm certainly not --

12       A.    Yeah, I think, I think there's another

13  document that I was able to pull some analytics from

14  Yelp, that shows on a daily basis what the reservations

15  and cancellations were, and I think Shelby provided that

16  and it's a lot more.  This shows the reservations in

17  with the -- with the red dots are the ones who canceled,

18  but there should be a document showing the reservations

19  per day and the reservations with cancellations.

20       Q.    Okay.  And really that's the one thing I

21  wanted to ask about this, what the different colored

22  dots meant.  So red means cancellation?

23       A.    Red is cancellation.  Green is confirmed.  And

24  the ones that are with no color, they usually are

25  coming.  They just didn't tap confirm.  When it asked

54

```
 1   them the day before, are you confirming, they don't get

 2   the message or decide not to answer.  So most of the

 3   times they're coming, but you don't know for sure.

 4        Q.   Okay.  That was what I needed to know.

 5   Thanks.  We will, let's then move to, I think the

 6   document that you were talking about would be Exhibit 8.

 7             (Defendant's Exhibit 8 was digitally marked

 8   for identification.)

 9   BY MR. STAFFORD:

10        Q.   Okay.  Let's see.  Can you see what we have up

11   there marked as Exhibit 8?

12        A.   Mm-hmm.  Yes, sir.

13        Q.   And is this what you were talking about that

14   Shelby sent?

15        A.   Yeah, I think there's one for each day, I

16   believe.

17        Q.   Yes, we'll go through those.

18        A.   Okay.

19        Q.   So can you just tell us what we're looking at

20   here in terms of --

21        A.   Well, this just shows, I mean, the only line

22   you're looking at is the totals, the 51 reservations,

23   and then canceled to the right shows nothing.  So that

24   was the 19th.  What day of the week was that, I don't

25   know.  That is Saturday, but it will show on the
```

1   right-hand side, it will show how many canceled

2   reservations that we had.

3       Q.   Okay.  And just in general trying to interpret

4   this, on that, the right-hand part of the chart that

5   mentions -- that had reservations and walk-ins?

6       A.   Yeah.  Walk-ins won't, walk-ins won't show up

7   on here because we don't put them into the Yelp.  It's

8   just those who call in to reserve a table.

9       Q.   Okay.

10      A.   If they do walk in and we want to assign them

11  the table, we can, but just a walk in is not at the

12  show, then that's -- that's not going to show on there.

13      Q.   Okay.  So this is, is this document, is it

14  generated as a result of the -- as part of the Yelp

15  application or --

16      A.   Yes.

17      Q.   Okay.  And I should have seen that when it

18  says Yelp Reservation at the top.  I apologize.  So this

19  is what you get from Yelp?

20      A.   Yeah, on the -- on the analytics that that

21  will, that will show just a -- a snapshot of

22  reservations and cancellations.

23      Q.   Okay.  Well, I'm done displaying how much

24  knowledge I have with the restaurant industry.  Sorry

25  about that.  The next page, I believe, is May 20.  Do

56

1    you see that?

2         A.   It hasn't popped up yet.

3         Q.   Okay.  Sorry.

4         A.   Yes.

5         Q.   Okay.  So that shows, according to Yelp, that

6    there were 14 cancellations out of a total of ---

7         A.   No, you've got some --

8         Q.   I'm sorry.  128 out of what, 138?

9         A.   128 out of 138 for that day.  There was two

10   shows that day.

11        Q.   And what does that bottom tab, the averages,

12   what does that mean?

13        A.   I wish I could tell you.  I don't know.  Is it

14   the average of both of those shows maybe?  Yeah.  Maybe

15   it's the average between the lunch and dinner, the 39 to

16   99, but it really doesn't -- and the average, it takes

17   an average of the two shows and there are 28 total and

18   it says 14 each.  So it really doesn't make any

19   difference on it.

20        Q.   So what we're -- the main thing we're looking

21   at is the totals?

22        A.   Correct.

23        Q.   Okay.  And the next page number three which is

24   May 21?

25        A.   That was Sunday, I believe.

57

1     Q.   Okay.  And that shows 27 out of 149?

2     A.   Correct.

3     Q.   And then the following, would that be the

4 following Friday from -- or would that be -- that would

5 be a Tuesday right, May 26?

6     A.   Um, that Tuesday, yeah, I don't, I'm not sure.

7 I don't know why it's showing an in-house because that's

8 weird.  Yeah, I don't know if that's a Tuesday.  Is that

9 a Tuesday?

10    Q.   If the 21st is a Sunday, I'm just trying to --

11

12    A.   Well, then that's a Friday, right?

13    Q.   Friday.  Okay.  Yeah.

14    A.   Okay.

15    Q.   Okay.

16    A.   Yeah, I mean it -- no cancellations on that

17 one, it looks like.

18    Q.   Okay.  All right.  And this, would you agree

19 that this, that these reports, they don't give -- they

20 don't provide a reason for the cancellations?

21    A.   They don't provide a reason for the

22 cancellations, but I will say for the number that these

23 that are cancelled, it's far above what we typically

24 would have.

25        In addition, when I made that comment, and I

58

1    think I made that comment in the press that we lost 20

2    percent of our reservations, which is true for that

3    Sunday, but in addition what's not calculated in here

4    are the number of people who call in the morning and

5    wanted to come to the shows, and we tell them that the

6    policy has changed and they didn't book.

7            So these numbers are analytical on what's

8    already in the system, but the ones who tried to call

9    and book, that we couldn't book because the law was in

10   effect, is probably another ten, ten or twelve percent

11   more at least, I think, and once when the initial law

12   went into effect for sure.

13       Q.   All right.  And how have the -- is this

14   something that you look at every, every day that, um,

15   the restaurant puts on, or I guess every -- every day

16   take a look at these?

17       A.   Yeah.  I mean I don't look at this report

18   because, to tell you the truth, I didn't know it existed

19   until I -- I dove deep into it.  But, you know, I -- I

20   look at the numbers and I see that, the cancels.  I know

21   daily how many we have, and at the end of the day, you

22   know, if there have been cancellations or reservations.

23   So do I look at it every day?  Absolutely.

24       Q.   Okay.  But if we ask, you would be able to

25   provide the -- this closing shift report for dates past

59

1    May 26 or whatever the last day is here?

2         A.    Sure.  But I will say, and again as -- as the

3    dates get further away from when the law was put into

4    effect, we put notice out there that there was, that the

5    rules have changed, so you'll have less people calling

6    to make a reservation because they know the new policy.

7    So the people that had reservations on the books

8    canceled because they had children with them, but it

9    doesn't calculate the number of people who wanted to

10   make a reservation or would have, but didn't because the

11   law is was in effect.

12        Q.    Okay.  Are you saying that the number of

13   cancellations that would show up in a report like this

14   would have gone down, gone down over time?

15        A.    I would say yes, but I haven't looked at

16   that report.  Because I know we received a lot of

17   phone calls where people didn't know, and we --

18   obviously, we couldn't put them in the system so they

19   just -- there was not a reservation to show canceled.

20   It just never booked.  And I didn't keep track of that

21   at that point because I didn't, obviously, think I'd

22   ever need that, but, you know, it was, it was a lot.

23   It was a lot of people calling to reserve that we had

24   to turn away.

25        Q.    Okay.  And this, this report, this close of

60

1  shift report from Yelp, that just deals with the

2  reservations, correct?

3      A.   The reservations that are called in that we

4  reserve on line, yeah.

5      Q.   But it's not going to, it's not going to show

6  the number that actually -- the number of guests who

7  actually attended a show?

8      A.   Well, I mean it's -- if the numbers, you know,

9  if there's 150 reserved and 25 cancelled, then we would

10  assume that 125 showed up.

11      Q.   But it wouldn't account for the numbers who --

12  would it account for the numbers who called in and

13  didn't use Yelp?

14      A.   And didn't get a reservation because they

15  weren't, they couldn't come with children, is that what

16  you're saying?

17      Q.   No, no.  I guess I'm still trying to

18  understand.  If somebody calls, so if somebody calls in

19  the morning for a reservation, would that be reflected

20  in Yelp?

21      A.   Yeah, there's no -- like I mentioned earlier,

22  there's no online reservation.  You can't reserve

23  without calling in because with the -- the system is not

24  smart enough to put you in a good seat.  Like the first

25  reservation for three months from now, you'd want right

1  up front. The Yelp system will put them toward the

2  back. So we go in and we -- we make sure that the

3  people who are calling first get the best seats. So,

4  but, yeah, I mean everything that is called in to

5  reserve is here. And it's through the restaurant, not

6  on line.

7      Q. What about walk-ins?

8      A. Walk-ins come in, if we're assigning them a

9  seat, we will put them in here. If they're just -- if

10  they're not staying for the show, if they're just going

11  to go to the bar and have a drink and leave, we wouldn't

12  put them in here.

13      Q. Okay. So the intent of this report is to

14  reflect everybody who has either made a reservation and

15  who attended the show?

16      A. Correct.

17      Q. Okay. Just kind of make sure what we're --

18  what we're looking at.

19        And then we have some, it's just some -- well,

20  we can start where I have general questions, just a

21  couple of general questions about the gross income, the

22  spreadsheet that -- that you provided. If we can put up

23  Exhibit 9, please.

24        (Defendant's Exhibit 9 was digitally marked

25  for identification.)

1   BY MR. STAFFORD:

2       Q.   And I'll tell you that what we did instead of

3   trying to put up, you know, to create the entire

4   spreadsheet and all the difficulty with putting that up

5   on screen-share, I just -- we saved it to PDF and just

6   came into different pages.  Can we scroll through that

7   and just -- and I just want, John, I just want you to

8   take a look at that, and see if that accurately reflects

9   the spreadsheet that was provided?

10      A.   Yes.

11      Q.   Unless you need to -- okay.  And there's one

12  more page, I believe.  And I mean this is what is, this

13  is basically what, this is the content of that

14  spreadsheet, correct?

15      A.   Yes.

16      Q.   Okay.  And it shows basically just the gross

17  income, just shows the numbers, correct?

18      A.   That's correct.

19      Q.   And it doesn't, this document, in and of

20  itself, doesn't give us any reason behind the numbers,

21  correct?

22      A.   Any, I'm sorry?

23      Q.   Any, the reason behind the numbers?

24      A.   It does not, no.

25      Q.   And I apologize for going back and forth, but

63

1  can we pull up the interrogatory number, let's see,

2  number 11, the response to interrogatory number 11.

3          And what I'm looking at there, this is

4  obviously the question asked about the -- identifying

5  the gross income attributed to drag performances.  And

6  in your answer, you say it's not possible to isolate.

7  And then down below, you kind of repeat the -- you have

8  the numbers that we see on the spreadsheet.  We can

9  scroll down to the next page.  And what I want to ask

10  about was part of that last sentence where it starts.

11  It says Plaintiff's gross income was down by more than

12  $185,000 compared to 2022 due to the hostile environment

13  around drag performances by the -- in the state of

14  Florida, including the passage of 1438.

15          Is that an accurate statement for the reason

16  you attribute for the -- for the loss of income compared

17  to the year previous?

18      A.   It is.

19          MR. STAFFORD:  Okay.  Can we go, can we take a

20      short five-, ten-minute break?  I think we're maybe

21      pretty close to wrapping this up.

22          MS. STEWART:  Sounds good.

23          MR. STAFFORD:  All right.

24          (Recess taken at 11:32 a.m. to 11:54 a.m.)

25          MR. STAFFORD:  Mr. Paonessa, I don't believe

64

1          I have any other questions for you.  I appreciate

2          your being here.  And I also don't believe I have

3          any questions for Mike.  You've done a great job

4          covering all the areas.

5                THE WITNESS:  All right.  I appreciate it.

6          Thank you very much.

7                          CROSS-EXAMINATION

8    BY MS. STEWART:

9          Q.   I have just one follow-up question if you

10   don't mind.  John, you mentioned in your testimony

11   earlier that you-all are able to track how many kid's

12   meals you sell, even if you're not able to track exactly

13   how many children attended.

14         A.   Mm-hmm.

15         Q.   What have those numbers shown in the last,

16   since April of 2023?

17         A.   Mike had done an analytic on that and he's

18   getting the information now, but what we did see was a

19   drastic -- and we'll get that number, the decrease in

20   kid's meals over the course of the second half of the

21   year.  And the reason that that's important is it's not

22   just tracking what's in the -- I'm sorry, glasses.  44.6

23   percent down for the number of kid's meals from the time

24   that the law went into effect until the end of the year.

25                And the important part of that is, it's not

65

1    just the kid's meals.  There's parents and groups coming

2    in with these kids to eat and either enjoy a show or

3    just come for just eating at Mary's.  But, you know, we

4    lose not only that business, but probably everybody else

5    who came with them.  And, you know, this, these are big

6    parties typically who come to our shows.

7            Oh, okay.  And so it's Mike's analytics so

8    he's telling me about -- but if -- in addition to our

9    shows, there's all -- we're right near Amway Center, so

10   there's the Orlando Magic plays there, the concerts and

11   everything like this.

12           And what we're finding is that we've -- this

13   law is not only keeping people who would have come here

14   for a show from going to Mary's, but what has been put

15   out there with the -- by the Governor and Representative

16   Fine is that what our drag queens are doing and what's

17   happening at Mary's is grooming pedophilia perversion.

18   And we see these families who used to come to our

19   restaurant before a Magic game or before a concert look

20   at Hamburger Mary's and walk by.

21           So this is a big part of the reason that, you

22   know, our revenues are down, we feel, because people

23   have it in their head who are following, who are maybe

24   supporters of, you know, our Governor and this

25   legislation, that they -- or -- and you know, we've

1  gotten phone calls from people saying, "Well, I didn't

2  know that was going on at your restaurant, I'm never

3  coming back," or, "I used to go to Mary's and I don't

4  anymore."

5          All of this was vitriol that comes around this

6  lawsuit has caused a drastic reduction in families

7  coming with their kids, coming to shows, and just coming

8  to Hamburger Mary's on a regular basis.  So it's -- it's

9  a shot to the heart is what's going on with this

10  lawsuit.  It's killing the business.

11          MS. STEWART:  Thank you, Mr. Paonessa.  I

12      don't have anything else.

13                  REDIRECT EXAMINATION

14  BY MR. STAFFORD:

15      Q.  All right.  Let me follow up with that just

16  briefly.  With respect to the kid's meals, and I know

17  Mike may have more information and we may want to have

18  him on just for a couple of questions, but did I

19  understand you correctly, with the information regarding

20  kid's meals, that would distinguish between a kid's meal

21  purchased during a show or at part of a reservation for

22  a show or kid's meals in general?

23      A.  Kid's meals in general for our business, I

24  mean, we -- we can't track it down to time of day, but

25  just the number of kid's meals we sold from that point

67

1  till the end of the year compared to what we normally

2  had done prior.

3      Q.   Okay.  And also just to make sure I understand

4  that the impact to HM Orlando, do you attribute both, do

5  you attribute to the hostile environment created by the

6  governor and legislators, that you attribute that to the

7  impact on your business?

8      A.   One hundred percent.  The -- the language that

9  they're using for what is happening in drag shows is

10  causing people to believe that their children are being

11  groomed.  And Representative Fine did say that, that

12  these, they're causing transgenderism, they're causing

13  -- and this is on record -- that they are grooming the

14  children.  And, you know, the people who are supportive

15  of -- of that party is going to follow that.  And that

16  that is causing a ripple effect across all of these

17  people who would have come to Hamburger Mary's before,

18  but now this is put in their head, that this is what

19  goes on at Hamburger Mary's so stay away from Hamburger

20  Mary's.

21          And, you know, I have, and I don't know if she

22  sent you phone calls -- not phone calls, but e-mails

23  from people calling us perverts and pedophiles.  "We

24  hope you close, we hope you die."

25          I mean, we -- I had security for the first two

1   months after, for myself and for the business, because

2   we were worried what some crazy person was going to do

3   because of, of what this law represents for -- to

4   Governor DeSantis and Randy Fine is.

5          And it's not about the children.  It's about

6   erasing the community and Mr. Fine has said that as

7   well.  He doesn't care if he erased, erases the LGBTQ+

8   community, as long as drag queens -- our children are

9   not put in front of drag queens.

10          And DeSantis said the other day, "I don't

11   think it's appropriate for a child to be in front of,

12   see a drag queen."  It doesn't matter if they're

13   showing, you know, cleavage or there's a little buttocks

14   showing.  To him, just the fact that a child is in a

15   room with a drag performer is enough for it to be

16   inappropriate.  So that's the baseline that the state is

17   working with, so why would we be worried about what

18   would happen if this law was in effect.

19       Q.   And would you, would you say that the effects

20   that are experienced by, that have been experienced by

21   HM Orlando, created by the statements of the governor

22   and elected officials, that would -- those impacts

23   would be the same regardless of the specific content

24   S.B. 1438?

25       A.   Well, I think what they're doing is they're

1   putting a false narrative out there to everyone who will

2   listen to them, that we what we do is criminal and what

3   the drag queens are doing is criminal.  And they, you

4   know, especially if they throw the children in there

5   just to rile people up.  And that's what they do.  They

6   say they're going after your children when nothing could

7   be further from the truth.

8            And I have been doing this for 16 years and

9   you can -- the history across the country with drag

10  performers, nobody is grooming a child.  Nobody is

11  fondling children.  If there are places where that's

12  being done, it's not in a drag show.

13           So we, I mean it's -- it's devastating on our

14  business.  And I'm sure, and I don't have any

15  information to back that up, but I'm sure it's affecting

16  restaurants who have drag shows nationwide because they

17  continue to -- every time something comes out in the

18  media about this lawsuit or DeSantis says something, the

19  phone calls start coming in, or Randy Fine, the phone

20  calls start coming in.  The e-mails start coming in

21  saying how much, you know, we, you know, what we're

22  doing and we're disgusting and it's -- just it's

23  ridiculous.  The fact that this is allowed, these

24  salacious comments are allowed to affect small business

25  is a travesty.

1       Q.   Understood.  You mentioned when we were

2  talking about the kid's meals, you were saying that Mike

3  had generated the reports.  If we deposed him about

4  those kid's meal, the kid's meals, would he be able to,

5  would he just be able to say that this is, these are the

6  reports that I generated from our records concerning the

7  sales of kid's meals?

8       A.   He's here now.  Do you want me to ask?

9       Q.   Well, what I would, what I would like to be

10  able to do --

11            MR. STAFFORD:  And Melissa, actually, can we

12       go off the record real quick?

13            MS. STEWART:  Yeah, let's go off the record

14       for a second.

15            (Discussion off the record.)

16            (Recess taken at 11:54 a.m. to 11:59 a.m.)

17            MR. STAFFORD:  And, Debbie, we can go back

18       on the record real quick.  And I have no further

19       questions, Mr. Paonessa.  Again, I appreciate your

20       being here.

21            THE WITNESS:  Thank you very much.  Appreciate

22       you --

23            MS. STEWART:  I also have no more questions.

24            MR. STAFFORD:  Thank you.  You guys have a

25       great day.

71

1          MS. STEWART:  Thank you.  You, too.

2          COURT REPORTER:  Mr. Paonessa, read or waive?

3     Ms. Stewart, read or waive?

4          MS. STEWART:  I'm sorry, what was that?

5          COURT REPORTER:  Read or waive?

6          THE WITNESS:  What is that?

7          MS. STEWART:  Oh, read, please.

8          COURT REPORTER:  Read, would that be through

9     your office?

10          MS. STEWART:  Yes, please.  We'll also take a

11     transcript.

12          COURT REPORTER:  Are you ordering at this

13     time, Mr. --

14          MR. STAFFORD:  Not yet.  And, John, what we

15     are talking about is when your attorney says she

16     wants to, she wants to read, that means you'll get

17     a chance to look at your -- at the deposition

18     transcript --

19          THE WITNESS:  Okay.

20          MR. STAFFORD:  -- if somebody orders it, and

21     have an opportunity to correct any errors.

22          THE WITNESS:  Okay.  Good.  Thank you.

23          (Whereupon, the deposition was concluded at

24     approximately 12:02 p.m.)

25

72

1                        CERTIFICATE OF OATH

2

3    STATE OF FLORIDA   )

4    COUNTY OF LEON     )

5

6          I, DEBORAH ALFF, the undersigned authority,

7    certify that JOHN PAONESSA appeared before me and was

8    duly sworn.

9          In WITNESS WHEREOF, I have set my hand in my

10   office in the County of Leon, State of Florida, this

11   12th day of February, 2024.

12

13

14

15                    DEBORAH ALFF, RPR

16                    Notary Public, State of Florida

17                    My Commission Number HH 063594

18                    Expires on February 24, 2025

19

20

21

22

23

24

25

73

1                    CERTIFICATE OF REPORTER

2

3    STATE OF FLORIDA      )

4    COUNTY OF LEON        )

5

6             I, DEBORAH ALFF, do hereby certify that I was

7    authorized to and did stenographically report the

8    deposition of JOHN PAONESSA; that a review of the

9    transcript WAS requested; and that the transcript, pages

10   1 through 75, contains a true record of my stenographic

11   notes and recordings thereof.

12            I FURTHER CERTIFY that I am not a relative,

13   employee, or attorney, or counsel of any of the parties,

14   nor am I a relative or employee of any of the parties'

15   attorney or counsel connected with the action, nor am I

16   financially interested in the action.

17

18            DATED this 12th day of February, 2024, at

19   Tallahassee, Leon County, Florida.

20

21

22   _____

23            DEBORAH ALFF, RPR

24

25

74

1                          ERRATA SHEET

2      Do not write on transcript - Enter Changes on this sheet

3      IN RE:  HM FLORIDA-ORL, LLC, VS. MELANIE GRIFFIN
       DEPOSITION OF:  JOHN PAONESSA
4      TAKEN ON:  JANUARY 25, 2024

5      Page #     Line #     Change/Correction          Reason

6      _____

7      _____

8      _____

9      _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

20     Subject to the above corrections, if any, my testimony
       reads as given by me in the foregoing deposition.

21

22     --------------          ------------------------------
       Date                    Signature of Deponent

23

24                             ------------------------------
                               Printed Name of Deponent

25

FOR THE RECORD REPORTING TALLAHASSEE FLORIDA  850.222.5491

75

```
1              FOR THE RECORD REPORTING, INC.
                1500 Mahan Drive, Suite 140
2               Tallahassee, Florida  32808

3        ForTheRecord@TallahasseeCourtReporting.com

4                   February 12, 2022


5

6   --- VIA E-MAIL ---

7   To:  John Paonessa
     c/o Melissa J. Stewart, Esq.
8   Donati Law, PLLC
     1545 Union Avenue
9   Memphis, Tennessee  38104

10  In Re:  Deposition of John Paonessa taken on 1-25-2024
             HM Florida-ORL, LLC, vs. Melanie Griffin
11

12  Dear sir or madam:

13  The transcript of the above-referenced deposition has
     been completed and forwarded to your offices.  The
14  reading and signing of the deposition transcript is
     reserved.
15
     Upon completion of the Errata, forward a copy to the
16  court reporter's office at the address shown above.
     Once received, the Errata will be forwarded to all
17  ordering parties for inclusion in the transcript.

18  Respectfully,

19  Deborah Alff, RPR

20


21

22  cc:  William H. Stafford, Esq.

23


24

25
```

## $

**$185,000 (1)**
63:12

## A

**abide (2)**
36:9,13
**ability (2)**
7:22;19:11
**able (8)**
11:4;53:13;58:24;
64:11,12;70:4,5,10
**above (1)**
57:23
**absolutely (2)**
43:5;58:23
**abundance (1)**
26:15
**according (1)**
56:5
**account (2)**
60:11,12
**accurate (1)**
63:15
**accurately (1)**
62:8
**across (3)**
20:8;67:16;69:9
**Act (1)**
48:11
**actions (1)**
30:14
**activities (5)**
14:2;35:23;36:4;
41:9
**acts (3)**
42:8,18;43:13
**actual (3)**
42:9,19,25
**actually (4)**
19:16;60:6,7;70:11
**added (6)**
17:21,23;18:1,5,18;
48:19
**addition (3)**
57:25;58:3;65:8
**adhere (1)**
35:10
**admission (1)**
22:8
**admissions (1)**
33:1
**admit (1)**
33:17
**adult (7)**
23:7;24:5;27:11;
28:16;32:9,10;33:14
**adults (1)**
25:19
**advertise (1)**

51:17
**advertising (1)**
50:22
**affect (3)**
7:22;16:16;69:24
**affected (1)**
25:23
**affecting (2)**
27:14;69:15
**again (14)**
6:13;15:17;19:9;
23:22;30:2;31:17;
32:10,17;41:4;47:16;
48:24;50:23;59:2;
70:19
**against (2)**
30:14;35:2
**age (6)**
20:25;22:8;24:2;
46:2;48:13,18
**agencies (1)**
13:14
**agency (1)**
30:10
**agent (1)**
48:25
**ages (2)**
26:25;27:1
**ago (3)**
12:6;17:23;35:9
**agree (3)**
33:1,11;57:18
**agreement (24)**
13:23;34:15;35:8;
36:5,10,21,23;37:2,7,
18,20,24;38:16,21;
39:17,21;40:4,10,16;
41:1,8,10,18;42:1
**ahead (11)**
7:1;9:24,24;20:12;
21:7;31:2;40:6;45:19;
46:11;52:3,6
**Alff (1)**
44:22
**allegation (1)**
53:6
**allow (5)**
40:2,15,25;41:16;
50:23
**allowed (5)**
36:19;48:21;49:21;
69:23,24
**Allstate (2)**
13:13,14
**along (1)**
12:25
**always (3)**
16:11;23:6,8
**amended (1)**
44:20;45:1;48:4
**Amway (1)**
65:9
**analytic (1)**

64:17
**analytical (1)**
58:7
**analytics (3)**
53:13;55:20;65:7
**anatomical (6)**
35:20;36:2;39:20;
40:3,11,15
**and/or (1)**
36:24
**anus (1)**
42:4
**anymore (1)**
66:4
**apologize (4)**
26:1;34:9;55:18;
62:25
**apparently (1)**
35:1
**application (1)**
55:15
**applied (1)**
23:9
**apply (2)**
44:7,10
**appreciate (6)**
24:25;27:7;64:1,5;
70:19,21
**appropriate (4)**
7:2;28:24;50:24;
68:11
**approve (1)**
17:14
**approximately (1)**
71:24
**April (11)**
22:23;24:1;26:7,20,
21,21;27:9,17;29:17;
32:2;64:16
**area (1)**
7:5
**areas (12)**
9:13,19,20;35:20;
36:2;39:16,20;40:3,
11,12,15;64:4
**around (6)**
16:7;24:10;34:25;
36:18;63:13;66:5
**article (1)**
24:10
**artificialities (1)**
6:1
**artists (1)**
35:9
**aspects (1)**
12:18
**assign (1)**
55:10
**assigning (1)**
61:8
**association (1)**
30:23
**assume (2)**

64:17
**assuming (1)**
13:22
**attend (5)**
33:14;48:13;49:5,
25;50:20
**attendance (2)**
49:11,17
**attended (3)**
60:7;61:15;64:13
**attending (1)**
49:15
**attorney (3)**
6:20;9:14;71:15
**attorneys (2)**
11:9;22:14
**attribute (4)**
63:16;67:4,5,6
**attributed (1)**
63:5
**average (4)**
56:14,15,16,17
**averages (1)**
56:11
**aware (5)**
30:8,13;31:9,17;
32:12
**away (5)**
37:20;38:15;59:3,
24;67:19

## B

**baby (1)**
50:14
**back (16)**
10:14;11:1;13:11;
17:6;32:8;34:1,2;
35:8,17;39:7;44:19;
61:2;62:25;66:3;
69:15;70:17
**bar (4)**
13:1,9;31:12;61:11
**bars (1)**
20:9
**based (2)**
51:1,18
**baseline (1)**
68:16
**basic (1)**
5:19
**basically (3)**
38:25;62:13,16
**basis (3)**
17:12;53:14;66:8
**bathrooms (1)**
17:6
**begin (1)**
6:25
**behind (3)**
34:20;62:20,23
**below (1)**
63:7

**best (3)**
6:4;23:15;61:3
**better (7)**
10:6,13;39:9;40:18;
44:15;52:4,14
**big (2)**
65:5,21
**bill (1)**
27:13
**bingo (4)**
17:13,20;18:11;
47:3
**bit (7)**
6:14;15:11;17:8;
20:25;33:21;34:18;
35:18
**blow (1)**
42:15
**board (1)**
31:6
**book (3)**
58:6,9,9
**booked (1)**
59:20
**bookings (2)**
53:7,8
**books (1)**
59:7
**booths (1)**
16:18
**both (5)**
11:17;19:23;36:2;
56:14;67:4
**bottom (6)**
22:3,4,17;29:14;
48:10;56:11
**bounce (1)**
16:5
**break (6)**
7:11,16;8:24;45:4;
51:9;63:20
**breasts (2)**
36:25;42:5
**Brice (1)**
11:17
**briefly (1)**
66:16
**Broadway (6)**
19:4;27:22;28:6,10;
48:1;51:15
**brunch (14)**
17:24,24,25;18:6,
17;19:4;27:18,22;
28:11,17;46:17;
47:20;48:1;51:15
**building (2)**
14:6;16:16
**burgers (2)**
14:18,20
**business (22)**
12:11,15,24;13:4;
14:7,10,17;15:24;
19:10;26:14;30:6,9,

11;44:4,8;65:4;66:10,
23;67:7;68:1;69:14,
24
**businesses (1)**
30:11
**bustiers (1)**
47:15
**buttocks (2)**
42:4;68:13

**C**

**Cabaret (2)**
18:20,22
**calculate (1)**
59:9
**calculated (1)**
58:3
**calendar (2)**
32:22;33:7
**call (12)**
8:18;10:22;16:6;
20:19;23:16;33:20;
39:14,15;49:19;55:8;
58:4,8
**Called (5)**
5:3;38:7;60:3,12;
61:4
**calling (6)**
8:21;59:5,23;60:23;
61:3;67:23
**calls (8)**
59:17;60:18,18;
66:1;67:22,22;69:19,
20
**came (6)**
24:10;34:21;37:2;
38:22;62:6;65:5
**Can (52)**
8:18;9:10;18:3;
22:2,2;26:16,22;28:3;
29:1,4,14;31:2,20;
33:14;34:3,6;35:16,
17;37:23;38:1,1;40:6;
41:3,4;44:22,24,25;
45:1,11,16;46:10;
47:2,2,2;49:22,23;
51:3;52:3,5;54:10,19;
55:11;61:20,22;62:6;
63:1,8,19,19;69:9;
70:11,17
**canceled (6)**
53:7,17;54:23;55:1;
59:8,19
**cancellation (2)**
53:22,23
**cancellations (12)**
52:1,10;53:10,15,
19;55:22;56:6;57:16,
20,22;58:22;59:13
**cancelled (2)**
57:23;60:9
**cancels (1)**

58:20
**capacity (1)**
16:21
**care (1)**
68:7
**case (2)**
7:6;8:19
**cases (1)**
5:16
**cast (2)**
20:21,22
**caused (2)**
35:2;66:6
**causing (2)**
67:10,12,12,16
**caution (1)**
26:15
**caveat (1)**
7:13
**celebrity (2)**
18:25;47:22
**cell (2)**
7:24;8:3
**censor (2)**
48:12;49:3
**censored (2)**
48:15,15
**Center (1)**
65:9
**certain (9)**
6:1;14:18;35:19,22;
36:2,4;39:20;40:10;
41:9
**certainly (8)**
14:10;36:18,19;
37:13;39:22;41:7;
52:5;53:11
**challenging (1)**
22:14
**chance (4)**
6:13;24:20;30:5;
71:17
**change (5)**
26:6;28:19;30:17;
32:7;33:17
**changed (9)**
16:17,20;17:7;
26:10;28:11,14;
48:17;58:6;59:5
**changes (3)**
11:3;16:15,23
**changing (1)**
48:20
**charge (1)**
50:1
**charities (1)**
17:14
**charity (1)**
17:13
**chart (1)**
55:4
**check (1)**
17:5

**Chicago (2)**
15:12,13
**child (3)**
68:11,14;69:10
**children (16)**
30:5;33:14;50:19,
24;51:4,16;59:8;
60:15;64:13;67:10,
14;68:5,8;69:4,6,11
**Church (1)**
16:11
**civil (2)**
5:16,17
**clean (1)**
6:2
**clear (1)**
53:11
**cleavage (1)**
68:13
**click (2)**
32:24;33:12
**close (3)**
59:25;63:21;67:24
**closed (1)**
15:14
**closing (1)**
58:25
**clubs (2)**
30:23;32:12
**color (1)**
53:24
**colored (1)**
53:21
**coming (14)**
17:16;25:20,22;
30:19;53:25;54:3;
65:1;66:3,7,7,7;69:19,
20,20
**comment (2)**
57:25;58:1
**comments (1)**
69:24
**common (1)**
31:8
**community (2)**
68:6,8
**compared (3)**
63:12,16;67:1
**complaint (3)**
44:20;45:1;48:5
**completely (1)**
6:15
**concerned (1)**
27:12
**concerning (1)**
70:6
**concert (1)**
65:19
**concerts (1)**
65:10
**concluded (1)**
71:23
**conduct (4)**

40:21,25;41:14,17
**confident (1)**
16:8
**confirm (1)**
53:25
**confirmation (1)**
23:19
**confirmed (1)**
53:23
**confirming (1)**
54:1
**connection (1)**
43:12
**considered (5)**
25:19;42:5,13,20;
43:2
**considering (1)**
36:21
**content (6)**
15:2;28:10;46:14,
22;62:13;68:23
**contents (1)**
35:14
**contest (1)**
7:10
**context (1)**
46:23
**continue (2)**
28:24;69:17
**contract (1)**
20:17
**control (4)**
14:1,3,5,13
**conversation (1)**
5:25
**copies (1)**
38:25
**copulation (2)**
42:10,20
**copy (6)**
8:13;21:5;33:25;
37:16;52:21,24
**core (2)**
17:17;20:2
**corporate (5)**
8:8;13:18,18;15:6,
12
**corporation (2)**
8:10;13:21
**correction (1)**
22:22
**correctly (1)**
66:19
**costume (1)**
51:22
**costumes (1)**
28:7
**country (2)**
16:7;69:9
**couple (8)**
5:19;8:2;11:18;
38:24;43:18;49:10;
61:21;66:18

**course (4)**
14:19;24:6;42:24;
64:20
**court (7)**
5:22;21:24;45:1;
71:2,5,8,12
**cover (2)**
39:16;50:1
**covered (1)**
46:4
**covering (1)**
64:4
**Covid (9)**
17:8;18:6;37:10,12;
38:13,21;43:19,20;
44:5
**crack (1)**
33:18
**crazy (1)**
68:2
**create (1)**
62:3
**created (2)**
67:5;68:21
**criminal (3)**
5:16;69:2,3
CROSS-EXAMINATION (1)
64:7
**current (3)**
17:10;32:25;46:14
**cut (1)**
17:6

**D**

**daily (2)**
53:14;58:21
**dancing (1)**
28:7
**dates (3)**
11:5;58:25;59:3
**day (15)**
48:22;53:19;54:1,
15,24;56:9,10;58:14,
15,21,23;59:1;66:24;
68:10;70:25
**days (3)**
11:5;16:24;18:2
**dealing (2)**
10:5;51:25
**deals (1)**
60:1
**dealt (1)**
35:16
**Debbie (1)**
70:17
**decide (3)**
49:2;50:23;54:2
**decided (4)**
24:17,21;30:17;
49:1
**decision (6)**
26:4;28:19;30:1,20,

21;41:24

**decrease (1)**
64:19

**deemed (4)**
40:21;41:14,16,17

**deep (1)**
58:19

**Defendant's (11)**
9:7;21:19;29:10;
31:21;34:10;38:2;
45:13;48:7;52:18;
54:7;61:24

**Define (1)**
43:9

**definition (2)**
39:23;40:11

**Department (1)**
30:9

**depending (1)**
17:14

**depo (1)**
9:4

**deposed (1)**
70:3

**deposition (10)**
5:11;7:9;8:7,13;
10:15,20;11:8,16;
71:17,23

**DeSantis (3)**
68:4,10;69:18

**describe (2)**
46:22;47:3

**described (2)**
40:3;41:10

**describes (1)**
46:17

**description (2)**
33:9;42:18

**designated (1)**
8:7

**destroy (1)**
26:14

**devastating (1)**
69:13

**die (1)**
67:24

**differ (1)**
27:23

**difference (1)**
56:19

**different (11)**
18:1,2;19:2;20:14;
25:25;27:21,22;28:8;
46:2;53:21;62:6

**difficulty (1)**
62:4

**digitally (11)**
9:7;21:19;29:10;
31:21;34:10;38:2;
45:13;48:7;52:18;
54:7;61:24

**dining (5)**
16:19;18:15;19:15;

20:20;47:11

**dinner (2)**
18:20;56:15

**DIRECT (1)**
5:7

**direction (1)**
6:11

**director (1)**
19:22

**dirty (1)**
47:14

**discuss (3)**
30:18,24;31:8

**discussed (1)**
8:6

**Discussion (3)**
21:25;31:6;70:15

**disgusting (1)**
69:22

**display (3)**
35:19;39:19;40:10

**displaying (1)**
55:23

**displays (3)**
40:2,2,15

**distancing (1)**
44:3

**distinction (2)**
26:20;36:24

**distinguish (1)**
66:20

**Divas (4)**
18:15;19:15;20:20;
47:11

**dividing (1)**
9:19

**document (10)**
34:7,13;39:2,9;
46:4;53:13,18;54:6;
55:13;62:19

**documentation (1)**
12:4

**documents (1)**
34:5

**done (11)**
10:19;12:13;17:20;
19:7;42:21;43:1;
55:23;64:3,17;67:2;
69:12

**dots (2)**
53:17,22

**dove (1)**
58:19

**down (12)**
8:4;29:14;35:18;
44:4;59:14,14;63:7,9,
11;64:23;65:22;66:24

**downtown (1)**
17:3

**drag (22)**
19:1;22:9;30:15,15,
24;31:7;32:13;33:22;
35:9;51:24;63:5,13;

65:16;67:9;68:8,9,12,
15;69:3,9,12,16

**drastic (2)**
64:19;66:6

**drink (1)**
61:11

**drinks (4)**
50:2,4,6,7

**dropoff (1)**
53:9

**drunk (1)**
17:4

**due (1)**
63:12

**duly (1)**
5:3

**during (8)**
35:5;40:22;43:1,19;
51:8,9,10;66:21

---

**E**

**earlier (4)**
40:9;46:1;60:21;
64:11

**easier (2)**
21:17;46:21

**easy (1)**
16:5

**eat (2)**
50:15;65:2

**eating (1)**
65:3

**edgy (1)**
28:23

**educate (1)**
50:18

**effect (12)**
13:23;28:20;34:17;
38:22;46:7;58:10,12;
59:4,11;64:24;67:16;
68:18

**effects (1)**
68:19

**effort (1)**
50:21

**efforts (1)**
50:18

**eight (2)**
34:4;48:5

**either (2)**
15:21;48:12;49:16;
50:2;61:14;65:2

**either/or (1)**
50:5

**elected (1)**
68:22

**else (6)**
11:25;20:16,18;
48:13;65:4;66:12

**e-mail (1)**
23:18

**e-mails (2)**

67:22;69:20

**employees (1)**
20:17

**enactment (1)**
29:20

**end (6)**
7:12;44:25;48:22;
58:21;64:24;67:1

**endurance (1)**
7:10

**engage (2)**
41:9;50:18

**enjoy (1)**
65:2

**enough (5)**
23:15;28:24;50:10;
60:24;68:15

**entertainer (18)**
34:15;36:5,10,21,
23;37:20;38:15,21;
39:17,21;40:3,10,16;
41:1,8,10,18,25

**entertaining (1)**
51:22

**entertainment (3)**
18:2;42:1;50:11

**entire (1)**
62:3

**entirely (1)**
6:21

**entity (2)**
13:18;43:24

**entree (2)**
50:3,8

**environment (2)**
63:12;67:5

**erased (1)**
68:7

**erases (1)**
68:7

**erasing (1)**
68:6

**err (1)**
24:21

**errors (1)**
71:21

**especially (2)**
39:19;69:4

**essentially (3)**
10:2;26:12;39:18

**estimate (2)**
44:12;51:3

**even (6)**
24:14;30:5;31:5;
51:14,14;64:12

**evening (1)**
20:21

**evenings (1)**
18:19

**event (4)**
7:9;17:16,17;33:5

**events (1)**
33:7

**everybody (4)**
5:24;45:5;61:14;
65:4

**everyone (1)**
69:1

**exactly (1)**
64:12

**EXAMINATION (2)**
5:7;66:13

**except (2)**
24:23;28:16

**exception (4)**
25:3,9;27:11,18

**excretory (1)**
43:7,11

**Exhibit (29)**
9:7,10,12;11:20;
21:8,19;29:2,10;
31:20,21;34:6,8,9,10;
38:1,2;44:23,23;
45:12,13;46:10;48:7;
52:16,18;54:6,7,11;
61:23,24

**existed (1)**
58:18

**expect (2)**
11:20;36:8

**experience (1)**
13:9

**experienced (2)**
68:20,20

**explain (1)**
34:20

**explained (2)**
33:19;39:11

**expose (1)**
36:1

**exposing (2)**
36:19;42:3

**exposure (1)**
41:20

---

**F**

**facing (1)**
8:4

**fact (3)**
11:11;68:14;69:23

**facts (1)**
53:6

**fair (5)**
6:18,19;7:17;10:16;
37:7

**fall (1)**
33:18

**falls (1)**
12:13

**false (1)**
69:1

**familiar (4)**
5:18;35:14;46:24,
24

**families (2)**

65:18;66:6
**family (1)**
  51:18
**family-friendly (3)**
  24:24;28:5;46:18
**far (5)**
  16:21;36:17;41:21;
  52:10;57:23
**fault (1)**
  25:1
**fear (1)**
  30:2
**fee (1)**
  50:11
**feedback (1)**
  16:8
**feel (4)**
  27:25;37:21;52:14;
  65:22
**feeling (2)**
  7:18;26:8
**felt (3)**
  16:8;27:25;28:21
**female (2)**
  36:25;42:4
**few (2)**
  17:23;37:12
**figure (1)**
  48:20
**file (1)**
  39:9
**finally (1)**
  31:18
**financial (3)**
  10:8;12:18,24
**financials (1)**
  10:3
**find (4)**
  24:19;26:2;30:3;
  34:6
**finding (1)**
  65:12
**fine (6)**
  49:1;65:16;67:11;
  68:4,6;69:19
**finish (4)**
  6:3,4,5;7:15
**fire (1)**
  8:23
**first (10)**
  5:3;18:24;19:2;
  25:12;37:15;45:20;
  48:4;60:24;61:3;
  67:25
**fit (2)**
  14:7,23
**five (7)**
  17:11,12,17;20:2,2;
  35:22;46:14
**five- (1)**
  63:20
**five-minute (1)**
  45:4

**five-program (1)**
  18:3
**flagship (2)**
  15:8,11
**floor (1)**
  51:4
**Florida (1)**
  63:14
**Florida-Orlando (1)**
  8:10
**focuses (1)**
  12:18
**folks (2)**
  29:16;32:1
**follow (2)**
  66:15;67:15
**following (3)**
  57:3,4;65:23
**follows (1)**
  5:5
**follow-up (1)**
  64:9
**fondling (3)**
  42:3;43:12;69:11
**forced (1)**
  48:12
**form (8)**
  31:1;32:16;40:5;
  41:2;42:11;43:8;47:5;
  51:6
**formal (1)**
  30:23
**FORRESTER (4)**
  9:4;29:7,9;45:21
**Fort (1)**
  13:15
**forth (1)**
  62:25
**found (1)**
  17:3
**four (9)**
  18:7,8,8;21:23;
  22:17,21;35:17,18;
  51:24
**fourth (1)**
  18:23
**frame (1)**
  27:17
**franchise (8)**
  13:17,22;14:6,11;
  15:6,22;19:10,11
**franchised (1)**
  13:5
**franchisees (3)**
  13:20;15:7,23
**franchisor (1)**
  13:20
**free (1)**
  14:16
**Friday (6)**
  17:1,23;19:22;57:4,
  12,13
**Fridays (2)**

18:15;47:12
**friendly (1)**
  51:18
**front (5)**
  21:5;33:25;61:1;
  68:9,11
**full (1)**
  14:23
**fun (3)**
  34:25;51:20,23
**function (1)**
  43:11
**functions (1)**
  43:7
**funding (1)**
  44:8
**funds (2)**
  44:10,11
**further (3)**
  59:3;69:7;70:18
**future (1)**
  53:8

**G**

**game (1)**
  65:19
**gears (1)**
  20:24
**general (16)**
  15:24;24:7;25:3;
  26:22;42:18,18;
  43:23;47:25;49:17;
  50:25;52:6;55:3;
  61:20,21;66:22,23
**generally (4)**
  22:19,23;23:4,5
**generated (3)**
  55:14;70:3,6
**genitalia (1)**
  36:24
**genitals (3)**
  36:19;41:20;42:4
**gentleman (1)**
  16:3
**given (1)**
  14:6
**gives (1)**
  40:18
**giving (2)**
  11:18;42:15
**glasses (1)**
  64:22
**GM (1)**
  13:1
**God (1)**
  17:20
**goes (1)**
  67:19
**Good (11)**
  5:9,11,11;6:7;8:17;
  11:23;16:5;45:5;
  60:24;63:22;71:22

**governing (1)**
  33:22
**governmental (1)**
  43:24
**Governor (5)**
  65:15,24;67:6;68:4,
  21
**grab (1)**
  35:6
**grabbed (1)**
  34:23
**granted (1)**
  44:10
**grants (1)**
  44:8
**Grease (1)**
  51:21
**great (4)**
  14:6;34:3;64:3;
  70:25
**green (3)**
  37:16;39:7;53:23
**groomed (1)**
  67:11
**grooming (3)**
  65:17;67:13;69:10
**gross (6)**
  52:1,12;61:21;
  62:16;63:5,11
**group (3)**
  30:23;31:5,10
**groups (1)**
  65:1
**guess (20)**
  13:17;15:5,21;21:3;
  23:23;25:2,4;27:22;
  29:16;32:21;33:4;
  35:19;39:14;49:25;
  50:2,25;52:1,3;58:15;
  60:17
**guest (2)**
  33:19;34:24
**guests (6)**
  23:12;44:1;46:2,6;
  49:19;60:6
**guideline (1)**
  40:19
**guys (4)**
  14:16;19:16;37:19;
  70:24

**H**

**Hairspray (1)**
  51:21
**half (3)**
  12:6,22;64:20
**Hamburger (31)**
  8:9,9;12:9;13:4,7,
  17,18,19;14:3,9,19;
  15:1;16:3,10;20:8;
  34:17,23;35:2;36:9,
  22;37:3;38:15,20;

46:17;48:14;50:17;
  65:20;66:8;67:17,19,
  19
**hand (1)**
  35:7
**handing (1)**
  12:23
**handling (2)**
  10:2;12:24
**happen (2)**
  8:15;68:18
**happened (2)**
  24:9;29:19
**happening (3)**
  26:9;65:17;67:9
**head (8)**
  5:23,24;11:1;31:13;
  34:24,25;65:23;67:18
**heart (1)**
  66:9
**heavily (1)**
  11:5;48:12,15
**held (1)**
  22:9
**helped (1)**
  12:4
**herein (1)**
  5:4
**highchair (1)**
  50:12
**history (1)**
  69:9
**HM (14)**
  8:10,10;24:1;26:23;
  29:16;32:20;42:22;
  43:20;44:7;48:14;
  49:12,14;67:4;68:21
**Hold (2)**
  45:19;52:8
**Hollywood (1)**
  15:14
**home (2)**
  10:2;12:23
**hope (2)**
  67:24,24
**host (1)**
  47:13
**hostile (2)**
  63:12;67:5
**hours (1)**
  16:23
**house (10)**
  38:7,16,22;39:5,15,
  16;40:1,14,20;41:13
**human (1)**
  42:3
**hundred (1)**
  67:8

**I**

**idea (2)**
  11:23;51:11

**ideas (1)**
16:5
**identification (11)**
9:8;21:20;29:11;
31:22;34:11;38:3;
45:14;48:8;52:19;
54:8;61:25
**identifying (1)**
63:4
**ignorance (1)**
19:14
**immediately (1)**
10:14
**impact (2)**
67:4,7
**impacts (1)**
68:22
**impersonation (1)**
47:22
**important (3)**
6:8;64:21,25
**impose (2)**
48:13,18
**imposed (2)**
43:20,24
**imposing (1)**
49:4
**inappropriate (16)**
24:14;30:3;40:22;
41:15,22,24;42:6,7,
13,16,21,24;43:3,16;
48:21;68:16
**inaudible (2)**
8:19;45:22
**include (1)**
36:3
**included (1)**
40:11
**including (4)**
22:8;42:9,19;63:14
**income (7)**
52:2,12;61:21;
62:17;63:5,11,16
**incomprehensible (1)**
6:10
**increase (1)**
53:10
**indicating (1)**
49:15
**industry (2)**
13:10;55:24
**influence (1)**
7:21
**informal (3)**
30:22,23;38:17
**information (11)**
10:7,21,23;11:19;
12:7;24:15;52:2;
64:18;66:17,19;69:15
**informed (2)**
9:14;26:3
**in-house (1)**
57:7

**initial (2)**
26:3;58:11
**initially (2)**
16:25;43:25
**injunction (3)**
32:4,7;46:7
**injury (1)**
35:1
**innuendo (1)**
47:8
**inspectors (2)**
24:11,11
**instead (2)**
48:19;62:2
**instructs (1)**
7:4
**insurance (1)**
13:13
**intended (6)**
39:16;40:2,15,18,
25;41:16
**intent (1)**
61:13
**intention (1)**
11:10
**intercourse (2)**
42:9,19
**interest (1)**
31:8
**interject (1)**
20:13
**International (5)**
13:19;14:3;15:1;
16:4;37:3
**interpret (2)**
27:13;55:3
**interpretation (3)**
36:15;39:25;40:19
**interrogaties (1)**
10:22
**interrogatories (1)**
33:25
**interrogatory (11)**
21:3;22:5;26:19;
27:8;33:23,24;37:9;
39:10;43:18;63:1,2
**interruption (1)**
44:9
**interrupts (1)**
21:24
**into (15)**
7:5;23:17;24:12;
32:7;33:21;38:22;
46:7;47:8;52:12;55:7;
58:12,19;59:3;62:6;
64:24
**introduced (1)**
6:1
**introduction (1)**
49:7
**investigate (1)**
30:11
**investigations (1)**

30:14
**investigators (1)**
30:9
**invite (1)**
50:18
**invited (1)**
15:7
**involved (3)**
10:3;12:15;15:19
**isolate (1)**
63:6
**issue (1)**
8:20
**issues (1)**
9:1
**items (1)**
14:23
**iterations (1)**
38:24

**J**

**Jimmy (1)**
19:23
**job (2)**
42:15;64:3
**JOHN (5)**
5:2;52:21;62:7;
64:10;71:14
**jokes (2)**
28:1;47:14
**June (3)**
26:22;32:3;46:6

**K**

**keep (6)**
15:25,25;25:21;
28:5;49:14;59:20
**keeping (1)**
65:13
**keeps (1)**
12:14
**kept (1)**
24:23
**kids (8)**
49:20,21;50:22;
51:10,20,22;65:2;
66:7
**kid's (16)**
49:22;50:16;64:11,
20,23;65:1;66:16,20,
20,22,23,25;70:2,4,4,
7
**killing (1)**
66:10
**kind (8)**
16:19,20;17:25;
20:24;34:24;49:14;
61:17;63:7
**kitchen (1)**
13:1
**knew (1)**

16:6
**knowledge (4)**
10:7;36:12;52:11;
55:24
**known (1)**
6:9

**L**

**LA (1)**
15:11
**language (4)**
28:1;47:7,15;67:8
**lap (1)**
12:13
**large (1)**
36:14
**last (11)**
9:10,14;11:13,18;
12:6,22;18:5,18;59:1;
63:10;64:15
**latest (1)**
17:7
**Lauderdale (1)**
13:15
**law (10)**
22:13;28:20;58:9,
11;59:3,11;64:24;
65:13;68:3,18
**lawsuit (5)**
35:2;37:3;66:6,10;
69:18
**lawyer (1)**
7:4
**layout (1)**
16:16
**learning (1)**
16:8
**least (1)**
58:11
**leave (1)**
61:11
**leaving (1)**
28:9
**leeway (1)**
14:6
**legislation (1)**
65:25
**legislators (1)**
67:6
**less (1)**
28:22;59:5
**LGBTQ+ (1)**
68:7
**license (6)**
24:19;25:24;26:3,
13;27:14;30:4
**limit (1)**
43:25
**limitation (2)**
48:19;49:4
**limitations (1)**
48:13

**line (3)**
54:21;60:4;61:6
**links (3)**
32:25;33:8,8
**liquor (6)**
24:19;25:24;26:3,
13;27:14;30:4
**list (1)**
40:20
**listed (2)**
33:2,8
**listen (1)**
69:2
**lists (1)**
33:7
**little (13)**
6:14;15:17,18;17:8;
19:2;20:25;23:13;
28:22;33:21;34:18,
20;35:18;68:13
**Live (3)**
24:9;48:24;49:6
**loans (1)**
44:8
**location (9)**
13:5,8;15:8,11,13;
16:11;19:25;20:6;
35:2
**locations (3)**
16:7;19:8;20:9
**long (8)**
7:9;11:12;17:19,20;
18:3;24:5;35:9;68:8
**longest (1)**
15:16
**look (13)**
19:12;34:3;45:2;
49:23;51:4;58:14,16,
17,20,23;62:8;65:19;
71:17
**lookalike (1)**
18:25
**looked (2)**
15:5;59:15
**looking (9)**
21:11;22:4;28:21;
49:3;54:19,22;56:20;
61:18;63:3
**looks (1)**
57:17
**loose (4)**
14:5,11;15:18;19:9
**lose (1)**
65:4
**losing (1)**
30:6
**loss (1)**
63:16
**lost (1)**
58:1
**lot (13)**
10:7,21,23;12:4,14;
20:15;30:2;51:10,23;

53:16;59:16,22,23
**loud (1)**
5:24
**lunch (1)**
56:15

## M

**Magic (2)**
65:10,19
**main (1)**
56:20
**majority (1)**
12:21
**makes (2)**
19:19,21
**making (1)**
12:13
**management (1)**
12:12
**manager (3)**
13:1,1;37:21
**many (7)**
5:14;51:4,12;55:1;
58:21;64:11,13
**March (1)**
24:10
**marked (12)**
9:7;21:19;29:10;
31:21;34:10;38:2;
45:13;48:7;52:18;
54:7,11;61:24
**Mary (2)**
20:20;51:20
**Mary's (36)**
8:9,9,18;10:4;12:9;
13:4,7,17,18,19;14:3,
9;15:1;16:3,10;18:17;
20:8;34:17,23;35:3;
36:9;37:3;38:15,20;
46:17;48:14;50:17;
65:3,14,17,20;66:3,8;
67:17,19,20
**Mary's's (1)**
36:22
**masturbating (1)**
43:4
**masturbation (3)**
42:25;43:13,15
**matter (3)**
24:17;48:23;68:12
**may (34)**
6:20;12:20;13:6;
17:16;19:12,12;
20:14,15,18,22;22:21;
25:7;26:18,21,21;
27:9,10,17;29:17,21,
22;32:3;33:18;45:10;
46:21,21;48:13;53:7;
55:25;56:24;57:5;
59:1;66:17,17
**maybe (8)**
12:21;17:13;25:25;

28:4;56:14,14;63:20;
65:23
**McDonald's (1)**
13:12
**meal (2)**
66:20;70:4
**meals (13)**
49:22;64:12,20,23;
65:1;66:16,20,22,23,
25;70:2,4,7
**mean (45)**
8:10;9:23;14:13,18;
15:9;16:17;19:1,9,22;
21:7;25:15,15,16;
26:6;27:25,25;30:2;
34:19;36:14,15,16;
38:23;39:22,22;
41:19;43:25;47:7,13,
13;49:18;50:9,21;
51:17,19;52:10;
54:21;56:12;57:16;
58:17;60:8;61:4;
62:12;66:24;67:25;
69:13
**means (3)**
6:2;53:22;71:16
**meant (2)**
23:3;53:22
**meantime (1)**
46:12
**media (2)**
30:13;69:18
**medications (1)**
7:22
**meeting (1)**
31:11
**meets (2)**
31:10,11
**Melissa (2)**
11:17;70:11
**mentioned (19)**
12:17;13:3,16;
14:24;15:6;22:18,19;
25:7;27:8,9,16;37:2,
10;39:11;43:14,18;
60:21;64:10;70:1
**mentions (1)**
55:5
**menu (3)**
14:14,23;50:16
**message (2)**
39:2;54:2
**mid (1)**
29:21
**middle (5)**
8:22;16:19;22:21,
24;43:4
**might (2)**
7:22;47:8
**Mike (19)**
10:1,7,12;12:10,17,
19,19,20;13:13;30:19,
21;44:15;52:4,7,13;

64:3,17;66:17;70:2
**Mike's (1)**
65:7
**Mimosas (1)**
18:17
**mind (5)**
21:9;34:8;44:23;
45:19;64:10
**mine (1)**
20:17
**minimum (1)**
50:2
**minor (1)**
25:20
**minors (6)**
24:2;49:11,15,17,
25;50:19
**missed (1)**
45:11
**Mm-hmm (11)**
9:18;18:14;23:2;
25:10;33:6;35:21;
39:13;41:12;46:19;
54:12;64:14
**moment (1)**
8:18
**momentarily (1)**
21:24
**Monday (1)**
8:7
**Mondays (1)**
18:11
**monitor (1)**
37:23
**month (6)**
17:13;18:21,23,24;
19:3;47:23
**months (2)**
60:25;68:1
**more (18)**
10:8;12:18;15:18;
40:2,15,18;41:16;
47:18;51:10,16,20,23;
53:16;58:11;62:12;
63:11;66:17;70:23
**morning (7)**
5:9;7:19;10:20;
17:2,4;58:4;60:19
**morphed (1)**
18:1
**most (7)**
6:8;10:2,5;37:22;
51:2;52:11;54:2
**move (4)**
6:11;7:6;35:6;54:5
**moved (1)**
34:24
**movie (2)**
46:23;47:6
**movie-wise (1)**
47:17
**moving (1)**
38:15

**much (7)**
10:6;14:16;44:12;
55:23;64:6;69:21;
70:21
**music (1)**
34:24
**mute (1)**
8:3
**myself (3)**
12:25;45:20;68:1

## N

**naked (1)**
36:18
**name (2)**
12:4;14:19
**narrative (1)**
69:1
**nationwide (1)**
69:16
**near (1)**
65:9
**necessarily (1)**
14:24
**neck (1)**
35:1
**need (7)**
5:22;7:5,10,12;
29:13;59:22;62:11
**needed (2)**
20:11;54:4
**needs (1)**
5:24
**new (3)**
15:7;18:1;59:6
**next (6)**
6:6;17:25;51:25;
55:25;56:23;63:9
**night (10)**
9:14;17:1,22,23;
18:22;19:2,23,23;
47:3,25
**nightclub (1)**
13:9
**nights (1)**
51:2
**Nobody (2)**
69:10,10
**nods (1)**
5:23
**normal (2)**
11:21;42:8
**normally (1)**
67:1
**notice (3)**
8:13;9:5;59:4
**nudity (4)**
39:20,22,23,24
**number (24)**
22:5;33:24;34:23;
35:17,18,22;36:3;
44:1;49:15,23;52:16;

56:23;57:22;58:4;
59:9,12;60:6,6;63:1,2,
2;64:19,23;66:25
**numbers (10)**
58:7;20;60:8,11,12;
62:17,20,23;63:8;
64:15

## O

**object (9)**
6:20;31:1;32:16;
40:5;41:2;42:11;43:8;
47:5;51:6
**objected (1)**
7:3
**objection (1)**
6:23
**obstructive (1)**
16:20
**obtaining (1)**
15:22
**obviously (11)**
26:13;35:11;36:18;
43:15;46:24;47:14,
18;50:4;59:18,21;
63:4
**occupancy (1)**
16:16
**occurred (1)**
49:7
**off (11)**
6:11;9:3;16:5;17:5;
21:25;45:2;50:16;
52:8;70:12,13,15
**off-color (1)**
28:1
**offered (1)**
14:14
**office (1)**
71:9
**officials (1)**
68:22
**often (1)**
33:17
**old (2)**
34:18;50:10
**once (3)**
17:13;32:6;58:11
**one (24)**
6:8,11;8:18;9:1;
12:10;18:18;20:11;
22:5;33:12;34:4,19,
22,22;35:7;38:23;
44:18;47:24;48:6;
53:20;54:15;57:17;
62:11;64:9;67:8
**ones (4)**
10:12;53:17,24;
58:8
**online (4)**
23:12,14;52:22;
60:22

**only (9)**
7:2,13;25:21;26:6,
7;51:18;54:21;65:4,
13
**open (8)**
12:20;13:6;16:11;
17:1,2,7;36:15;39:24
**opened (3)**
16:14,25;17:21
**opening (4)**
13:7;15:22;16:23,
24
**operate (1)**
14:17
**operational (1)**
10:6
**operators (1)**
31:6
**opinion (5)**
24:13;30:4;39:8;
41:23;42:7
**opportunity (1)**
71:21
**opposed (1)**
26:24
**opted (1)**
49:4
**oral (3)**
42:10,19,24
**order (3)**
6:1;11:15;50:15
**ordering (1)**
71:12
**orders (1)**
71:20
**original (2)**
32:8;34:19
**Orlando (19)**
13:14,17;16:10;
17:3;24:1;26:24;
29:16;32:20;36:22;
42:22;43:20;44:7;
48:14,14;49:14;
50:17;65:10;67:4;
68:21
**Orlando's (1)**
49:12
**others (1)**
9:21
**otherwise (1)**
38:17
**ours (1)**
20:10
**out (19)**
5:24;8:22;10:11;
17:3;24:10;26:2;
33:17;35:3;48:20;
50:21;51:4;56:6,8,9;
57:1;59:4;65:15;69:1,
17
**outfits (2)**
36:17;47:8
**over (10)**

5:19;11:13,17;18:1;
21:2;23:16;49:24;
52:13;59:14;64:20
**override (5)**
25:14;26:5,24;
28:15,16
**own (5)**
12:10;16:3,4;24:6;
33:8
**owned (1)**
15:13
**owner (2)**
12:16;41:22
**owners (2)**
12:10;15:13;16:2;
19:10,11;31:6

## P

**package (1)**
52:23
**page (17)**
9:10;18:10;21:23;
22:2,3,4,17,21;23:1;
32:22;34:4;35:25;
48:5;55:25;56:23;
62:12;63:9
**pages (1)**
62:6
**pandemic (1)**
43:21
**PAONESSA (13)**
5:2,9;9:12;22:3;
29:4;31:25;34:13;
38:5;45:16;63:25;
66:11;70:19;71:2
**paperwork (1)**
10:24
**paragraph (4)**
35:18;48:6,11,11
**pardon (1)**
19:14
**parent (2)**
27:4;50:23
**parental (6)**
25:3,9,14;26:4,24;
28:15
**parents (4)**
25:18,20,22;65:1
**part (12)**
14:8,10;25:5;36:5;
41:13;43:11;55:4,14;
63:10;64:25;65:21;
66:21
**particular (4)**
19:6;20:7,19;38:23
**parties (1)**
65:6
**party (1)**
67:15
**pass (1)**
52:12
**passage (7)**

22:10;23:23;26:23;
48:16;49:7;51:15;
63:14
**passed (1)**
25:8
**past (2)**
38:12;58:25
**Pause (1)**
44:19
**pay (1)**
50:11
**PDF (1)**
62:5
**pedophiles (1)**
67:23
**pedophilia (1)**
65:17
**pending (1)**
7:14
**people (21)**
15:15;17:4;19:10;
20:22;25:21;49:20;
58:4;59:5,7,9,17,23;
61:3;65:13,22;66:1;
67:10,14,17,23;69:5
**per (1)**
53:19
**percent (7)**
12:11;44:2;53:7;
58:2,10;64:23;67:8
**Perfect (1)**
10:19
**perform (1)**
20:18
**performance (6)**
22:9;35:5;40:23;
42:22;43:1,5
**performances (17)**
14:25;15:2,3;17:11;
19:7;27:24;30:15;
31:7;32:22,25;33:23;
38:18;46:21;49:12,
15;63:5,13
**performed (3)**
20:4,5;36:9
**performer (4)**
35:12;36:1,3;68:15
**performers (10)**
20:14,15;34:22;
36:9,13;37:14;39:12;
41:9;51:24;69:10
**performing (1)**
42:24
**period (2)**
32:2;38:19
**peripherally (1)**
10:3
**permit (1)**
41:17
**permitted (1)**
24:2
**person (1)**
68:2

**perspective (2)**
24:15;48:22
**perversion (1)**
65:17
**perverted (1)**
42:9
**perverts (1)**
67:23
**PG (3)**
47:1;48:1,2
**PG-13 (1)**
47:1
**phone (9)**
7:24;8:3;23:17;
59:17;66:1;67:22,22;
69:19,19
**phonetic (1)**
10:23
**place (11)**
17:19;18:4;25:11,
12;26:15,17;32:5,7;
37:24;38:12;44:19
**places (1)**
69:11
**Plaintiff (1)**
48:12
**Plaintiff's (2)**
22:23;63:11
**plays (1)**
65:10
**Plaza (3)**
24:9;48:24;49:6
**please (8)**
6:3,23;33:3;44:24;
52:17;61:23;71:7,10
**pm (1)**
71:24
**point (5)**
15:19;24:21;28:20;
59:21;66:25
**policies (7)**
20:25;22:8,8;23:11;
33:22;35:10;46:2
**policy (22)**
11:3;23:6,8;24:1,8;
25:5,9;26:15,23;27:2;
28:14,19;30:7,17;
32:7,8;33:1;38:17;
45:12;46:5;58:6;59:6
**popped (1)**
56:2
**Poppins (1)**
51:20
**popular (1)**
19:1
**portion (2)**
10:8;12:24
**position (1)**
51:1
**possible (1)**
63:6
**post (1)**
37:16

**posted (2)**
37:15;38:16
**posting (2)**
37:13;39:5
**PPP (1)**
44:10
**precise (1)**
20:5
**preface (1)**
41:7
**preliminary (1)**
46:7
**premises (1)**
22:9
**prep (1)**
11:21
**prepare (2)**
10:19;11:15
**present (2)**
22:22;46:7
**press (1)**
58:1
**pretty (3)**
14:16;52:6;63:21
**previous (1)**
63:17
**Previously (2)**
34:18;51:19
**prior (20)**
13:7,8,12;15:21;
18:8;22:9,22,22;23:6,
23;26:17,21,23;30:7,
19;37:11;49:7;51:14,
14;67:2
**privileged (1)**
7:5
**probably (5)**
10:6;37:8,12;58:10;
65:4
**proceed (1)**
10:10
**produce (1)**
19:16
**produced (2)**
19:15;20:4
**produces (1)**
19:23
**productions (1)**
28:6
**Professional (1)**
30:10
**program (2)**
19:17;33:13
**programs (5)**
17:10;32:13;33:9;
46:21,22
**prohibited (4)**
40:10;41:1,8,17
**proper (1)**
6:21
**properly (1)**
12:14
**prosthetic (1)**

36:24
**provide (4)**
12:5;57:20,21;
58:25
**provided (8)**
8:13;34:5;38:6;
46:2;53:5,15;61:22;
62:9
**provocative (5)**
28:3,23;36:17;47:8,
18
**pubic (1)**
42:4
**publish (1)**
32:21
**pull (3)**
45:11;53:13;63:1
**purchased (1)**
66:21
**push (1)**
47:8
**put (42)**
8:16,17,22;12:4;
14:8,8,25;21:7;23:15,
17;26:15,17;29:1,6,
24;30:15,24;31:7,20;
32:21;34:1,2,7;38:1;
44:22,24;46:11;
50:21;52:17;55:7;
59:3,4,18;60:24;61:1,
9,12,22;62:3;65:14;
67:18;68:9
**puts (2)**
23:17;58:15
**putting (4)**
21:9;39:9;62:4;
69:1

**Q**

**queen (1)**
68:12
**queens (7)**
28:2;35:4;36:16;
65:16;68:8,9;69:3
**quick (1)**
8:24;70:12,18

**R**

**Randy (2)**
68:4;69:19
**rated (2)**
47:9,17
**rater (1)**
47:6
**rating (2)**
46:23;47:4
**read (6)**
71:2,3,5,7,8,16
**ready (1)**
39:8
**real (3)**

36:24;70:12,18
**really (7)**
15:10,19;19:12;
47:7;53:20;56:16,18
**reason (14)**
6:12;7:11;24:7;
25:4,11,21;39:4;
57:20,21;62:20,23;
63:15;64:21;65:21
**reasons (1)**
51:18
**recall (2)**
40:12;41:11
**received (2)**
44:13;59:16
**Recess (3)**
45:8;63:24;70:16
**recognize (6)**
29:13,15;34:13;
38:9;46:5;53:3
**record (13)**
5:22,23;6:2;9:3;
21:25;28:18;45:2,11;
67:13;70:12,13,15,18
**records (2)**
49:14;70:6
**red (3)**
53:17,22,23
**REDIRECT (1)**
66:13
**reduction (1)**
66:6
**refer (1)**
34:7
**referring (1)**
41:19
**refers (3)**
34:5;35:19,22
**reflect (1)**
61:14
**reflected (1)**
60:19
**reflects (1)**
62:8
**reg (1)**
18:21
**regard (6)**
10:9,25;13:2;20:3;
39:24;43:15
**regarding (4)**
22:8;33:1;38:17;
66:19
**regardless (1)**
68:23
**regions (1)**
42:4
**regular (2)**
17:12;66:8
**Regulation (1)**
30:10
**reign (2)**
14:16,23
**remained (1)**

16:22
**remove/add (1)**
14:23
**repeat (6)**
20:21;31:3;33:3;
40:7;41:4;63:7
**report (7)**
58:17,25;59:13,16,
25;60:1;61:13
**reported (1)**
24:12
**reporter (7)**
5:23;21:24;45:1;
71:2,5,8,12
**reports (4)**
30:13;57:19;70:3,6
**represent (1)**
38:5
**representative (3)**
8:8;65:15;67:11
**represents (1)**
68:3
**requested (2)**
10:24;11:24
**require (1)**
50:14
**required (6)**
11:24;12:7;14:25;
15:7;23:7;50:13
**requirement (2)**
14:7;26:3
**requirements (2)**
14:12;23:19
**requires (2)**
32:9,10
**reservation (15)**
23:12,18,21;33:20;
49:19;55:18;59:6,10,
19;60:14,19,22,25;
61:14;66:21
**reservations (20)**
23:14,15,16;29:17;
32:2;46:3;52:22;
53:14,16,18,19;54:22;
55:2,5,22;58:2,22;
59:7;60:2,3
**reserve (5)**
55:8;59:23;60:4,22;
61:5
**reserved (1)**
60:9
**resolve (1)**
6:25
**resolved (1)**
9:1
**respect (4)**
46:20;48:4;49:16;
66:16
**respond (2)**
6:4;10:24
**responded (1)**
32:13
**responding (1)**

6:15
**response (2)**
27:8;63:2
**restaurant (15)**
10:1;12:15,21;13:9;
14:2;15:22;16:21;
44:1,11;51:2;55:24;
58:15;61:5;65:19;
66:2
**restaurants (1)**
69:16
**restrictions (4)**
15:2;43:19,22,23
**result (7)**
28:11;37:3;43:20;
44:4,8;48:16;55:14
**revenues (1)**
65:22
**reverted (1)**
32:8
**reviewed (2)**
10:25;35:11
**revise (1)**
6:13
**Revitalization (1)**
44:11
**ridiculous (2)**
49:2;69:23
**right (31)**
10:17;13:3;18:6,22;
21:12;23:3;31:14,16,
18;35:25;37:5;42:17;
43:11;45:7,22;46:12,
12;48:3,10;50:5,7;
54:23;57:5,12,18;
58:13;60:25;63:23;
64:5;65:9;66:15
**right-hand (2)**
55:1,4
**rile (1)**
69:5
**ripple (1)**
67:16
**risk (1)**
27:13
**Rogier (4)**
9:15,16,17,22
**role (1)**
12:8
**roles (1)**
12:15
**rolling (1)**
9:11
**room (4)**
16:19;37:16;39:8;
68:15
**Rossi (1)**
19:23
**rotating (2)**
20:8,22
**rules (15)**
5:19;33:22,22;
37:15;38:7,16,22;

39:5,15,16;40:1,14,
20;41:13;59:5
**run (1)**
27:13
**running (1)**
16:1

**S**

**safe (1)**
28:9
**safety (1)**
24:22
**sage (1)**
18:10
**salacious (1)**
69:24
**sales (1)**
70:7
**same (17)**
16:11,22;19:18;
20:1,3,14,21,22,23;
21:11;27:17;38:25;
39:16;43:6;47:21,25;
68:23
**Saturday (16)**
17:1,22,24,25;18:5,
17,19,20,22,24;19:2;
20:21;47:20,23,24;
54:25
**Saturdays (1)**
18:24
**saved (1)**
62:5
**saying (6)**
39:2;59:12;60:16;
66:1;69:21;70:2
**SB (12)**
22:10,13;23:24;
25:8;26:17;28:12;
29:20;32:14;48:16;
49:8;51:15;68:24
**schedule (3)**
17:19;18:3,8
**schedules (1)**
19:13
**school (1)**
51:10
**screen (11)**
8:4,16,17;21:8,10;
29:7;34:1,2;45:17;
52:17;53:1
**screen-share (1)**
62:5
**scroll (4)**
29:14;35:18;62:6;
63:9
**seat (4)**
50:9,10;60:24;61:9
**seats (1)**
61:3
**second (7)**
9:1;18:23;35:25;

**44:**18;48:6;64:20;
70:14
**section (1)**
35:17
**security (1)**
67:25
**seeking (1)**
9:13
**sell (2)**
49:22;64:12
**semi-retired (1)**
12:22
**sense (2)**
19:19,21
**sent (14)**
10:23;23:11,12,18;
29:15,16;32:1;35:3;
46:6;52:2,2,23;54:14;
67:22
**sentence (1)**
63:10
**set (1)**
10:11
**seven (4)**
33:24;36:1,3;44:6
**sex (5)**
42:8,18,23,24;
43:13
**sexual (4)**
35:23;36:4;41:9;
47:7
**shakes (1)**
5:23
**Shaking (1)**
31:13
**shall (2)**
36:1,3
**share (1)**
6:10
**Shelby (3)**
12:3;53:15;54:14
**shift (2)**
58:25;60:1
**shook (1)**
34:25
**short (1)**
63:20
**shot (1)**
66:9
**show (49)**
17:22,23;18:5,6,20,
22,25,25;19:1,15,16,
22;20:5,21,23;23:19;
24:23;25:18;28:4,8,
11,17;31:24;40:18;
47:19,22;49:21,22;
50:1;51:7,8;53:8;
54:25;55:1,6,12,12,
21;59:13,19;60:5,7;
61:10,15;65:2,14;
66:21,22;69:12
**showed (1)**
60:10

**showing (4)**
53:18;57:7;68:13,
14
**shown (1)**
64:15
**shows (58)**
14:8,20,25;17:21;
18:8,9;19:6,7,24;20:2,
7,15,19;22:18,19,23;
23:9;24:18,23;26:4;
27:10;28:2,8,15;
29:24;30:6,24;43:22;
46:14,14;47:25;
48:12,16,20;49:16;
50:19,20,20;51:16;
53:9,9,14,16;54:21,
23;56:5,10,14,17;
57:1;58:5;62:16,17;
65:6,9;66:7;67:9;
69:16
**shut (1)**
44:4
**side (2)**
24:22;55:1
**sign (2)**
35:9,12
**signed (2)**
37:20,24
**signing (2)**
37:17;39:9
**Similar (1)**
47:13
**simulated (3)**
42:9,19,25
**situated (1)**
16:18
**situation (1)**
48:24
**situations (1)**
35:7
**six (2)**
17:15;36:1
**six-feet (1)**
44:3
**slate (1)**
17:10
**slow (1)**
45:21
**slowdowns (1)**
43:19
**slowly (1)**
17:21
**small (1)**
69:24
**smart (2)**
23:15;60:24
**snapshot (1)**
55:21
**social (1)**
44:3
**sodomy (2)**
42:10,20
**sold (2)**

13:13;66:25
**solely (1)**
30:21
**somebody (4)**
42:15;60:18,18;
71:20
**somebody's (2)**
31:11,11
**someone (5)**
24:18;26:11;42:15,
23;43:4
**sometime (1)**
24:10
**Sometimes (2)**
17:15;33:17
**somewhere (2)**
20:16,18
**soon (1)**
17:2
**Sorry (19)**
8:21;9:11,23;12:3;
14:1;19:20;20:12;
22:22;31:18;32:3;
34:8;37:11;38:19;
55:24;56:3,8;62:22;
64:22;71:4
**sort (5)**
13:25;14:3;15:1;
30:22;31:5
**Sounds (2)**
6:7;63:22
**speak (4)**
5:3;11:4,7,9
**speaking (2)**
8:8;49:6
**special (2)**
17:15,17
**specific (3)**
32:25;49:16;68:23
**specifically (1)**
46:3
**spoke (6)**
11:10,11,25;12:2,2;
51:19
**spoken (1)**
11:17
**sporadically (1)**
17:13
**spreadsheet (5)**
61:22;62:4,9,14;
63:8
**spring (1)**
51:9
**staff (1)**
23:17
**STAFFORD (45)**
5:8;8:24;9:9;21:12,
15,21;22:1;29:1,3,12;
31:2,4,20,23;32:17,
19;34:12;38:4;40:6,8;
41:3,6;42:12;43:10;
44:22;45:3,7,9,15,23;
47:10;48:9;51:13;

52:20;54:9;62:1;
63:19,23,25;66:14;
70:11,17,24;71:14,20
**star (2)**
14:20;18:25
**start (11)**
6:10,22;9:20;11:21;
21:3;52:3,16;61:20;
69:19,20,20
**started (4)**
6:24;15:25;39:4;
44:2
**starts (1)**
63:10
**state (8)**
24:14;26:8;27:13;
30:3,10;49:1;63:13;
68:16
**statement (1)**
63:15
**statements (1)**
68:21
**states (1)**
36:1
**state's (1)**
48:21
**stay (2)**
17:2;67:19
**stayed (1)**
17:1
**staying (1)**
61:10
**STEWART (20)**
21:9,13;31:1;32:16;
40:5;41:2;42:11;43:8;
47:5;51:6;63:22;64:8;
66:11;70:13,23;71:1,
3,4,7,10
**still (8)**
12:23;19:1,1;24:16;
25:20;28:23;36:16;
60:17
**stop (1)**
6:23
**stopped (1)**
38:21
**store (3)**
10:5;12:12;15:15
**stores (2)**
14:22;16:4
**story (1)**
34:20
**Street (1)**
16:12
**strict (2)**
28:16;30:18
**Strike (3)**
14:1;36:22;37:25
**structural (1)**
16:15
**stuff (1)**
11:6
**subject (2)**

50:1,3
**suggest (1)**
14:18
**suggestions (2)**
14:21;15:24
**suited (1)**
10:13
**summer (1)**
51:9
**Sunday (16)**
17:16,17,24;19:4,
23;24:23;27:18,23;
28:10,17;46:16;
47:19;51:15;56:25;
57:10;58:3
**Sundays (1)**
28:22
**supervision (6)**
23:7;24:5;27:11;
32:9,11;33:15
**supplemental (2)**
21:14;22:17
**supplementals (1)**
21:22
**supplied (1)**
12:5
**support (1)**
53:6
**supporters (1)**
65:24
**supportive (1)**
67:14
**supposed (2)**
5:25;7:10
**sure (28)**
5:18;8:3,25,25;
9:20;10:18;11:2,23;
12:13;14:20;18:10;
19:13;21:10;23:5;
31:25;33:16;45:3,10;
46:4;54:3;57:6;58:12;
59:2;61:2,17;67:3;
69:14,15
**switch (2)**
20:24;33:21
**sworn (1)**
5:3
**system (5)**
46:23;58:8;59:18;
60:23;61:1

# T

**tab (2)**
33:5;56:11
**table (3)**
23:16;55:8,11
**tables (2)**
16:18;44:3
**talk (3)**
15:23;20:25;31:12
**talked (3)**
40:9;46:1,16

**talking (10)**
15:6;18:9;22:12;
23:23;25:25;37:14;
54:6,13;70:2;71:15
**tap (1)**
53:25
**target (1)**
30:4
**targeted (2)**
24:16;26:8
**technical (1)**
8:25
**Teeter (1)**
12:3
**telling (1)**
65:8
**temporary (2)**
32:4,6
**ten (4)**
37:8;38:12;58:10,
10
**ten-minute (1)**
63:20
**term (2)**
23:4;42:18
**terms (7)**
14:2;36:15;39:19;
41:18;46:13;50:25;
54:20
**testified (2)**
5:5;27:12
**testifying (2)**
9:21,22
**testimony (2)**
9:13;64:10
**Thanks (2)**
45:7;54:5
**thinking (1)**
11:21
**third (1)**
18:23
**thought (2)**
28:8,23
**three (11)**
16:3;18:21,21,23;
22:2,3,5;49:20;51:23;
56:23;60:25
**throughout (1)**
17:22
**throw (3)**
17:5,5;69:4
**tied (1)**
8:19
**till (4)**
6:4;25:8;29:17;
67:1
**timelines (1)**
11:3
**times (7)**
5:14;11:13;18:21,
21,23;43:18;54:3
**today (1)**
15:20

**together (2)**
12:5;31:7
**top (1)**
55:18
**total (3)**
17:11;56:6,17
**totals (2)**
54:22;56:21
**touch (2)**
8:23;35:5
**touched (1)**
28:17
**touching (1)**
42:3
**toward (1)**
61:1
**track (4)**
59:20;64:11,12;
66:24
**tracking (1)**
64:22
**tracks (1)**
49:24
**train (2)**
15:15,18
**trained (2)**
15:11,14
**training (2)**
15:8,10
**transcript (2)**
71:11,18
**transgenderism (1)**
67:12
**travel (1)**
20:16
**traveling (1)**
19:17
**travesty (1)**
69:25
**tried (1)**
58:8
**true (1)**
58:2
**truth (5)**
5:4,4,4;58:18;69:7
**try (4)**
9:24;28:4;48:20;
49:2
**trying (7)**
17:1;26:2;39:6;
55:3;57:10;60:17;
62:3
**Tuesday (6)**
18:12;47:9;57:5,6,
8,9
**Tuesdays (1)**
18:13
**turn (2)**
8:3;59:24
**turning (1)**
12:14
**twelve (1)**
58:10

**Twisted (1)**
18:10
**Two (9)**
5:15;16:2;25:25;
50:2,6,7;56:9,17;
67:25
**type (1)**
13:25
**types (2)**
15:2;30:25
**typically (2)**
57:23;65:6

## U

**um (4)**
34:19;40:17;57:6;
58:14
**under (9)**
7:21;23:7;27:3;
32:9,10;33:5,8;35:17;
41:18
**undercover (2)**
24:11;48:25
**Understood (4)**
23:22;26:16;27:7;
70:1
**undertake (1)**
36:4
**unique (3)**
19:24;20:9;23:13
**Unless (1)**
62:11
**unprofessional (8)**
40:22;41:15,21,23;
42:5,14,21;43:2
**up (42)**
8:16,19;9:19;15:25;
17:5,5;21:7,7,10,16;
26:12;29:1,6;31:20;
32:21;34:1,7;37:10;
38:1;44:22,24;45:12,
16;46:11;50:9,10;
52:17,25;54:10;55:6;
56:2;59:13;60:10;
61:1,22;62:3,4;63:1,
21;66:15;69:5,15
**use (3)**
14:22;45:3;60:13
**used (7)**
14:21;35:8;37:8,10;
39:20;65:18;66:3
**using (4)**
8:9;38:21;45:21;
67:9
**usually (2)**
6:25;53:24

## V

**vague (1)**
39:23
**varies (1)**

**51:7**
**venue (1)**
24:12
**venues (6)**
26:9;30:15,24;31:7;
32:13;34:22
**verbal (1)**
5:22
**version (1)**
21:13
**violation (1)**
24:15
**visit (1)**
30:11
**vitriol (1)**
66:5

## W

**wait (2)**
6:3,5
**waive (3)**
71:2,3,5
**walk (2)**
17:5;55:10,11;
65:20
**walking (1)**
36:17
**walk-ins (5)**
55:5,6,6;61:7,8
**wander (1)**
25:17
**wants (2)**
71:16,16
**watch (1)**
25:18
**way (8)**
10:10;14:7;16:17;
25:23;26:17;28:25;
42:2;49:18
**wearing (1)**
47:15
**website (3)**
15:6;32:21;33:4
**week (8)**
11:13;12:6,6;17:18;
18:2,2,21;20:23;54:24
**weeks (2)**
11:18;44:6
**weird (1)**
57:8
**welcome (4)**
27:1,3;32:10;50:20
**weren't (2)**
49:1;60:15
**West (1)**
15:14
**what's (10)**
10:4;37:23;45:16;
50:23;52:25;58:3,7;
64:22;65:16;66:9
**wheel (1)**
12:14

**Whereupon (2)**
5:1;71:23
**whole (1)**
5:4
**wish (1)**
56:13
**without (7)**
11:4;24:14;25:17,
22;27:11;37:23;60:23
**witness (20)**
5:3,6;8:18;9:2,6;
21:17;29:8;31:3;
32:18;40:7;41:4;43:9;
45:6;47:6;51:7;64:5;
70:21;71:6,19,22
**word (1)**
23:5
**work (3)**
8:21;17:14;45:22
**worked (3)**
12:6,20;13:13
**working (7)**
10:6;11:4;12:19,23;
13:11;52:11;68:17
**works (2)**
10:1;11:19
**worried (2)**
68:2,17
**worry (2)**
26:11;30:6
**wrapping (1)**
63:21
**wrong (1)**
17:10

## Y

**year (6)**
12:22;51:8;63:17;
64:21,24;67:1
**years (14)**
12:20;13:4;14:21;
17:22,23;18:1,7;21:2;
27:2,2;37:8,12;38:12;
69:8
**Yelp (5)**
23:14,18,20,22;
29:16;53:14;55:7,14,
18,19;56:5;60:1,13,
20;61:1
**you-all (1)**
64:11
**younger (1)**
25:22

## Z

**Zero (1)**
14:5
**Zoom (1)**
31:11

## 1

**1 (2)**
  21:8,19
**1:00 (1)**
  17:4
**10 (3)**
  44:23;46:10;48:7
**10:01 (1)**
  9:3
**10:58 (1)**
  45:8
**100 (1)**
  12:11
**1099 (1)**
  20:17
**11 (4)**
  9:7;44:23;63:2,2
**11:00 (1)**
  17:7
**11:05 (1)**
  45:8
**11:32 (1)**
  63:24
**11:54 (2)**
  63:24;70:16
**11:59 (1)**
  70:16
**12 (1)**
  49:20
**12:02 (1)**
  71:24
**125 (1)**
  60:10
**128 (2)**
  56:8,9
**138 (2)**
  56:8,9
**14 (2)**
  56:6,18
**1438 (14)**
  22:10,13;23:24;
  25:8;26:17,23;28:12;
  29:20;32:14;48:16;
  49:8;51:15;63:14;
  68:24
**149 (1)**
  57:1
**150 (1)**
  60:9
**16 (3)**
  12:20;13:4;69:8
**17 (4)**
  13:11;22:21;27:10;
  29:22
**18 (4)**
  23:7;27:3;32:9,10
**18-plus (23)**
  22:20,23;23:4,7;
  24:7,22;25:3,4,9,13,
  18;26:4,7,10,24;
  27:10;28:15,16;

29:24;30:18;32:9;
33:13;48:19
**19th (1)**
  54:24
**1st (1)**
  47:23

## 2

**2 (2)**
  29:2,10
**2:00 (2)**
  17:2,2
**20 (4)**
  24:11;53:7;55:25;
  58:1
**2007 (1)**
  15:10
**2008 (2)**
  13:6;16:15
**2010 (1)**
  35:8
**2020 (2)**
  22:21;25:8
**2022 (1)**
  63:12
**2023 (15)**
  22:23;24:1;26:21,
  21,22;27:9,10,17;
  29:17,17,21;32:3;
  46:6;53:7;64:16
**21 (2)**
  53:7;56:24
**21st (1)**
  57:10
**24 (1)**
  46:6
**25 (2)**
  44:2;60:9
**26 (2)**
  57:5;59:1
**27 (1)**
  57:1
**28 (1)**
  56:17

## 3

**3 (2)**
  31:20,21
**30b6 (1)**
  8:7
**34 (2)**
  48:6,11
**39 (1)**
  56:15

## 4

**4 (3)**
  34:8;45:12,13
**44.6 (1)**
  64:22

## 5

**5 (2)**
  34:9,10
**51 (1)**
  54:22
**5-year-old (1)**
  25:17

## 6

**6 (2)**
  38:1,2

## 7

**7 (2)**
  52:16,18
**7-year-old (1)**
  50:15

## 8

**8 (3)**
  54:6,7,11
**8-year-old (1)**
  25:17

## 9

**9 (2)**
  61:23,24
**9:59 (1)**
  9:3
**99 (1)**
  56:16



**JOHN PAONESSA
DEPOSITION
EXHIBIT #1**
January 25, 2024  D.A.

**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**HM FLORIDA-ORL, LLC,**

      **Plaintiff,**

**v.**

**MELANIE GRIFFIN, in her official
capacity as Secretary of the Florida
Department of Business & Professional
Regulation,**

      **Defendant.**

**Case No. 6:23-cv-950 – GAP-LHP**

---

**PLAINTIFF'S FIRST SUPPLEMENTAL RESPONSES TO DEFENDANT MELANIE
GRIFFIN'S, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE FLORIDA
DEPARTMENT OF BUSINESS & PROFESSIONAL REGULATION, FIRST SET OF
INTERROGATORIES**

---

Plaintiff HM Florida-Orl, LLC, for its responses to Defendant Melanie Griffin, in her

official capacity as Secretary of the Florida Department of Business & Professional Regulation

(hereinafter "Defendant"), First Set of Interrogatories respectfully state as follows:

## I. GENERAL OBJECTIONS

In addition to the specific objections raised to any particular Interrogatory or Request for

Production of Documents below, the following general objections are made to each of the

discovery requests propounded by the Defendant.

Plaintiff undertakes to respond to these discovery requests only in the form, and to the

extent, required by the Federal Rules of Civil Procedure and the Local Rules of Practice of the

United States District Court of Middle District of Florida (hereinafter collectively referred to as

**EXHIBIT**

_____
**1**

"the Rules"). Plaintiff objects generally to the discovery requests to the extent any specific request imposes an obligation concerning the form or content of any response beyond those required by the Rules or which exceeds the scope of discovery imposed or permitted by the Rules.

Plaintiff generally objects to each request to the extent the request seeks information which is protected by the attorney-client privilege or the attorney work-product doctrine. *See* Fed. R. Civ. P. 26(b)(5).

Plaintiff objects to each request to the extent Defendant requests documents and information from August 1, 2013 to present. Senate Bill 1438, the law at issue in this case, was signed into law May 17, 2023. Defendant thus requests documents and information for nearly a decade prior to the passage of SB 1438. Such as request is overly broad, irrelevant, and unduly burdensome for Plaintiff, a small business already struggling to recover from the impacts of the pandemic and SB 1438. Plaintiff thus responds to Defendant's interrogatories and requests for production from May 17, 2020 to present.

Plaintiff further objects to any request that requires it to list any documents that support Plaintiff's allegations or claims and Defendants' Defenses or Affirmative Defenses in this cause. Such a request constitutes an effort to procure insight into Plaintiff's counsel's strategies, thought processes, and opinions concerning this case. Therefore, this line of inquiry is precluded by the attorney-work product doctrine. While Plaintiff does not assert that the documents themselves constitute attorney-work product, the process of selecting and/or grouping such documents is reflective of Plaintiff's counsel's legal opinions and mental impressions concerning strategy in this case. The disclosure of the trial strategy of Plaintiff's counsel would occur if Plaintiff were

required to specifically enumerate documents supportive of his position in this lawsuit. Such disclosures would violate the attorney work-product doctrine and thus should be precluded.

Plaintiff further objects to each request to the extent any information requested therein is already in the possession, custody, or control of Defendant, on the grounds that such discovery is obtainable from another source that is more convenient, less burdensome or less expensive. *See* Fed. R. Civ. P. 26(b)(1).

Plaintiff's objections and responses to the requests set forth below shall be deemed to incorporate, and shall not be deemed a waiver of, these general objections. Further, each of these general objections is incorporated by reference into the response to each request as if set forth therein verbatim.

## II. RESERVATION OF OBJECTIONS AND RIGHTS

Plaintiff reserves all objections with respect to relevancy and materiality as well as the right to interpose additional objections and to move for an appropriate protective order in the event additional discovery and pre-trial preparation develop further information with respect to any of the requests set forth below.

Plaintiff's answers herein are made without waiver of, or prejudice to, any such objections or rights. Plaintiff specifically reserves the right to amend and/or supplement his responses to these discovery requests. Plaintiff's supplemental answers incorporate all prior answers as if fully set forth therein.

## INTERROGATORIES

**INTERROGATORY NO. 1:** Please describe all policies, including age policies, regarding admission to drag performances held on your premises or otherwise sponsored by you prior to the passage of Senate Bill 1438.

**ANSWER:** Plaintiff produced a copy of its current policies for admission to drag performances held on Plaintiff's premises in response to RFP No. 2.

At all times from since at least May 17, 2020 to present, Plaintiff has provided its policies for drag performances held on its premises at the time of reservation. If the reservation was made online, the person making the reservation was provided a written copy of the policies. If the reservation was made by phone, the policies were provided verbally at the time the reservation was made.

From May 17, 2020 to present, Plaintiff is able to identify one substantive change to its policies: age requirements.

Prior to April 2023, Plaintiff's shows were generally 18+. However, persons under 18 were allowed to attend with adult supervision. Before the enactment of SB 1438, Plaintiff's policies for drag performances, including its age policy, were enforced based on an honor system.

Beginning in April 2023, Plaintiff modified its age policy out of an abundance of caution given the political climate around drag performances in the state. From April 2023 until SB 1438 was enacted, Plaintiff made all of its shows 18+, except for its family-friendly Sunday Brunch. Beginning in April 2023, Plaintiff did not have an adult supervision exception for its 18+ shows.

**FIRST SUPPLEMENTAL ANSWER:** Plaintiff refers Defendant to its First Supplemental Response to RFP No. 2. Plaintiff is a small, family-owned business in downtown Orlando. It has put on drag performances since 2008. Plaintiff has routinely welcomed people under 18, including people under 18 attending with their parents and even grandparents. Prior to the current administration of Republican Gov. Ron DeSantis,

Plaintiff has had no reason for doubting its age-policy or enforcement thereof. At times, Plaintiff will include "18+" in its social media posts or event artwork as guidance to parents that may be contemplating bringing their children. With the exception of the time period ranging from the enactment of S.B. 1438 until the issuance of the preliminary injunction, this 18+ indicator has been a general indicator of the type of content one could expect to see, similar to a movie rating. It is not a definitive statement on the content of the show, and it is certainly not an indicator of obscene content. Rather, it serves to guide parents in determining whether they feel the content is appropriate for their child, depending on the child's age. For example, it may be reasonable for a parent to decide that a show marketed as 18+ is appropriate for their 16-year-old but not their 5-year-old. This determination is left to the parent or supervising adult.

For clarity, the age policy at HM Florida-Orl, LLC has been the following:

- **Prior to April 2023 – All shows are 18+, but those under 18 may attend _any_ show with adult supervision. Enforced by honor system.**

- **April 2023 to Enactment of S.B. 1438 – All shows are strictly 18+ without an adult supervision exception. The one exception was the family-friendly Sunday Broadway Brunch, which was generally 18+ but those under 18 could attend with adult supervision. Enforced by honor system.**

- **Enactment of S.B. 1438 to issuance of preliminary injunction – All shows, including Sunday Broadway Brunch, are strictly 18+ without an adult supervision exception. Enforced by I.D. checks by private, armed security.**

- **Preliminary injunction to present – Reverted to policy in effect prior to April 2023: All shows are 18+, but those under 18 may attend *any* show with adult supervision. Enforced by honor system.**

**INTERROGATORY NO. 2:** Please describe all policies, including age policies, regarding admission to drag performances held on your premises or otherwise sponsored by you after the passage of Senate Bill 1438.

**ANSWER: Plaintiff produced a copy of its current policies for admission to drag performances held on Plaintiff's premises in response to RFP No. 2.**

**At all times from since at least May 17, 2020 to present, Plaintiff has provided its policies for drag performances held on its premises at the time of reservation. If the reservation was made online, the person making the reservation was provided a written copy of the policies. If the reservation was made by phone, the policies were provided verbally at the time the reservation was made.**

**From May 17, 2020 to present, Plaintiff is able to identify one substantive change to its policies: age requirements.**

**Between the passage of SB 1438 and this Court issuing the preliminary injunction prohibiting Defendant from enforcing SB 1438, Plaintiff again modified its age policy, making every drag performance on its premises 18+. During the same period, to ensure the safety of its patrons, performers, and employees, and to ensure compliance with SB 1438, Plaintiff hired armed security for its establishment. The security officer also checked I.D.s to ensure compliance with Plaintiff's age policy.**

**FIRST SUPPLEMENTAL ANSWER: Plaintiff refers Defendant to its First Supplemental Answer to Interrogatory No. 2.**

**INTERROGATORY NO. 3**: Please identify each and every instance in which a complaint was filed against you by the Florida Department of Business and Professional Regulation ("DBPR") or any other state agency. For each such instance, please provide the name of the agency, and the result of the investigation, and identify all documents pertaining to the complaint.

**ANSWER: Plaintiff is not aware of any complaints filed against it by DBPR or any other state agency.**

**INTERROGATORY NO. 4:** Please identify each and every instance in which you were investigated by DBPR or any other state agency. For each such instance, please provide the name of the agency, the date and disposition of the complaint, and identify all documents pertaining to the complaint.

**ANSWER: Plaintiff is not aware of it being the subject of any investigations by DBPR or any other state agency.**

**INTERROGATORY NO. 5**: Other than the three identified in the First Amended Complaint, please identify each and every occasion of which you are aware in which a Florida business was investigated or prosecuted for activities connected to a drag performance. For each occasion, please provide the name of the business, the investigating agency, the approximate date and result of the investigation.

**ANSWER: Plaintiff objects to this Interrogatory because the information requested is equally, if not more readily, available to Defendant. Nevertheless, Plaintiff responds as follows:**

The examples identified in the First Amended Complaint, and referenced by Defendant in this Interrogatory are illustrative examples of the hostile environment in the State of Florida for drag performers and venues that host drag performances. They are just three examples of Florida businesses being targeted following drag performances *before* SB 1438 was signed into law. Plaintiff is a small-business and has not kept tabs on all of the investigations and prosecutions of businesses conducted by the State of Florida since the passage of SB 1438. Plaintiff does not have additional investigations or prosecutions to identify at this time.

**INTERROGATORY NO. 6**: Please identify the fees you have charged for admission to drag performances held on your premises or otherwise sponsored by you.

**ANSWER: All fees charged in connection to drag performances held on Plaintiff's premises are detailed in its policies, which have been produced in relation to Request for Production No. 2.**

**From May 17, 2020 to present, Plaintiff has charged an entertainment fee ranging from $2.99 to $6.99 for its drag performances. In addition, Plaintiffs require a minimum purchase of one entrée or two alcoholic drinks per person. Guests that do not meet this minimum purchase requirement may be charged a $15 cover charge. Additionally, an 18% gratuity is added to each guest's check on all show nights and special events. Collected gratuity is distributed to the servers.**

**INTERROGATORY NO. 7**: Please identify all rules or other policies governing your drag performances held on your premises or otherwise sponsored by you, including but not limited to, rules or policies for the performers, the content of such performances, and the performers' costumes or outfits.

**ANSWER: All rules and policies governing drag performances held on Plaintiff's premises have been produced in response to Requests for Production Nos. 2 and 6.**

**Plaintiff directs Defendant to the "Entertainer Agreement" produced in response to Request for Production No. 7. Prior to the March 2020 Covid-19 restrictions, performers were provided an "Entertainer Agreement" (HM_000003) to sign. Upon re-opening once the Covid-19 restrictions were lifted, Plaintiff's house rules have been verbally communicated and posted in the performers' dressing room. A copy of the house rules, as posted in the dressing room, has been produced: HM_000005.**

**INTERROGATORY NO. 8**: Please identify the principal or material facts you contend support your allegation in Paragraph 33 of the First Amended Complaint that "20% of Plaintiff's bookings cancelled for the May 21, 2023 show and for future bookings."

**ANSWER: The quoted language Defendant identifies from Paragraph 33 of the First Amended Complaint is itself a fact, not an allegation requiring additional factual support. Documentation relating to this fact has been produced in response to Request for Production No. 8.**

**FIRST SUPPLEMENTAL RESPONSE: On January 16, 2024, Defendant stated that "documents provided in RFP 13 . . . are not responsive to either the interrogatory or RFP", and asked Plaintiff to "revise your responses to explain, document your contention regarding booking cancellations for May 21, May 28, as well as any other dates encompassed by the term 'future bookings.'" Plaintiff reiterates its position that the quoted language Defendant identifies from Paragraph 33 of the First Amended Complaint is itself a fact, not an allegation requiring additional factual support. Nevertheless, Plaintiff responds as follows:**

HM_000028, which was provided in response to RFP No. 13, reflects online cancellations for May 20, 21, and 28, which immediately followed S.B. 1438 being signed into law, and is therefore responsive. Nevertheless, Plaintiff was able to generate a more streamlined report that shows the total number of online guest reservations and online cancellations for shows at HM Florida-Orl, LLC from May 17, 2023, S.B. 1438's enactment, to May 28, 2023. These reports have been produced as HM_000041-000046. There is not a report for days in which Plaintiff did not host a performance.

In its First Amended Complaint, Plaintiff states as a fact that "Upon the announcement that S.B. 1438 had been signed and the law was in effect . . . [i]mmediately, 20% of Plaintiff's bookings cancelled for the May 21, 2023 show and for future bookings." First Amended Complaint, Paragraphs 32-33. First, the 20% statistic is an approximation of the total number of guest reservations that were cancelled immediately following the enactment of SB 1438. Second, the vast majority of reservations at Hamburger Mary's Orlando are made within days of a show, although some are made within a few weeks of the particular show. See, for example, HM_000028 (second column showing date reservation was created). Thus, the cancellations for the May 20, 2023 show and for future bookings "immediately" following the enactment of SB 1438 is fairly tied to the May 17, 2023 to May 28, 2023 time period.

For clarity, the online reservations and cancellations from May 17, 2023 to May 28, 2023 are as follows:

May 19, 2023 (HM_000041) –

    Total number guests with online reservations: approx. 51.

    Total number of guests that cancelled their online reservations:  approx. 0.

Total online reservations cancelled as a percentage: 0%

**May 20 (HM_000042) –**

Total number guests with online reservations: approx. 138.

Total number of guests that cancelled their online reservations:  approx. 28.

Total online reservations cancelled as a percentage: 20%.

**May 21, 2023 (HM_000043) –**

Total number guests with online reservations: approx. 149.

Total number of guests that cancelled their online reservations: approx. 27.

Total online reservations cancelled as a percentage: 18%.

**May 26, 2023 (HM_000044) –**

Total number guests with online reservations: approx. 109.

Total number of guests that cancelled their online reservations: approx. 0.

Total online reservations cancelled as a percentage: 0%.

**May 27, 2023 (HM_000045) –**

Total number guests with online reservations: approx. 240.

Total number of guests that cancelled their online reservations: approx. 24.

Total online reservations cancelled as a percentage: 10%.

**May 28, 2023 (HM_000046) –**

Total number guests with online reservations: approx. 156.

Total number of guests that cancelled their online reservations: approx. 26.

Total online reservations cancelled as a percentage: 17%.

To further support its claim, Plaintiff refers its Answer to Interrogatory No. 11 and RFP No. 8, which demonstrate Plaintiff's loss in revenue between 2022 and 2023.

Specifically, Plaintiff brought in $23,262 less in May 2023 than it did in May 2022, and approximately $10,000 less in June 2023 than June 2022. *See* HM_000008. In total between January 2023 and November 2023, Plaintiff's gross income was down by more than $185,000 compared to 2022 due to the hostile environment around drag performances in the State of Florida, including the passage of SB 1438.  *See* HM_000008.

**INTERROGATORY NO. 9:** Please identify the principal or material facts you contend support your allegation in Paragraph 34 of the First Amended Complaint that "[t]he Act has forced Plaintiff to either heavily censor its shows, or else impose age limitations on who may attend . . . . "

**ANSWER: The quoted language Defendant identifies from Paragraph 33 of the First Amended Complaint is itself a fact, not an allegation requiring additional factual support. Nevertheless, Plaintiff responds as follows:**

**Plaintiff imposed a strict 18+ age limit following the enactment of SB 1438 because similarly situated businesses hosting drag performances had already been targeted prior to the passage of SB 1438 and because the language in SB 1438 was so vague and broad that Plaintiff could not ensure that performances would not violate SB 1438. Plaintiff could not risk its business or the safety and well-being of its performers by maintaining its normal course of business and allowing those under 18 to attend with adult supervision. Documentation relating to this fact has been produced in response to Request for Production No. 9.**

**INTERROGATORY NO. 10:** Please describe whether, and if so how, you have "heavily censor[ed] [your] shows, . . . , or else impose[d] age limitations on who may attend . . . . " as alleged in Paragraph 34 of the First Amended Complaint.

**ANSWER:** **Plaintiff refers Defendant to Plaintiff's Complaint and its Answer to Interrogatory No. 9. From the effective date of SB 1438 until the preliminary injunction was issued, Plaintiff made all shows 18+ and enforced this policy by checking I.D.s at the door.**

**INTERROGATORY NO. 11:** Please identify the gross income you attribute to drag performances held on your premises or otherwise sponsored by you from August 1, 2018 to the present.

**ANSWER:** **It is not possible to isolate the gross income of Plaintiff's business that is exclusively attributable to drag performances. Plaintiff is a restaurant in downtown Orlando, Florida, and drag performances are an integral part of Plaintiff's business model. As discussed in response to Interrogatory No. 6, Plaintiff currently charges a $6.99 "entertainment fee," but the actual income generated from drag performances depend on how much attendees of each show eat or drink. Plaintiff does not distinguish revenue from drag performances from other revenue streams.   Thus, Plaintiff responds to this interrogatory by providing its total gross income from 2018 to present:**

> **2018: $1,875,225**
>
> **2019: $1,791,924**
>
> **2020: $752,141**
>
> **2021: $1,466,322**
>
> **2022: $1,800,143**
>
> **2023: $1,458,616**

**From 2010 to 2019, Plaintiff reported approximately $1.8-2.3 million in gross income each year. That number was cut by more than half in 2020 due to the Covid-19**

pandemic and restrictions imposed by the State of Florida. In 2021, gross income began returning to pre-pandemic levels and stabilized in 2022, with $1.8 million in gross income. Between January 2023 and November 2023, Plaintiff's gross income was down by more than $185,000 compared to 2022 due to the hostile environment around drag performances in the State of Florida, including the passage of SB 1438.

**INTERROGATORY NO. 12:** Please identify the percentage of your gross income you attribute to drag performances held on your premises or otherwise sponsored by you from August 1, 2018 to the present.

**ANSWER: Plaintiff refers Defendant to its Answer to Interrogatory No. 11.**

**INTERROGATORY NO. 13:** Please identify all documents that reflect the content of your drag performances held on your premises or otherwise sponsored by you from August 1, 2018 to the present.

**ANSWER: Plaintiff produced the following documents, which are illustrative of the content of drag performances hosted at HM Florida-Orl, LLC: HM_000009-000027.**

**Plaintiff further directs Defendant to its website and social media pages for publicly available descriptions of its drag performances:**

> **https://www.hamburgermarys.com/orlando/**
>
> **https://www.facebook.com/hamburger.maryorlando/**

**INTERROGATORY NO. 14:** Please identify the schedule of drag performances held on your premises or otherwise sponsored by you from August 1, 2018 to the present.

**ANSWER: For the reasons outlined in the general objections, Plaintiff objects to the scope of this interrogatory as overly broad to the extent it requests information before May 17, 2020. Nevertheless, Plaintiff responds as follows:**

From August 1, 2018 to present, with the exception of during the Covid-19 restrictions, Plaintiff has hosted five weekly drag performances, one monthly special, and the occasional charity performance. Charity performances have raised funds for a variety of philanthropic causes including but not limited to: PFLAG, the Orlando Youth Alliance, the Zebra Coalition, and the Pet Alliance of Greater Orlando. The weekly schedule is as follows:

- Tuesday Night Drag Bingo

- Friday Night Drag Show

- Saturday Drag Brunch

- Saturday Drag Cabaret Dinner Show

- Sunday Broadway Drag Brunch

**INTERROGATORY NO. 15:** Please identify all activities you have been prevented or otherwise deterred from engaging in as a result of the passage of Senate Bill 1438.

**ANSWER: From the passage of SB 1438 until the preliminary injunction, Plaintiff was unable to offer entry to any of its shows to persons under the age of 18. During that period, every drag event hosted at or by Plaintiff was impacted by the passage of SB 1438. In addition, Plaintiff typically hosts the opening night block party for Come Out with Pride, Orlando's October Pride celebration. In recent years, Plaintiff has hosted the opening block party, which included drag performances at the main stage. Due to safety concerns for its performers and an inability to secure its typical corporate funding, Plaintiff made the decision to not participate with drag performers at Come Out with Pride, Orlando in 2023.**

**INTERROGATORY NO. 16:** Please identify all individuals who have performed in drag performances held on your premises or otherwise sponsored by you from August 1, 2018 to the present.

**ANSWER: Plaintiff objects to this Interrogatory as unduly burdensome. Due to the impacts of the pandemic, the part-time nature of employment as a drag performer, and the hostile political environment around drag performances in the State of Florida, there is significant turnover of drag performers. Plaintiff does not keep track of each and every drag performer that performs on its premises and is unable to obtain a comprehensive list. Furthermore, Plaintiff only has the stage name of many performers. To the extent Plaintiff is required to produce such a list, Plaintiff will seek a protective order prior to production of any performer name.**

## VERIFICATION

**I certify under penalty of perjury that the foregoing is true and correct.**

/s/       *John Paonessa*
John Paonessa

/s/       *Mike Rogier*
Mike Rogier

[*signature on next page*]

Respectfully submitted,

/s/   *Melissa J. Stewart*
Melissa J. Stewart, Esq. *Pro Hac Vice*
Brice M. Timmons, Esq. *Pro Hac Vice*
DONATI LAW, PLLC
1545 Union Ave.
Memphis, TN 38104
(901) 278-1004 – Telephone

16

(901) 278-3111 – Facsimile
brice@donatilaw.com
melissa@donatilaw.com

Gary S. Israel, Esq
121 S. Orange Ave., Suite 1500
Orlando, FL 32801
(407) 210-3834
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on January 18, 2024, a true and correct copy of the foregoing was served via email on the following:

Henry C. Whitaker
SOLICITOR GENERAL
henry.whitaker@myfloridalegal.com

Nathan A. Forrester
SENIOR DEPUTY SOLICITOR GENERAL
nathan.forrester@myfloridalegal.com

William H. Stafford III
Special Counsel
William.Stafford@myfloridalegal.com

/s/     *Melissa J. Stewart*
          Melissa J. Stewart



**JOHN PAGNESSA**
**DEPOSITION**

**EXHIBIT #2**

January 25, 2024   D.A.

HM Florida-ORL, LLC Drag Performance Policies From April 2023 until Enactment of S.B. 1438

### Message from Hamburger Mary's

Thanks for booking with Hamburger Mary's Orlando! Here is some important information about your reservation that we encourage you to share with everyone in your group. PLEASE NOTE: ALL SHOW are only for guests 18 and up except Sunday Broadway Brunch which is family friendly. We may change this rule soon, as we are working through our lawsuit against the State. If you want to vent, please write to your Governor in Tallahassee.

We hold tables for 15 minutes; if you're running late please call us at 321-319-0600 so we don't release your table to someone on our wait list. Incomplete parties may not be seated until the entire party has arrived.

There are numerous options for parking nearby including various garages, lots, and street parking. Parking can often be a challenge downtown, especially when events are scheduled at the various venues in the area. Please plan accordingly in order to arrive at Mary's in time for your scheduled reservation. Information about downtown parking can be found here: http://www.downtownorlando.com/getting-around/parking/

If you'd like to take an advance look at our menu please go to the following: http://www.hamburgermarys.com/orlando/HMOrlandoMenu.pdf

FOR MARY'S EVENTS (including Bingo, Dining with the Divas, Mary's & Mimosas Brunch, Illusions, Cabaret, and Broadway Brunch) - . Hamburger Mary's has a minimum purchase of one ENTREE or two ALCOHOLIC drinks per person in your party. Guests not meeting the minimum purchase requirement may be subjected to a $15 cover charge. Also, Mary's has a $6.99 Entertainment Fee per person for all of Mary's shows. (Select special entertainment may carry a larger entertainment fee.). Charity Bingo on select Thursday's will have a $2.99 entertainment fee to cover the fee of the host. PLEASE NOTE: An 18% gratuity will be added to each person's guest check on show nights and special events.

FOR ALL OF MARY'S SHOWS (including Bingo, Dining with the Divas, Mary's & Mimosas Brunch, Illusions, Cabaret, and Broadway Brunch) - Hamburger Mary's

**EXHIBIT**

**2**

Orlando requires a valid credit card number to hold the reservation. Your credit card will not be charged at this time; however, we reserve the right to charge $15 per person for no-shows. To avoid this charge changes to the reservation - including cancellations - must be made by close of business the day prior to the reservation.

If anyone in your party requires special assistance (such as wheelchairs, high chairs, people of size, service animals, etc.) please call us as soon as possible and we will do everything we can to accommodate.

Tables are seated closest to the stage based on when the reservation is made. Changes to the size of your party may affect where you are seated.

Remember: dollar bills are like magnets for drag queens! For the best up-close encounters with Mary's performers be sure to bring change as we keep only a limited supply on hand.

Mary's is a celebration destination! Guests are allowed to decorate their tables, however confetti is not permitted. Also, balloons are not encouraged as they may need to be relocated in order to not block views of the stage for other guests. Guests may bring their own cake, but will also need to supply paper plates and plasticware.

We'll be in touch a few days prior to your reservation to confirm, typically by phone or text. Your reservation is subject to cancellation if not confirmed.

Thanks for booking with us; we look forward to seeing you soon!

HM_000037



JOHN ROBINSON
DEPOSITION

EXHIBIT #3

January 25, 2024  D.A.

HM Florida-ORL, LLC Drag Performance Policy from Enactment of SB 1438 until Preliminary Injunction Issued

**Message from Hamburger Mary's**

Thanks for booking with Hamburger Mary's Orlando! Here is some important information about your reservation that we encourage you to share with everyone in your group. PLEASE NOTE: ALL SHOW are only for guests 18 and up. We had hoped that we could keep our Sunday Broadway Brunch show family friendly, but our Governor has signed in legislation making it illegal. If you want to vent, please write to your Governor in Tallahassee.

We hold tables for 15 minutes; if you're running late please call us at 321-319-0600 so we don't release your table to someone on our wait list. Incomplete parties may not be seated until the entire party has arrived.

There are numerous options for parking nearby including various garages, lots, and street parking. Parking can often be a challenge downtown, especially when events are scheduled at the various venues in the area. Please plan accordingly in order to arrive at Mary's in time for your scheduled reservation. Information about downtown parking can be found here: http://www.downtownorlando.com/getting-around/parking/

If you'd like to take an advance look at our menu please go to the following: http://www.hamburgermarys.com/orlando/HMOrlandoMenu.pdf

FOR MARY'S EVENTS (including Bingo, Dining with the Divas, Mary's & Mimosas Brunch, Illusions, Cabaret, and Broadway Brunch) - . Hamburger Mary's has a minimum purchase of one ENTREE or two ALCOHOLIC drinks per person in your party. Guests not meeting the minimum purchase requirement may be subjected to a $15 cover charge. Also, Mary's has a $6.99 Entertainment Fee per person for all of Mary's shows. (Select special entertainment may carry a larger entertainment fee.). Charity Bingo on select Thursday's will have a $2.99 entertainment fee to cover the fee of the host. PLEASE NOTE: An 18% gratuity will be added to each person's guest check on show nights and special events.

FOR ALL OF MARY'S SHOWS (including Bingo, Dining with the Divas, Mary's & Mimosas Brunch, Illusions, Cabaret, and Broadway Brunch) - Hamburger Mary's

EXHIBIT

3

Orlando requires a valid credit card number to hold the reservation. Your credit card will not be charged at this time; however, we reserve the right to charge $15 per person for no-shows. To avoid this charge changes to the reservation - including cancellations - must be made by close of business the day prior to the reservation.

If anyone in your party requires special assistance (such as wheelchairs, high chairs, people of size, service animals, etc.) please call us as soon as possible and we will do everything we can to accommodate.

Tables are seated closest to the stage based on when the reservation is made. Changes to the size of your party may affect where you are seated.

Remember: dollar bills are like magnets for drag queens! For the best up-close encounters with Mary's performers be sure to bring change as we keep only a limited supply on hand.

Mary's is a celebration destination! Guests are allowed to decorate their tables, however confetti is not permitted. Also, balloons are not encouraged as they may need to be relocated in order to not block views of the stage for other guests. Guests may bring their own cake, but will also need to supply paper plates and plasticware.

We'll be in touch a few days prior to your reservation to confirm, typically by phone or text. Your reservation is subject to cancellation if not confirmed.

Thanks for booking with us; we look forward to seeing you soon!


**Please note:**

There is a $1.99 entertainment fee for our shows that will be added to your check. We also have a minimum of an entree or 2 alcoholic beverages per person or a $10 cover fee will be added.


**Cancellation policy:**

For all shows Hamburger Mary's Orlando requires a valid credit card number to hold the reservation. Your credit card will not be charged at this time. However,

Hamburger Mary's Orlando reserves the right to charge $15 per person for no-shows. To avoid this charge, changes to the reservation - including cancellations - must be made no later than 24 hours before your reserved showtime.

HM_000040



JOHN PAONESSA
DEPOSITION

EXHIBIT #4

January 25, 2024   D.A.

HM Florida-Orl, LLC Current Drag Performance Policies – June 24, 2023 to Present

**Message from Hamburger Mary's**

Thanks for booking with Hamburger Mary's Orlando! Here is some important information about your reservation that we encourage you to share with everyone in your group. PLEASE NOTE: All shows are 18 and up, however under 18 are allowed with adult supervision. We hold tables for 15 minutes; if you're running late please call us at 321-319-0600 so we don't release your table to someone on our wait list. Incomplete parties may not be seated until the entire party has arrived.

There are numerous options for parking nearby including various garages, lots, and street parking. Parking can often be a challenge downtown, especially when events are scheduled at the various venues in the area. Please plan accordingly in order to arrive at Mary's in time for your scheduled reservation. Information about downtown parking can be found here: http://www.downtownorlando.com/getting-around/parking/

If you'd like to take an advance look at our menu please go to the following: http://www.hamburgermarys.com/orlando/HMOrlandoMenu.pdf

FOR MARY'S EVENTS (including Bingo, Dining with the Divas, Mary's & Mimosas Brunch, Illusions, Cabaret, and Broadway Brunch) - . Hamburger Mary's has a minimum purchase of one ENTREE or two ALCOHOLIC drinks per person in your party. Guests not meeting the minimum purchase requirement may be subjected to a $15 cover charge. Also, Mary's has a $6.99 Entertainment Fee per person for all of Mary's shows. (Select special entertainment may carry a larger entertainment fee.). Charity Bingo on select Thursday's will have a $2.99 entertainment fee to cover the fee of the host. PLEASE NOTE: An 18% gratuity will be added to each person's guest check on show nights and special events.

FOR ALL OF MARY'S SHOWS (including Bingo, Dining with the Divas, Mary's & Mimosas Brunch, Illusions, Cabaret, and Broadway Brunch) - Hamburger Mary's Orlando requires a valid credit card number to hold the reservation. Your credit card will not be charged at this time; however, we reserve the right to charge $15 per person for no-shows. To avoid this charge changes to the reservation - including cancellations - must be made by close of business the day prior to the reservation.

If anyone in your party requires special assistance (such as wheelchairs, high chairs, people of size, service animals, etc.) please call us as soon as possible and we will do everything we can to accommodate.

Tables are seated closest to the stage based on when the reservation is made. Changes to the size of your party may affect where you are seated.

Remember: dollar bills are like magnets for drag queens! For the best up-close encounters with Mary's performers be sure to bring change as we keep only a limited supply on hand.

EXHIBIT

_____
4

Mary's is a celebration destination! Guests are allowed to decorate their tables, however confetti is not permitted. Also, balloons are not encouraged as they may need to be relocated in order to not block views of the stage for other guests. Guests may bring their own cake, but will also need to supply paper plates and plasticware.

We'll be in touch a few days prior to your reservation to confirm, typically by phone or text. Your reservation is subject to cancellation if not confirmed.

Thanks for booking with us; we look forward to seeing you soon!



**JOHN PAONESSA DEPOSITION**

**EXHIBIT #5**

January 25, 2024   D.A.

## ENTERTAINER AGREEMENT
### For rendering services as a performer at Hamburger Mary's

This Agreement is made and entered into as of ████████ between HM Florida-ORL,LLC d/b/a Hamburger Mary's Orlando, a Limited Liability Company and _____, an individual (hereinafter referred to as "Performer" ████████████

### RECITALS

A. Hamburger Mary's hereby hires Performer, as an independent contractor, to perform live entertainment at Hamburger Mary's Orlando, located at 110 W. Church Street, Orlando, FL (referred to as the "Premises")

B. Hamburger Mary's and the Performer desire to enter into this Agreement to set forth their respective rights and obligations relating to this Agreement.

NOW, THEREFOR, in consideration of the foregoing and for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Hamburger Mary's and the Performer hereby covenant and agree as follows:

### DEFINITIONS

1. "Performer" is an individual hired by Hamburger Mary's as an independent contractor to perform any live entertainment, including but not limited to, comedic performances, bingo hosting, karaoke hosting, at the Premises.
2. "Performance" includes but is not limited to, any live entertainment at the Premises.
3. "Lap dance" is a dance which may include physical contact between performer and another person, involving certain sexual activities.
4. "Certain anatomical areas" shall mean and include any of the following:
   a. Less then completely and opaquely covered human genitals, pubic region, buttocks, anus or female breasts below a point immediately above the top of the areola; or
   b. Human male genitals in a flaccid state or in discernibly turgid state, even if completely and opaquely covered.
5. "Certain sexual activities" shall mean and include any of the following:
   c. The fondling, exposing or touching of human genitals, pubic region, buttocks, anus or female breast
   d. Sex acts, normal or perverted, actual or simulated, including intercourse, oral copulation or sodomy;
   e. Masturbation, actual or simulated;
   f. Excretory functions as part of, or in connection with any of the activities set forth in subdivisions (a) through (e) of this subsection.

**EXHIBIT**

**5**

## TERMS AND CONDITIONS

6. The Performer shall not expose his/her certain anatomical areas at any time.
7. The Performer shall not include or undertake certain sexual activities at any time.
8. The Perform shall not perform a Lap Dance for any patron, employee or any other person at the Premises at any time.
9. The Performer may only accept tips from a patron or any other person when that patron or other person places the tip in a separate marked container not located on the Performer's body.
10. Only the Performer is allowed in the dressing room. The Performer shall not invite or allow any patron or any other person into the dressing room without the express consent of Hamburger Mary's.
11. The Performer will fulfill all obligations and duties under this Agreement, will obey and follow any additional rules and regulations at Hamburger Mary's and will obey and follow all laws of the City of Orlando, County of Orange and State of Florida.
12. Entire Agreement. This Agreement represents the final expression of, and contains the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior understandings with respect thereto. This Agreement may not be modified, changed, supplemented or terminated, nor may any obligations hereunder be waived, except by written instrument signed by the party to be charged or as otherwise expressly permitted herein.
13. The parties hereto acknowledge that this Agreement has been negotiated and entered into in the State of Florida. The parties hereto expressly agree that this Agreement shall be governed by, the interpreted under, and construed and enforced in accordance with the laws of the State of Florida. Any action which arises under this Agreement shall be brought in Orange County, Florida.
14. The Performer hereby releases, acquits, hold harmless and forever discharges Hamburger Mary's from any and all actions, causes of action, claims, demands, liabilities, damages, losses, costs and expenses of every kind and nature whatsoever, in law and in equity, whether known or unknown, suspected or unsuspected, foreseen or unforeseen, and whether grounded in current law or a change in the law at some future date, for personal injury incurred by Performer while at the Premises.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year written above.

HAMBURGER MARYS'                          PERFORMER

By _John Paionessa_                        _Aysa Black_
Its _OWNER_                                Print Name _Aysa Black_



JOHN PAONESSA
DEPOSITION

**EXHIBIT #6**

January 25, 2024   D.A.

**To our Drag Performers:**

Please note that Hamburger Marys has guidelines in place for any performances at this location:

- There will be no exposure or nudity of any kind.
- There will be no lap dances or touching of the guests at any time.
- Tips shall be collected by hand and not inserted in any area on the body.
- There will be no conduct that is deemed unprofessional or inappropriate at any time during their performance.
- Only the performer is allowed in the dressing room area. If a performer has an assistant that is required for costume changes, mgt approval is required.

Violation of any of these guidelines will cause performer to be removed from the show and banned from performing at Hamburger Marys Orlando in the future. We appreciate your cooperation and adherence to these rules.  Thank you.



**EXHIBIT**

6



HM_000028











HM_000033





HM_000035



JOHN PAONESSA
DEPOSITION

EXHIBIT #8

January 25, 2024   D.A.

HM_000041

Shift Overview   **Analytics**   Cover Flow   Shift Summary   Activity

https://www.yelpreservations.com/dashboard/hamburger-marys/overview/end-of-shift/

# Close of Shift Report
Data current as of Jan 18, 2024, 3:24 p.m.

DATE RANGE

May 19, 2023

DAYS OF THE WEEK

Mon   Tue   Wed   Thu   Fri   Sat   Sun

SHIFTS

Breakfast   Brunch   Lunch   Dinner

| Date | Online | In-House | Total | Reservations | Walk-ins | Total | No Show | Cancelled |
|---|---|---|---|---|---|---|---|---|
| Lunch 2023-05-19 | 0 (0%) | 0 (0%) | 0 | 0 (0%) | 0 (0%) | 0 | 0 | 0 |
| Dinner 2023-05-19 | 0 (0%) | 51 (100%) | 51 | 51 (100%) | 0 (0%) | 51 | 0 | 0 |
| **TOTALS** | **0** | **51** | **51** | **51** | **0** | **51** | **0** | **0** |
| **AVERAGES** | **0 (0%)** | **26 (100%)** | **26** | **26 (100%)** | **0 (0%)** | **26** | **0** | **0** |



EXHIBIT

8

exhibitsticker.com



Floor   Book   Grid   Guests   Configure   Account   Overview   Logout   Support



# Close of Shift Report
Data current as of Jan. 18, 2024, 3:24 p.m.

DATE RANGE: May 20, 2023

DAYS OF THE WEEK: Mon | Tue | Wed | Thu | Fri | Sat | Sun

SHIFTS: Breakfast | Brunch | Lunch | Dinner

| Date | Online | In-House | Total | Reservations | Walk-Ins | Total | No Show | Cancelled |
|------|--------|----------|-------|--------------|----------|-------|---------|-----------|
| Lunch 2023-05-20 | 0 (0%) | 39 (100%) | 39 | 39 (100%) | 0 (0%) | 39 | 0 | 6 |
| Dinner 2023-05-20 | 0 (0%) | 99 (100%) | 99 | 99 (100%) | 0 (0%) | 99 | 0 | 22 |
| TOTALS | 0 | 138 | 138 | 138 | 0 | 138 | 0 | 28 |
| AVERAGES | 0 (0%) | 69 (100%) | 69 | 69 (100%) | 0 (0%) | 69 | 0 | 14 |

HM_000042

HM_000043

Shift Overview · **Analytics** · Cover Flow · Shift Summary · Activity

# Close of Shift Report

Data current as of Jan. 18, 2024, 3:24 p.m.

DATE RANGE: May 21, 2023

DAYS OF THE WEEK: Mon | Tue | Wed | Thu | Fri | Sat | Sun

SHIFTS: Breakfast | Brunch | Lunch | Dinner



| Date | Online | In-House | Total | Reservations | Walk-Ins | Total | No Show | Cancelled |
|---|---|---|---|---|---|---|---|---|
| Lunch 2023-05-21 | 0 (0%) | 149 (100%) | 149 | 149 (100%) | 0 (0%) | 149 | 0 | 27 |
| Dinner 2023-05-21 | 0 (0%) | 0 (0%) | 0 | 0 (0%) | 0 (0%) | 0 | 0 | 0 |
| TOTALS | 0 | 149 | 149 | 149 | 0 | 149 | 0 | 27 |
| AVERAGES | 0 (0%) | 75 (100%) | 75 | 75 (100%) | 0 (0%) | 75 | 0 | 14 |

Floor · Book · Grid · Guests · Configure · Account · Overview · Logout · Support

HM_000044

Shift Overview | **Analytics** | Cover Flow | Shift Summary | Activity

# Close of Shift Report
Data current as of Jan. 18, 2024, 3:24 p.m.

DATE RANGE
May 26, 2023

DAYS OF THE WEEK: Mon | Tue | Wed | Thu | Fri | Sat | Sun

SHIFTS: Breakfast | Brunch | Lunch | Dinner



| Date | Online | In-House | Total | Reservations | Walk-ins | Total | No Show | Cancelled |
|---|---|---|---|---|---|---|---|---|
| Lunch 2023-05-26 | 0 (0%) | 0 (0%) | 0 | 0 (0%) | 0 (0%) | 0 | 0 | 0 |
| Dinner 2023-05-26 | 0 (0%) | 109 (100%) | 109 | 109 (100%) | 0 (0%) | 109 | 0 | 0 |
| TOTALS | 0 | 109 | 109 | 109 | 0 | 109 | 0 | 0 |
| AVERAGES | 0 (0%) | 55 (100%) | 55 | 55 (100%) | 0 (0%) | 55 | 0 | 0 |



Floor | Book | Grid | Guests | Configure | Account | Overview | Logout | Support

https://www.yelpreservations.com/dashboard/hamburger-marys/overview/end-of-shift/

HM_000045



# Close of Shift Report

Data current as of Jan. 18, 2024, 3:24 p.m.

DATE RANGE: May 27, 2023

DAYS OF THE WEEK: Mon | Tue | Wed | Thu | Fri | Sat | Sun

SHIFTS: Breakfast | Brunch | Lunch | Dinner

| Date | Online | In-House | Total | Reservations | Walk-Ins | Total | No Show | Cancelled |
|---|---|---|---|---|---|---|---|---|
| Lunch 2023-05-27 | 0 (0%) | 106 (100%) | 106 | 106 (100%) | 0 (0%) | 106 | 0 | 16 |
| Dinner 2023-05-27 | 0 (0%) | 134 (100%) | 134 | 134 (100%) | 0 (0%) | 134 | 0 | 8 |
| TOTALS | 0 | 240 | 240 | 240 | 0 | 240 | 0 | 24 |
| AVERAGES | 0 (0%) | 120 (100%) | 120 | 120 (100%) | 0 (0%) | 120 | 0 | 12 |

Shift Overview | Analytics | Cover Flow | Shift Summary | Activity

HM_000046

Shift Overview  **Analytics**  Cover Flow  Shift Summary  Activity

# Close of Shift Report
Data current as of Jan. 18, 2024, 3:24 p.m.

DATE RANGE

May 28, 2023

DAYS OF THE WEEK

| Mon | Tue | Wed | Thu | Fri | Sat | Sun |

SHIFTS

| Breakfast | Brunch | Lunch | Dinner |

| Date | Online | In-House | Total | Reservations | Walk-Ins | Total | No Show | Cancelled |
|------|--------|----------|-------|--------------|----------|-------|---------|-----------|
| Lunch 2023-05-28 | 0 (0%) | 156 (100%) | 156 | 156 (100%) | 0 (0%) | 156 | 0 | 26 |
| Dinner 2023-05-28 | 0 (0%) | 0 (0%) | 0 | 0 (0%) | 0 (0%) | 0 | 0 | 0 |
| **TOTALS** | **0** | **156** | **156** | **156** | **0** | **156** | **0** | **26** |
| **AVERAGES** | **0 (0%)** | **78 (100%)** | **78** | **78 (100%)** | **0 (0%)** | **78** | **0** | **13** |



Floor  Book  Grid  Guests  Configure  Account  Overview  Logout  Support

| 2008 | | 2009 | | 2010 | | 2011 | |
|---|---|---|---|---|---|---|---|
| May open 05/08/08 | $ 95,616.70 | January | $ 131,579.13 | January | $ 136,459.97 | January | $ 177,462.36 |
| June | $ 129,620.86 | February | $ 118,522.23 | February | $ 122,645.99 | February | $ 189,863.05 |
| July | $ 137,296.79 | March | $ 125,397.00 | March | $ 138,778.08 | March | $ 192,890.91 |
| August | $ 142,942.27 | April | $ 90,311.94 | April | $ 122,242.05 | April | $ 192,347.94 |
| September | $ 135,150.02 | May | $ 124,477.32 | May | $ 125,834.69 | May | $ 147,636.23 |
| October | $ 141,514.54 | June | $ 119,581.18 | June | $ 122,577.66 | June | $ 151,985.27 |
| November | $ 121,618.45 | July | $ 116,724.35 | July | $ 132,354.56 | July | $ 171,105.83 |
| December | $ 114,327.54 | August | $ 122,316.34 | August | $ 129,526.36 | August | $ 135,928.06 |
| | | September | $ 111,353.51 | September | $ 120,091.04 | September | $ 129,428.64 |
| | | October | $ 126,221.06 | October | $ 174,356.81 | October | $ 147,242.11 |
| | | November | $ 105,649.36 | November | $ 154,561.30 | November | $ 120,968.82 |
| | | December | $ 105,004.47 | December | $ 154,009.85 | December | $ 161,605.10 |
| 2008 TOTAL | $ 1,018,087.17 | 2009 TOTAL | $ 1,397,137.90 | 2010 TOTAL | $ 1,633,438.36 | 2011 TOTAL | $ 1,918,464.32 |



JOHN PAONESSA
DEPOSITION
EXHIBIT #9
January 25, 2024  D.A.
exhibitsticker.com



EXHIBIT
9
exhibitsticker.com

| 2012 | | 2013 | | 2014 | | 2015 | |
|---|---|---|---|---|---|---|---|
| January | $ 192,430.26 | January | $ 184,108.31 | January | $ 183,063.61 | January | $ 237,797.50 |
| February | $ 221,025.91 | February | $ 175,821.22 | February | $ 169,600.68 | February | $ 205,627.03 |
| March | $ 206,858.27 | March | $ 194,848.11 | March | $ 231,871.97 | March | $ 274,160.12 |
| April | $ 171,801.92 | April | $ 172,059.61 | April | $ 191,314.71 | April | $ 223,700.45 |
| May | $ 165,971.20 | May | $ 156,840.48 | May | $ 192,677.83 | May | $ 200,930.29 |
| June | $ 163,067.13 | June | $ 162,643.69 | June | $ 173,713.13 | June | $ 191,984.77 |
| July | $ 146,574.49 | July | $ 153,408.88 | July | $ 171,312.95 | July | $ 167,808.75 |
| August | $ 155,560.53 | August | $ 153,798.78 | August | $ 169,851.01 | August | $ 169,286.32 |
| September | $ 125,973.79 | September | $ 134,789.58 | September | $ 166,002.74 | September | $ 152,143.72 |
| October | $ 164,782.34 | October | $ 171,776.33 | October | $ 196,353.41 | October | $ 196,118.69 |
| November | $ 148,244.59 | November | $ 184,168.01 | November | $ 166,370.67 | November | $ 170,552.03 |
| December | $ 165,845.70 | December | $ 180,408.45 | December | $ 211,837.62 | December | $ 185,704.64 |
| | | | | | | | |
| 2012 TOTAL | $ 2,028,136.14 | 2013 TOTAL | $ 2,024,671.45 | 2014 TOTAL | $ 2,223,970.33 | 2015 TOTAL | $ 2,375,814.31 |
| | | | | | | | |
| | | | | | | | |

| 2016 | | 2017 | | 2018 | |
|---|---|---|---|---|---|
| January | $ 207,324.79 | January | $ 218,800.93 | January | $ 169,516.77 |
| February | $ 197,506.55 | February | $ 192,410.27 | February | $ 168,999.15 |
| March | $ 202,071.97 | March | $ 255,995.24 | March | $ 205,633.05 |
| April | $ 189,359.81 | April | $ 239,100.79 | April | $ 145,596.91 |
| May | $ 166,862.90 | May | $ 167,956.58 | May | $ 157,563.06 |
| June | $ 184,331.90 | June | $ 168,294.74 | June | $ 157,826.32 |
| July | $ 182,322.32 | July | $ 158,262.34 | July | $ 146,443.90 |
| August | $ 143,790.48 | August | $ 154,169.25 | August | $ 156,544.10 |
| September | $ 171,425.67 | September | $ 121,565.22 | September | $ 142,354.75 |
| October | $ 188,393.33 | October | $ 195,209.96 | October | $ 144,495.48 |
| November | $ 153,561.73 | November | $ 149,906.79 | November | $ 120,953.01 |
| December | $ 169,325.41 | December | $ 177,365.03 | December | $ 159,299.43 |
| Side Bar Total | $ 67,449.74 | | | | |
| | | | | | |
| 2016 TOTAL | $ 2,156,276.86 | 2017 TOTAL | $ 2,199,037.14 | 2018 TOTAL | $ 1,875,225.93 |

| 2019 | | 2020 | | 2021 | |
|---|---|---|---|---|---|
| January | $ 177,452.37 | January | $ 142,334.69 | January | $ 84,069.98 |
| February | $ 161,489.41 | February | $ 149,293.83 | February | $ 88,296.12 |
| March | $ 191,412.06 | March | $ 65,117.03 | March | $ 89,418.70 |
| April | $ 147,451.12 | April | $ - | April | $ 97,721.08 |
| May | $ 134,797.48 | May | $ 20,524.24 | May | $ 136,384.95 |
| June | $ 138,184.28 | June | $ 29,938.62 | June | $ 120,266.23 |
| July | $ 144,776.99 | July | $ 27,938.62 | July | $ 139,968.79 |
| August | $ 147,235.78 | August | $ 53,984.70 | August | $ 118,515.82 |
| September | $ 119,107.81 | September | $ 54,407.85 | September | $ 109,324.37 |
| October | $ 143,073.50 | October | $ 82,445.00 | October | $ 171,599.48 |
| November | $ 141,356.92 | November | $ 65,048.12 | November | $ 147,075.37 |
| December | $ 145,586.59 | December | $ 35,544.31 | December | $ 163,681.48 |
| | | | $ - | | |
| 2019 TOTAL | $ 1,791,924.31 | 2020 TOTAL | $ 726,577.01 | 2021 TOTAL | $ 1,466,322.37 |

| 2022 | | 2023 | | YEAR OVER YEAR |
|---|---|---|---|---|
| January | $ 140,115.31 | January | $ 142,961.65 | $ 2,846.34 |
| February | $ 160,563.63 | February | $ 148,162.52 | $ (12,401.11) |
| March | $ 193,621.13 | March | $ 162,730.59 | $ (30,890.54) |
| April | $ 193,221.34 | April | $ 135,617.70 | $ (57,603.64) |
| May | $ 140,708.00 | May | $ 117,446.48 | $ (23,261.52) |
| June | $ 136,070.81 | June | $ 125,275.35 | $ (10,795.46) |
| July | $ 145,269.35 | July | $ 134,463.00 | $ (10,806.35) |
| August | $ 131,593.56 | August | $ 95,597.31 | $ (35,996.25) |
| September | $ 120,606.11 | September | $ 121,823.41 | $ 1,217.30 |
| October | $ 159,726.25 | October | $ 145,027.69 | $ (14,698.56) |
| November | $ 122,193.33 | November | $ 129,510.74 | $ 7,317.41 |
| December | $ 156,454.72 | December | | $ (156,454.72) |
| | | | | $ - |
| | | | | $ - |
| 2022 TOTAL | $ 1,800,143.54 | 2023 TOTAL | $ 1,458,616.44 | $ (341,527.10) |
| | | | | |
| | | | | |
| REVENUE SINCE INCEPTION 2008 | | | | $ 28,093,843.57 |



JOHN PAONESSA
DEPOSITION
**EXHIBIT #10**
January 25, 2024   D.A.

United States District Court
Middle District of Florida
Orlando Division

HM FLORIDA-ORL, LLC,

        Plaintiff,                     Case No. 6:23-cv-00950-GAP-IRHP

v.

MELANIE GRIFFIN,

        Defendant

---

## FIRST AMENDED COMPLAINT

---

### I.    NATURE OF THE ACTION

1.    This action is brought under 42 U.S.C. § 1983 and is premised on the First and Fourteenth Amendments to the United States Constitution

### II.    SUBJECT MATTER AND JURISDICTION

2.    This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 on the grounds that the claims asserted herein arise under U.S.C. §§ 1983 and 1988.

3.    Venue is proper in this Court and Division pursuant to 28 U.S.C. § 1391 on the grounds that all or a substantial portion of the acts giving rise to the violations alleged herein occurred in this judicial district.

### III.    THE PARTIES AND PERSONAL JURISDICTION

4.    Plaintiff, HM FLORIDA-ORL, LLC, is a Florida limited liability company, registered in the State of Florida in Orlando, Florida since 2008. Plaintiff is a restaurant and bar which serves alcohol and presents drag show performances, comedy sketches, and dancing.

**EXHIBIT**

**10**

5.     Defendant MELANIE GRIFFIN (hereinafter "Defendant" or the "State") is the Secretary of the State Department of Business and Professional Regulation for the state of Florida. She is sued in her official capacity and individual capacity. Defendant GRIFFIN may be served with process at her office, 2601 Blairstone Rd, Tallahassee, FL 32399.

## IV.     FACTUAL ALLEGATIONS

6.     In December 2022, the State of Florida began administrative proceedings with the Department of Business and Professional Regulation against businesses for violating public nuisance, lewd activity and disorderly conduct laws.[1]

7.     Two of the businesses, a hotel and a performing arts center, both hosted an event entitled, "A Drag Queen Christmas." The third business was a restaurant that hosted a drag queen weekend brunch. DBPR is seeking to revoke the liquor licenses of these businesses.[2]

8.     The venues are accused to failing to provide notice of the "sexually explicit nature of the performance" DBPR alleges that drag shows are tantamount to "lewd exhibition, operating a lewd establishment, public exposure, obscene exhibition, breach of the peace and public nuisance." The case is pending.[3]

---

[1] Tampa Bay Times, Ana Ceballos and Joey Flechas, *Florida goes after liquor license of Miami hotel over drag show,* March 14, 2023, https://www.tampabay.com/news/florida-politics/2023/03/14/drag-queen-minors-liquor-license- lgbtq-hotel-miami/

[2] Administrative Complaint, *Department of Business and Professional Regulation, Division of Alcoholic Beverages and Tobacco, Petitioner, v. HRM Owner, LLC, d/b/a Hyatt Regency Miami,* March 14, 2023

[3] The statutes that were allegedly violated and listed in the complaint were: Lewd or lascivious exhibition in the presence of a minor less than 16 years of age (s. 800.04{7)(a), F.S.); Operation of any place, structure, building, or conveyance for the purposes of lewdness (s. 796.07(2)(a0, F.S.); The unlawful exposing or exhibiting of one's sexual organs in public or on the private premises of another in a vulgar or indecent manner (s. 800.03, F.S.); Knowingly promoting, conducting, performing, or participating in an obscene show, exhibition, or performance by live persons or a live person before an audience (s. 847.011(4), F.S.; Breach of the peace and disorderly conduct with acts that are of such nature as to corrupt the public morals, or outrage the sense of public decency (s. 877.03, F.S.); and Maintaining a nuisance by erecting or maintaining a structure that tends to annoy the community or injure the health or the community, or becomes manifestly injurious to the morals or manners of the people (s. 8230.5(1), F.S.)

9.      On May 17, 2023, Governor DeSantis signed Senate Bill 1438 into law (hereinafter

"S.B. 1438" or "the Act"). The Act amended FL. Stat. § 509.261 to include the following

provisions:

> **(10)(a) The division may fine, suspend, or revoke the license of any public lodging establishment or public food service establishment if the establishment admits a child to an adult live performance, in violation of s. 827.11.**
>
> **(b) A violation of this subsection constitutes an immediate serious danger to the public health, safety, or welfare for the purposes of s. 120.60(6).**
>
> **(c) Notwithstanding subsection (1), the division may issue a $10,000 fine for an establishment's second or subsequent violation of this subsection.**

Paragraph (1) of FL. Stat. § 561.29 was amended to include the following language:

> **Revocation and suspension of license; power to subpoena.**
>
> **(1) The division is given full power and authority to revoke or suspend the license of any person holding a license under the Beverage Law, when it is determined or found by the division upon sufficient cause appearing of:**
>
> **(l) Maintaining a licensed premises that admits a child to an adult live performance in violation of s. 827.11.**
>
> > **1. A violation of this paragraph constitutes an immediate, serious danger to the public health, safety, or welfare for the purposes of s. 120.60(6).**
> >
> > **2. The division may issue a $5,000 fine for a first violation of this paragraph.**
> >
> > **3. The division may issue a $10,000 find for a second or subsequent violation of this paragraph.**

FL. Stat. § 827.11 was created to read:

**Exposing children to an adult live performance**

> **(1) As used in this section, the term:**
>
> > **(a) "Adult live performance" means any show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, specific sexual activities as those terms are defined in s. 847.011, lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts when it:**

       **1. Predominantly appeals to a prurient, shameful, or morbid interest;**
       **2. Is patently offensive to prevailing standards in the adult community of this state as a whole with respect to what is suitable material or conduct for the age of the child present; and**

       **3. Taken as a whole, is without serious literary, artistic, political, or scientific value for the age of the child present.**

    **(b) Knowingly" means having general knowledge of, reason to know, or a belief or ground for belief which warrants further inspection or inquiry of both:**

       **1. The character and content of any adult live performance described in this section which is reasonably susceptible of examination by the defendant; and**

       **2. The age of the child.**

  **(2) A person's ignorance of a child's age, a child's misrepresentation of his or her age, or a bona fide belief of a child's consent may not be raised as a defense in a prosecution for a violation of this section.**

  **(3) A person may not knowingly admit a child to an adult live performance.**

  **(4) A violation of subsection (3) constitutes a misdemeanor of the first degree, punishable as provided in § 775.082 or § 775.083.**

13.    Plaintiff's restaurant, HAMBURGER MARY'S, has presented drag performances at its venue since 2008.

14.    Drag is defined as "clothing more conventionally worn by the other sex, especially exaggeratedly feminine clothing, makeup, and hair adopted by a man."[4]

15.    Drag is usually performed as entertainment and often includes comedy, singing, dancing, lip-syncing, or all of the above. Prosthetic breasts are commonly used by men impersonating women as part of the art.

---

[4] *Drag,* OxfordlearnersDictionary.com, https://www.oxfordlearnersdictionaries.com/us/definition/english/drag (last visited March 25, 2023)

16.     Drag is not a new art form; nor is it inherently - or even frequently - indecent. Drag has been present in western culture dating back to Ancient Greek theatrical productions, where women were often not permitted to perform onstage or become actors. Instead, male actors would don women's attire and perform the female roles.[5]

17.     The earliest productions of William Shakespeare's plays also featured male actors in drag playing the female roles. By the 1800s, "male or female impersonation" was known as "drag".[6]

18.     The vaudeville shows of the late 1800s and early 1900s popularized drag, or "female impersonators."[7] One of the most well-known vaudeville female impersonators, Julian Eltinge, made his first appearance on Broadway in drag in 1904.[8]

19.     By 1927, drag had become specifically linked with the LGBTQIA community, and by the 1950s, drag performers began entertaining in bars and spaces that specifically catered to gay people. In the decades that followed, drag solidified itself as an art form.[9]

20.     Although drag is still centered around and holds special historical significance for the LGBTQIA community, the art form is now definitely a part of mainstream culture. One is as likely to find straight people at a drag show as gay people. RuPaul 's Drag Race - a drag competition

---

[5] Ken Gewertz, *When Men Were Men (and Women, Too),* The Harvard Gazette (July 17, 2003), https://news.harvard.edu/gazette/story/2003/07/when-men-were-men-and-women-too/

[6] Lucas Garcia, *Gender on Shakespeare's State: A Brief History,* Writer's Theatre, (November 21, 2018), https://www.writerstheatre.org/blog/gener-shakespeares-stage-history/

[7] Nan Alamilla Boyd, Wide Open Town: A History of Queer San Francisco to 1965, University of California Press, 2003.

[8] Michael F. Moore, Drag! Male and Female Impersonators on State, Screen, and Television: An illustrated World History, McFarland & Company, 1994.
[9] Nan Alamilla Boyd, *Wide Open Town: A History of Queer San Francisco to 1965*, University of California Press, 2003.

television show - has won seven Emmy Awards and is currently in its fifteenth season. The show has spinoffs in the UK, Australia, Chile, Thailand, Canada, Italy, Spain, and elsewhere.

21.     Like all forms of performance art, drag encompasses a vast spectrum of expression. Every drag performer makes unique choices about attire, choreography, comedy, and music which can range from a performer in a floor-length gown lip-syncing to Celine Dion songs and making G- rated puns, to the Rocky Horror Picture Show, to sexual innuendo and the kind of dancing on could expect to see at a Taylor Swift or Miley Cyrus concert.

22.     Modern drag performances typically do not contain nudity. More often than not, drag performers wear more clothing than one would expect to see at a public beach, and many drag shows are intended to be appropriate for all ages.

23.     Undercover state agents were sent by the administration of Republican Florida Gov. Ron DeSantis to spy on an Orlando drag show- and they found nothing "lewd" about it, according to the Miami Herald. Yet, Florida has moved to revoke the venue operator's liquor license, alleging in an official complaint that the venue violated state law "by allowing performers to expose genitals in a lewd or lascivious manner and by conducting acts simulating sexual activity in the presence of children younger than 16 years of age."

24.     Undercover agents who attended the December 28, 2022 show titled, "A Drag Queen Christmas." at Orlando's Plaza Live recorded the performance on their state-issued iPhone's and spotted three children at the drag show, according to the Herald, which obtained and published an incident report from the agents. "Besides some of the outfits being provocative (bikinis and short shorts), agents did not witness any lewd acts such as exposure of genital organs," the agents

wrote in their report, according to the newspaper. "The performers did not have any physical contact while performing to the rhythm of the music with any patrons."[10]

25.     It is apparent from the actions of the State of Florida that it considers drag shows to be a public nuisance, lewd, disorderly, sexually explicit involving public exposure and obscene and that it is necessary to protect children from this art form, in spite of evidence to the contrary. Such is the Summary Analysis of the Florida Senate when it passed the law signed by Governor Desantis.

26.     Florida already has laws preventing exposure of minors to lewd, sexually explicit, obscene, vulgar or indecent displays. *See generally*, FL. Stat. Chapter 847.

27.     The Act, as passed, intends to use the FDBP to revoke or suspend the licenses of businesses if it admits a child to an adult live performance, in violation of § 827.1113 It reads: (l0)(a) The division may fine, suspend, or revoke the license of any public lodging establishment or public food service establishment if the establishment admits a child to an adult live performance, in violation of § 827.11. (b) A violation of this subsection constitutes an immediate serious danger to the public health, safety, or welfare for the purposes of § 120.60(6).

28.     Plaintiff's business relies on drag performances to bring in business. Its performances are open to all ages, and many of its patrons are families. Parents and grandparents frequently dine at Hamburger Mary's with their children.

29.     The Act is incredibly broad, prohibiting "lewd conduct" and "lewd exposure of prosthetic or imitation genitals or breasts," without defining "lewd" anywhere in the law. Plaintiff cannot know what conduct would run afoul of such a vague prohibition.

---

[10] *DeSantis Admin Sent Undercover Agents to Drag Show, Found Nothing 'Lewd'* (businessinsider.com)
https://www.businessinsider.com/desantis-florida-undercover-agents-drag-show-found-nothing-lewd-2023-3

30. Because Plaintiff's business model revolves around its drag shows, its performers frequently wear prosthetic breasts, as is common in the art of drag.

31. Plaintiff is reasonably concerned that its future performances will violate the law.

32. Upon the announcement that S.B. 1438 had been signed and the law was in effect, Hamburger Mary's advised its customers that children would not be permitted to attend any drag shows, except a single, Sunday afternoon show aimed at very young children. The Sunday show usually includes material from Disney and other, similar media intended for small children.

33. Immediately, 20% of Plaintiff's bookings cancelled for the May 21, 2023 show and for future bookings.

34. The Act has forced Plaintiff to either heavily censor its shows, or else impose age limitations on who may attend, depriving Plaintiff of both revenue and of its First Amendment rights to free speech and expression.

35. Plaintiff simply cannot take the chance that their business or liquor licenses would be suspended for hosting a drag show where children attend.

36. In addition, the criminal penalties of the law put Plaintiff's individual performers at risk of prosecution because of the content of their speech.

## V.     CAUSES OF ACTION

### COUNT 1 -   VIOLATION OF 42 U.S.C. SECTION 1983
### FIRST AMENDMENT

37. Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

38. As alleged above, the Act is an unconstitutional violation of the First Amendment both on its face and as applied for the following reasons.

8

39.     ***First***, Defendant seeks to restrict protected, First Amendment speech based on its content and message. The fact that drag may contain elements of non-obscene sexuality does not dispel First Amendment protections. *See, e.g., Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 557 (1975).

40.     S.B. 1438 is a content-based restriction. As such, it is therefore "presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). That is, strict scrutiny.

41.     S.B. 1438 fails strict scrutiny. Its sweeping effect is divorced from any real purpose. It is broad enough to encompass a wide variety of performances that are not harmful to minors, and removes from parents any freedom to decide what appropriate performances might be. Nor is the law narrowly tailored. It is broad enough to encompass even the most innocuous drag performances and provides virtually no standards by which to determine its scope in practice.

42.     ***Second***, S.B. 1438 is facially overbroad. A law is facially overbroad and violates the First Amendment when it sweeps in more speech than is necessary to satisfy the state's interest, regulating both protected and unprotected speech. *See Broadrick v. Oklahoma*, 413 U.S. 601, 610 (1973).

43.     S.B. 1438 goes far beyond obscenity and reaches protected speech such as drag, as well as concerts, dancing, theater, etc. The unprotected speech that S.B. 1438 reaches—obscenity—is already proscribed by numerous statutes in Florida law and so the broad sweep of S.B. 1438 targets protected expression directly.

44.     The Act also opens up any establishment - or even a private home - that hosts drag shows to police raids, so law enforcement can be certain that no children are present at the event.

45. The law is therefore facially overbroad and impinges on the rights of Plaintiffs and countless others across Florida. Such an overbroad law violates the First Amendment and will have a chilling effect on the protected speech of citizens.

46. **Third**, and in the alternative, S.B. 1438 was adopted for an impermissible purpose. The text of Fla. Stat. § 827.11 demonstrates that the Act was "adopted by the government because of disagreement with the message the speech conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). While many terms in the Act appear elsewhere in the Florida code, "lewd exposure of prosthetic or imitation genitals or breasts" is unique to the Act. There are two primary categories of people who wear prosthetic breasts: people who have had mastectomies and drag performers. Since the Act specifically regulates "any show, exhibition, or other presentation in front of a live audience," the law is obviously targeted at the conduct of *performers* who wear prosthetic breasts. It impermissibly target targets drag performers.

## COUNT TWO: 42 U.S.C. § 1983
## FOURTEENTH AMENDMENT DUE PROCESS (VAGUENESS)

47. Plaintiffs incorporate all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

48. A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citations omitted).

49. S.B. 1438 is unconstitutionally vague, as it is impossible to determine from the text of the statute what conduct is prohibited. The statute encompasses "lewd conduct," but nowhere in the text of the law is "lewd" defined.

50.     The statute also prohibits "lewd exposure of prosthetic or imitation genitals and breasts," but "lewd exposure" is undefined. Does prosthetic cleavage, common at drag shows, qualify as "lewd exposure?"

51.     Plaintiff is left without any certainty as to whether it or its performers may face criminal or civil penalties for engaging in an array of expressive activities, or whether the penal activity may vary across the state. As such, S.B. 1438 is unconstitutionally vague.

## COUNT THREE: 28 U.S.C. § 2201 DECLARATORY JUDGMENT

52.     Plaintiff incorporates all allegations of fact in all preceding paragraphs as if fully set forth in this Count.

53.     28 U.S.C. § 2201(a) provides: "In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration[.]"

54.     This case presents an actual controversy between the Plaintiff and Defendant as to whether Plaintiff has a First Amendment right to engage in expressive activity. As alleged, Plaintiff's claims S.B. 1438 violates its First Amendment rights.

55.     Plaintiff seeks a declaration that S.B. 1438 violates the Constitution on its face.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendant on each Count of the Complaint and prays for the following relief:

1.     That the Defendant be permanently enjoined from enforcing S.B. 1438;

2.     That this Court declare that S.B. 1438 violates the Constitution on its face;

3.     Award costs and expenses incurred in this action pursuant to Rule 54 of the Federal Rules of Civil Procedure.

4.      Grant the Plaintiff such further relief as the Court may deem just and proper.


Respectfully submitted,

*/s/ Melissa J. Stewart*
Melissa J. Stewart, Esq. *Pro Hac Vice*
Brice M. Timmons, Esq. *Pro Hac Vice*
DONATI LAW, PLLC
1545 Union Ave.
Memphis, TN 38104
(901) 278-1004 – Telephone
(901) 278-3111 – Facsimile
brice@donatilaw.com


Gary S. Israel, Esq. 270709
121 S. Orange Avenue, Suite 1500
Orlando, Florida 32801
407 210-3834
attorneyisrael@hotmail.com
gsi55@hotmail.com
Counsel for Plaintiff

\

## <u>CERTIFICATE OF SERVICE</u>

    I HEREBY CERTIFY that a true and correct copy of the foregoing document has been served upon all parties to this action via the court's ECF filing system this 15th day of August 2023.

<em>/s/ Melissa J. Stewart</em>



**IN THE UNITED STATES DISTRICT COURT FOR THE**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

HM FLORIDA-ORL, LLC,

     Plaintiff,

**v.**                             Case No.: 6:23-cv-00950-GAP-LHP

MELANIE GRIFFIN**,**

     Defendant.

_____/

### <u>NOTICE OF DEPOSITION PURSUANT TO Fed. R. Civ. P. 30(B)(6)</u>

PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, undersigned will take the testimony through one or more officers, directors, agents, or other representatives of Plaintiff, HM FLORIDA-ORL, LLC, by deposition upon oral exanimation regarding all information known or reasonably available to Defendants with respect to the subjects identified in Exhibit A.

The deposition shall commence on **January 25, 2024, at 10:00 a.m. EST**. The deposition will be conducted via Zoom or other agreed-upon virtual means and take place before a notary public or other person authorized by law to administer oaths.

The deposition will be taken for the purpose of discovery, for use at trial, or for both, and for such other purposes as permitted under the Federal Rules of Civil Procedure and other applicable law.

**EXHIBIT**

**11**

In accordance with the Americans with Disabilities Act of 1990, persons in need of a special accommodation to participate in the proceeding should contact the undersigned prior to the proceeding. If hearing impaired, contact William Stafford via the Florida Relay Service at 1-800-955-8771 (TDD), or 1-800-955-8770 (voice), for assistance.

PLEASE GOVERN YOURSELF ACCORDINGLY.

Respectfully submitted,

**ASHLEY MOODY**
**ATTORNEY GENERAL**

*/s/ Nathan A. Forrester*
Nathan A. Forrester (FBN 1045107)
SENIOR DEPUTY SOLICITOR GENERAL

*/s/ William H. Stafford III*
William H. Stafford III (FBN 70394)
Office of the Attorney General

The Capitol – PL 01
Tallahassee, FL 32399-1050
Tel: (850) 414-3785
Nathan.Forrester@myfloridalegal.com
William.Stafford@myfloridalegal.com

*Counsel for Defendant*

2

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served by electronic mail on January 22, 2024, on Brice M. Timmons, brice@donatilaw.com, and Melissa J. Stewart, melissa@donatilaw.com, at DONATI LAW, PLLC, and Gary S. Israel, attorneyisrael@hotmail.com.

*/s/ William H. Stafford III*
WILLIAM H. STAFFORD III

# EXHIBIT A

1.  Plaintiff's Initial Disclosures.

2.  Responses to Defendants' Request for Admissions.

3.  Responses and supplemental responses to Defendants' First Set of Interrogatories.

4.  Responses and supplemental responses to Defendants' First Request for Production of Documents.

5.  Background and history of HM Florida-ORL, LLC ("HM").

6.  Duties and responsibilities of members of HM and managers of the Hamburger Mary's franchise in Orlando ("Hamburger Mary's").

7.  Terms of franchise agreements in place.

8.  Prior work experience of members and managers of Hamburger Mary's.

9.  Knowledge of other local regional venues (e.g., restaurants, bars, nightclubs) that present drag shows.

10. Schedule and content of drag shows presented by Hamburger Mary's.

11. Policies regarding guest admission to drag shows at Hamburger Mary's, including changes to such policies over time.

12. Policies and guidelines for the content of drag shows and conduct of drag show performers at Hamburger Mary's, including changes to such policies over time.

13. Information regarding attendance at drag shows at Hamburger Mary's.

14. Impacts of SB 1438 on HM and Hamburger Mary's.

15. Information regarding reservation cancellations following passage of SB 1438.

16. Gross income of HM and Hamburger Mary's.