## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

_____

HM FLORIDA-ORL, LLC,

     Plaintiff

v.                                     Case No. 6:23-cv-00950

THE STATE OF FLORIDA,
MELANIE GRIFFIN, in her
Official capacity as Secretary of THE
STATE DEPARTMENT OF BUSINESS
AND PROFESSIONAL REGULATION,
STATE OF FLORIDA,

     Defendant.

---

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Plaintiff HM Florida-Orl, LLC ("HM") respectfully submits its Response in Opposition to Defendant's Motion for Summary Judgment (ECF 56). Defendant's Motion for Summary Judgment recycles the same arguments she has unsuccessfully made before this Court, before the Eleventh Circuit, and before the Supreme Court. Nothing has changed in the interim, either in the text of the Act or in the body of

First Amendment caselaw. For the following reasons, this Court should deny Defendant's motion.

## **LEGAL STANDARD**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). District courts must "view all the evidence and draw all reasonable inferences in favor of the nonmoving party." *Tana v. Datanna's*, 611 F.3d 767, 772 (11th Cir. 2010).

## **ARGUMENT**

### I.   **HM has Article III Standing to Bring First and Fourteenth Amendment Challenges to the Act.**

Hamburger Mary's has plead facts sufficient to establish Article III standing to challenge the Act. Plaintiffs in federal court must establish Article III standing by demonstrating: "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). The Eleventh Circuit has long recognized that the injury in fact requirement is applied "most loosely where First Amendment rights

are involved, lest free speech be chilled even before the law or regulation is enforced." *Harrell v. The Fla. Bar,* 608 F.3d 1241, 1254 (11th Cir. 2010) (citing *Hallandale Prof'l Fire Fighters Local 2238 v. City of Hallandale,* 922 F.2d 756, 760 (11th Cir.1991)).

It is well-settled that an "actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." *Wollschlaeger v. Governor of Fla.*, 814 F.3d 1159, 1173 (11th Cir. 2015) (quoting *Pittman v. Cole,* 267 F.3d 1269, 1283 (11th Cir. 2001) (internal quotations omitted)). A plaintiff need not "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). In the First Amendment context, "self-censorship . . . may be a cognizable injury-in-fact for standing purposes." *Wollschlaeger*, 814 F.3d at 1173.

HM has suffered a cognizable self-censorship injury because HM has demonstrated an intention to engage in conduct "arguably proscribed" by the Act. *See Driehaus*, 573 U.S. at 159. The Act prohibits, among other things, "lewd conduct" and "lewd exhibition of prosthetic genitals or breasts," without providing definitions for any of these terms. The majority of HM's performers wear prosthetics, which are a standard part of drag attire. DE1 at PageID 6 ("Prosthetic breasts are commonly used by men impersonating women as part of the art."). And

3

while HM does not consider any of its shows to be "obscene," some of the performances feature jokes, dances, and innuendo that might not be appropriate for every child. *See Id.* at PageID 6-7; *see also Id.* at PageID 13 (raising concerns that moderating content to "what is suitable material or conduct for the age of the child present is too indistinct for the speaker to know what is prohibited."). Plaintiff's 30(b)6 witness testified that some of the drag shows at Hamburger Mary's fall into the category of R-rated content. DE56-1 at PageID 746:6-9. It is plausible that some or all of HM's drag performances could be viewed as violating the Act. HM need only demonstrate that its conduct is "arguably proscribed" by the statute; it need not prove conclusively that its conduct is proscribed under the State's preferred reading of the statute.

To establish a credible threat of prosecution, HM must show that "there is at least some minimal probability that the challenged rules will be enforced if violated." *Wollschlaeger*, 814 F.3d at 1174 (quoting *Harrell*, 608 F.3d at 1241 (internal citations omitted)). Article III standing requires a credible *threat* of prosecution under the Act; a plaintiff need not prove that prosecution is certain. If, as is the case in this litigation, "the challenged law or rule was recently enacted, or if the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred." *Id.* (internal citations omitted). Here, as in *Wollschlaeger*, "[t]he Act was recently enacted, and the State is defending it, so we

may infer that there is at least some probability that the Act will be enforced if violated." *Id.* HM has thus established a cognizable self-censorship injury for their First Amendment and vagueness claims.

## II.   The Act is an Unconstitutional Regulation of Protected Speech

### A. The Act regulates protected speech.

In an attempt to spare the Act from strict scrutiny, the State claims that the Act exclusively regulates speech unprotected by the First Amendment because it "regulated only unprotected speech—speech that is obscene for minors—and places no burden on speech that is protected for adults." DE56 at PageID 682. This disregards a host of Supreme Court precedent that is directly on point.

"Obscenity" is a legally-defined category of speech that is unprotected by the First Amendment. *Miller v. California*, 413 U.S. 15, 24 (1973). The Supreme Court has only sparingly labeled speech as "obscene." Most nudity – and much pornography – does not qualify as obscenity under *Miller*. Even simulated child sex abuse materials ("sexually explicit images that appear to depict minors but were produced . . . using adults who look like minors or by using computer imaging") do not inherently cross the line of the *Miller* test and trigger a strict scrutiny analysis. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 239 (2002). Speech that is "obscene" under *Miller* is distinct from speech that is merely indecent or offensive.

"Sexual expression which is indecent but not obscene is protected by the First Amendment." *Sable Communications of Cal. v. FCC*, 492 U.S. 115, 126 (1989).

Fla. Stat. § 827.11 incorporates an amended version of the *Miller* standard to define "Adult live performance:"

> **(a)** "Adult live performance" means any show, exhibition, or other presentation in front of a live audience which, in whole or in part, depicts or simulates nudity, sexual conduct, sexual excitement, or specific sexual activities as those terms are defined in s. 847.001, lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts when it:
>
> > 1. Predominantly appeals to a prurient, shameful, or morbid interest;
> >
> > 2. Is patently offensive to prevailing standards in the adult community of this state as a whole with respect to what is suitable material or conduct **for the age of the child present**; and
> >
> > 3. Taken as a whole, is without serious literary, artistic, political, or scientific value **for the age of the child present**.

Fla. Stat. § 827.11 (emphasis added). In *Ashcroft v. ACLU*, 542 U.S. 656 (2004) ("*Ashcroft II*"), the Supreme Court considered the constitutionality of the Child Online Protection Act (COPA), a federal statute enacted to protect children from exposure to sexually explicit materials on the internet that were "harmful to minors." COPA defined "harmful to minors" by adapting the *Miller* test in a manner nearly identical to the Act's definition of "Adult live performance." *Ashcroft II*, 542 U.S. at 661. The Supreme Court found that COPA was a content-based regulation on protected speech, because the law "effectively suppresses a large amount of speech

that adults have a constitutional right to receive and address to one another[.]" *Id.* at 665 (quoting *Reno v. ACLU*, 542, U.S. 844, 874 (1997). The Court applied strict scrutiny, and determined that COPA violated the First Amendment. *Ashcroft II* conclusively contravenes the notion that the Act proscribes only unprotected speech.

To support its assertion that the Act regulates only unprotected speech, the State relies primarily on *Ginsberg v. New York*, 390 U.S. 629 (1968). *Ginsberg* is a pre-*Miller* case wherein the Supreme Court considered the constitutionality of a New York state law which prohibited the sale of certain explicit content to minors, such as pornographic "girlie" magazines. *Ginsberg*, 390 U.S. at 632. The statute at issue defined "harmful to minors" by adapting a pre-*Miller* definition of "obscenity:" *Id.* at 646. A bookseller who had been tried and convicted under the statute challenged the constitutionality of the law under the First Amendment, and the Court upheld the statute. *Id.* The State notes that the definition of "harmful to minors" in the Act is substantially similar to that in *Ginsberg*; the Florida law adapts the *Miller* standard for obscenity to apply to minors, just as the New York law adapted a pre-miller standard for obscenity to apply to minors. This comparison is technically accurate, but ultimately irrelevant to the question of whether the Act in this case regulates protected speech.

Contrary to the State's assertion, the *Ginsberg* Court did not decline to apply strict scrutiny "because obscenity is not protected expression." DE 56 at PageID 683

(quoting *Ginsberg*, 390 U.S. at 641). Rather, the Court considered whether it was constitutionally permissible "to accord minors under 17 a more restricted [First Amendment] right than that afforded to adults to judge and determine what sex material they may read or see." *Ginsberg*, 390 U.S. at 637. The Court answered in the affirmative, and determined that the New York statute was not "an invasion of such minors' constitutionally protected freedoms." *Id.* at 638.

In *American Booksellers v. Webb*, 919 F.2d 1493, 1501 (11th Cir. 1990), the Eleventh Circuit analyzed *Ginsberg* to mean that "[m]inors have no right to view or in any way consume" sexually explicit materials "obscene as to them," as defined by an adapted obscenity standard. *Webb*, 919 F.2d at1501. The State's argument would transform the *Ginsberg* holding to mean that such materials are legally obscene, and therefore entirely outside the bounds of the First Amendment. "*Ginsberg* did not address the difficulties which arise when the government's protection of minors burdens (even indirectly) adults' access to material protected as to them." *Id.* The bookseller challenged the law only in so far as it violated the First Amendment rights of minors under the age of 17, and did not claim that the law implicated the constitutional rights of adults. *Ginsberg*, 390 U.S. at 636. "We must look to other case law and general principles of First Amendment jurisprudence to discern the constitutional parameters of the government's power under these circumstances." *Webb*, 919 F.2d at 1501.

"The mere fact that a statutory regulation of speech was enacted for the important purpose of protecting children from exposure to sexually explicit material does not foreclose inquiry into its validity." *Reno*, 521 U.S. at 876. In its efforts to skirt constitutional scrutiny, the State asks this Court to ignore decades of subsequent case law explicitly rejecting its arguments. This Court should decline to do so.

**B. The Act is a content-based regulation of protected speech.**

"As a general matter, the First Amendment means that the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) ("*Ashcroft I*"). Content-based regulations on speech are therefore "presumptively unconstitutional," and must survive strict scrutiny "regardless of the government's benign motive" or "content-neutral justification." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015). A law is content-based when it "'targets speech based on its communicative content' – that is, if it 'applies to particular speech because of the topic discussed or the idea or message expressed.'" *City of Austin v. Reagan Nat'l Adver. of Austin, LLC*, 142 S. Ct. 1464, 1471 (2022) (quoting *Reed*, 576 U.S. 155,163 (2015)).

The Act prohibits children from viewing "adult live performances" which feature certain content, such as "nudity, sexual conduct, sexual excitement . . . lewd conduct, or the lewd exposure of prosthetic or imitation genitals or breasts when it . . . offends the prevailing standards in the adult community…with respect to what is

suitable material…for the age of [a] child present". Fla. Stat. § 827.11(a). The prohibition is defined exclusively by the content of the performance. Therefore, the Act is a facially content-based restriction.

The State argues that "the Act suppresses no protected speech for adults." But, as discussed previously, this is untrue. The Act will force HM to either self-censor its performances or close its family-oriented establishment to anyone under the age of 18. The Act does not regulate "obscenity" within the meaning of *Miller*. It regulates something more – content the government contends is indecent for children, but which is still protected speech for adults. Thus, as a facially content-based restriction on protected speech, the Act is subject to strict scrutiny.

### C. Alternatively, the Act was created for an impermissible purpose.

"Because strict scrutiny applies either when a law is content based on its face or when the purpose and justification for the law are content based, a court must evaluate each question before it concludes that the law is content neutral and thus subject to a lower level of scrutiny." *Reed*, 576 U.S. at 167 (citing *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). If this Court finds that the Act is facially content-neutral, but that "an impermissible purpose or justification" underpins the law, then the law is still subject to strict scrutiny.

The text of the Act is "the best indicator of intent." *Nixon v. United States*, 506 U.S. 224, 232 (1993). The text of Fla. Stat. 827.11 demonstrates that the Act

was "adopted by the government because of disagreement with the message the speech conveys." *Ward*, 491 U.S. at 791. While many terms in the Act appear elsewhere in the Florida code, "lewd exposure of prosthetic or imitation genitals or breasts" is unique to the Act. There are two primary categories of people who wear prosthetic breasts: people who have had mastectomies and drag performers. Since the Act specifically regulates "any show, exhibition, or other presentation in front of a live audience," the law is obviously targeted at the conduct of *performers* who wear prosthetic breasts. It targets drag performers.

Governor DeSantis, who signed the Act into law on May 17, 2023, stated just before signing the bill that the law was about "adult performances, like these drag shows" and described drag as "sexually explicit" and "adult entertainment."[1]  While HM maintains that the text of the Act is sufficient to demonstrate impermissible purpose, statements from the Governor further supports that the Act was adopted by the State to target drag, because the State disagrees with the message drag conveys. Thus, even if the law is facially neutral, it is still subject to strict scrutiny.

### D. The Act does not survive strict scrutiny because it is not narrowly tailored.

Because the Act is a content-based regulation, it is "presumptively unconstitutional" and must pass strict scrutiny. *Reed*, 576 U.S. at 163; *see also*

---

[1] Full Press Conference: Governor Ron DeSantis signs education bills in Tampa (May 17, 2023) at timestamp 8:10, https://www.youtube.com/watch?v=t1kIP2dd2xc

*Ashcroft I*, 535 U.S. at 573. Under strict scrutiny, the government bears the burden of proving that the law is narrowly tailored to serve compelling state interests. *Id.* (quoting *R.A.V.*, 505 U.S. at 395); *see also Ashcroft II*, 542 U.S. at 665. To make this determination, "the Court inquires 'whether the challenged regulation is the least restrictive means among available, effective alternatives.'" *Friends of Georges, Inc. v. Mulroy*, No. 2:23-cv-02163-TLP-tmp, 2023 U.S. Dist. LEXIS 96766, *83 (W.D. Tenn. June 2, 2023) (quoting *Ashcroft II*, 542 U.S. at 666).

First, despite including a "knowledge" requirement, the Act seemingly creates a strict liability offense as to the age of the child present. When a crime contains a *mens rea* requirement, as the Act does, absence of *mens rea* is inherently a defense to prosecution. Yet the Act precludes such a defense stating that "[a] person's ignorance of a child's age, a child's misrepresentation of his or her age, or a bona fide belief of a child's consent may not be raised as a defense in a prosecution for a violation of this section." Fla. Stat. § 827.11(2). Thus, even with stringent security measures and I.D. checks, a person may face criminal prosecution under the Act for *unknowingly* admitting a child to a prohibited performance. The legislature could have written the law to require the "willful admission" of a child to a proscribed performance, as it has done in the context of liability arising from the sale of alcohol to minors. *See* Fla. Stat. § 768.125. The State offers no explanation whatsoever as to why a willfulness requirement as to the child's age would not suffice in this context.

Second, the Act contains no exception for parental consent, which the Supreme Court has repeatedly taken issue with. For example, in *Ginsberg,* 390 U.S. 629 (1968), the Court upheld a law prohibiting the sale of "girlie magazines" to minors under the age of 17, in part because "the prohibition against sales to minors does not bar parents who so desire from purchasing the magazines for their children." *Id*. Relying on the "principle that 'the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society,'" the Supreme Court specifically distinguished the contested statute in *Reno* from that in *Ginsberg*, beginning with the fact that the statute in Reno failed to provide a parental consent exception. *Reno v. ACLU*, 521, 542 U.S at 874. Furthermore, the Court found that user-based software which parents could use to "prevent their children from accessing material which the *parents* believe is inappropriate" was a sufficient alternative to the criminal statute, even though such software was only hypothetical at the time the Court rendered its decision. *Id.* at 877 (emphasis original). The Act provides no such limiting language or affirmative defenses. If parental monitoring was a sufficient alternative to regulating internet pornography, it is certainly a sufficient alternative to regulating the far broader category of expression that falls under whatever the State arbitrarily interprets as "lewd conduct."

As this Court has previously said, other Florida laws, such as Fla. Stat. §

847.013(3) regulate the "exposure of minors to 'harmful motion pictures, *exhibitions, shows, presentations*, or representations.' That law prohibits the kind of obscene material described in *Miller* and, indeed, the Act here, with the exception that it does not incorporate ambiguities like 'lewd conduct' or 'lewd exposure of prosthetic or imitation genitals or breasts.'" DE30 at PageID 447 (citing § 847.013(3)). Critically, however, § 847.013 includes a limiting provision which specifically allows for minors *of any age* to attend such exhibitions if they are accompanied by a parent. Fla. Stat. § 847.013(3)(c). The State has offered no explanation why parental consent is a suitable exception under § 847.013 but not § 827.11.

Finally, the Act differs from the statutes like those in *Ginsberg* and *Webb* in several other ways. For example, "the statute in *Ginsberg* only applied to commercial transactions, as opposed to the apparent universal application of § 827.11 to anyone, anywhere—the statute does not define a 'live performance,' which could conceivably range from a sold-out burlesque show to a skit at a backyard family barbecue." DE30 at PageID 446 (citing *Reno*, 521 U.S. at 865).

At the very least, a functional *mens rea* requirement or parental consent exception would be less restrictive means for achieving the State's interest in protecting children from inappropriate material. HM is not required "to introduce, or offer to introduce, evidence that [its] proposed alternatives are more effective.

The Government has the burden to show they are less so." *Ashcroft II*, 542 U.S. at 669. The government cannot make this showing because it has not chosen the least restrictive means of regulating inappropriate content for minors.

## III. The Act is Unconstitutionally Vague

A law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citations omitted). As the district court pointed out, the "void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." DE30 at PageID 448 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). Courts are especially concerned with discriminatory enforcement of vague statutes. The Supreme Court has held that "legislatures [are required to] establish minimal guidelines to govern law enforcement." *Id.* at 358. The text of § 827.11 is open to numerous interpretations, leaving the Act ripe for discriminatory enforcement. *See* Doc. 30 at 40.

There are several aspects of § 827.11 that raise vagueness concerns, specifically the undefined terms "lewd conduct" and "lewd exposure of prosthetic or imitation genitals or breasts." In an attempt to define "lewd conduct" and "lewd

exposure" on behalf of the legislature, the State points to one United States Supreme Court case, one Florida criminal law case, and a set of Florida Supreme Court Jury Instructions. These proposed definitions only exacerbate the vagueness issue.

First, the State cites to a fifty-year-old Florida Supreme Court case, which defines "lewd" as "an unlawful indulgence in lust, eager for sexual indulgence." *Chesebrough v. State*, 255 So. 2d 675, 677 (Fla. 1971); Doc. 30 at 40-41. *Chesebrough* again presents a drastically different context from the instant case. First, the statute in *Chesebrough* did not involve government restriction of protected speech. It was an as-applied challenge by a defendant accused of knowingly exhibiting sexual intercourse to her fourteen-year-old son. The Florida Supreme Court "primarily held that this particular egregious act sufficiently fell within the bounds of a 'lewd and lascivious act.'" DE30 at PageID 451. The Florida statute at issue in *Chesebrough* included detailed descriptions of the prohibited conduct, including "handl[ing], fondl[ing] or mak[ing] an assault upon any male or female child under the age of fourteen years in a lewd, lascivious or indecent manner" and "knowingly commit[ting] any lewd or lascivious act in the presence of such child, without intent to commit rape." Fla. Stat. § 800.04. In the context of § 800.04, the Florida Supreme Court stated that these terms are "in common use, and the definitions indicate with reasonable certainty the character of the acts and conduct" prohibited. *Chesebrough*, 255 So. 2d at 676. The court went on to explain that "when

used in a statute to define an offense," lewd and lascivious can be defined as "an unlawful indulgence in lust, eager for sexual indulgence." *Id.* at 677. As this Court has already noted, "that calculation was understandably less opaque in a case which held that sexual intercourse exhibited to a fourteen-year-old was sufficient to constitute a 'lewd and lascivious act'." DE30 at PageID 450.

Most critically, this case is from 1971, a time when "lewd and lascivious" may very well have been in common use. But "definitions of 'an unlawful indulgence in lust, eager for sexual indulgence,' do very little to inform a 'person of ordinary understanding [today] … what conduct on his part is condemned' under Fla. Stat § 827.11." DE30 at PageID 451.

The State also provides two possible definitions that can be found in existing Florida law. The first is a jury instruction that defines "lewd" as "wicked, lustful, unchaste, licentious, or sensual intent on the part of the person doing an act" (Fla. Bar, Criminal Jury Instructions S 11.10(d)). This definition "serves only to further broaden the scope of what may be covered by using terms like 'wicked,' 'lustful,' and 'unchaste' – all vulnerable to broad subjectivity which ultimately leaves an individual of common intelligence to 'necessarily guess at [their] meaning.'" DE30 (citing *Connally*, 269 U.S. at PageID 449). Furthermore, this definition is used to retroactively categorize the criminal *intent* of a defendant in a trial context. It is not

used in real-time to subjectively describe or analyze evolving, context-specific conduct.

Taken independently or together, citizens of Florida have no meaningful way to discern what conduct is prohibited by the Act. Would Taylor Swift's performance of "Vigilante Shit" at the Eras Tour constitute "an unlawful indulgence in lust, eager for sexual indulgence"? What about performances by the Miami Dolphins cheerleaders? Defining "lewd" to include "wicked, lustful, unchaste, licentious, or sensual design on the part of the perpetrator," sweeps in a range of conduct susceptible to discriminatory enforcement. For example, "a fully clothed drag queen with cleavage-displaying prosthetic breasts reading an age-appropriate story to children may be adjudged 'wicked'—and thus 'lewd'—by some, but would not constitute the kind of obscene conduct prohibited by the statutes in cases like *Miller.*" DE30 at PageID 451. Similarly, many people have claimed that Taylor Swift's performances in the Eras Tour are witchcraft and adjudged "wicked." Neither of these examples "constitute the kind of obscene conduct prohibited by the statutes in cases like *Miller*." *Id*. Rather, they demonstrate how the vague statutory language is "dangerously susceptible to standardless, overbroad enforcement which could sweep up substantial protected speech[.]" *Id.*

**IV.    The Scope of Relief Should Not Be Limited to HM.**

Finally, the State reiterates the same arguments that have already been rejected by the 11th Circuit and the Supreme Court. The State puts forward a theory of "traditional equitable constraints" that explains how, in the State's view, the law *should* be. While this makes for an interesting academic exercise, it is not the law. The State's Motion does not meaningfully engage with modern precedent that is directly on-point, such as *Ashcroft II*. The two primary contemporary cases that the State cites, *United States v. Nat'l Treas. Emps. Union ("NTEU")*, 513 U.S. 454 (1995) and *Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975) have already been analyzed and distinguished from the present case by both the Eleventh Circuit and the Supreme Court.

This Court has found that HM is likely to succeed on the merits of its overbreadth claim, because the Act is "dangerously susceptible to standardless, overbroad enforcement which could sweep up substantial protected speech[.]" DE30 at PageID 451-452. It is well-settled in both Supreme Court and Eleventh Circuit precedent that a successful facial overbreadth challenge "suffices to invalidate *all* enforcement of th[e] law 'until and unless a limiting construction or partial invalidation so narrows it as to remove the threat or deterrence to constitutionally protected expression.'" *Hicks*, 539 U.S. at 119 (emphasis in original) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)); *See, e.g., FF Cosmetics Fl, Inc.*

*v. City of Miami Beach*, 866 F.3d 1290, 1303-04 (11th Cir. 2017) (relying on *Broadrick* and explaining that enforcement of the overbroad ordinance was "totally forbidden" until it was judicially narrowed or partially invalidated); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1262, 1273 (2006) (permanent injunction: "Quite simply, the district court did not abuse its discretion by enjoining the enforcement of section 1.0 of the [billboard] ordinance."); *Clean Up '84 v. Heinrich*, 759 F.2d 1511, 1512–1514 (11th Cir. 1985) (affirming a district court's ruling that a Florida statute prohibiting the solicitation of signatures on petitions within 100 yards of a polling place was facially overbroad and affirming a preliminary injunction prohibiting enforcement of the statute).

The State argues that this "conflates the merits of a legal claim with the scope of the remedy for that claim." DE 56 at PageID 697 (quoting Brasher, J., dissenting from denial of partial stay). But the Supreme Court explicitly "provided this *expansive remedy* out of concern that the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech." *Hicks*, 539 U.S. at 119 (emphasis added). "Overbreadth adjudication, by suspending *all* enforcement of an overinclusive law, reduces the social costs caused by the withholding of protected speech." *Id*.

The overbreadth doctrine is concerned not only with the parties before the court, but with a chilling effect on society as a whole. The State asks this Court to

require that every person affected by an overbroad restriction on speech litigate the issue individually in order to secure their own rights. This impracticality is precisely what the overbreadth doctrine seeks to remedy. "Many persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech – harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas." *Id.*

Here, genuine issues of material fact exist so that there is sufficient evidence for a trier of fact to find for Plaintiff. As such, summary judgment is inappropriate in this matter.

## **CONCLUSION**

For the foregoing reasons, Plaintiff respectfully asks that this Court deny Defendant's Motion for Summary Judgment in its entirety.

Respectfully submitted,

*/s/ Melissa J. Stewart*
Melissa J. Stewart, Esq. *Pro Hac Vice*
Brice M. Timmons, Esq. *Pro Hac Vice*
Craig A. Edgington, Esq. *Pro Hac Vice*
DONATI LAW, PLLC
1545 Union Ave.
Memphis, TN 38104
(901) 278-1004 – Telephone
(901) 278-3111 – Facsimile
melissa@donatilaw.com

brice@donatilaw.com
craig@donatilaw.com

Gary S. Israel, Esq. 270709
121 S. Orange Avenue, Suite 1500
Orlando, Florida 32801
407 210-3834
attorneyisrael@hotmail.com
gsi55@hotmail.com
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing document has been served upon all parties to this action via the court's ECF filing system this 16th day of April, 2024.

/s/ Melissa J. Stewart